# EXHIBIT 6

1

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4

5   SERGIO L. RAMIREZ,

    on behalf of himself

6   and all others similarly

    situated,

7                Plaintiffs,

8      vs.              No. 3:12-CV-00632-JSC

9   TRANS UNION, LLC,

10               Defendant.

11

12   _____

13

14    VIDEOTAPED DEPOSITION OF SERGIO L. RAMIREZ

15            San Francisco, California

16                October 1, 2012

17

18

19   Reported by:

20   KENNETH T. BRILL

21   CSR NO. 12797

22

23

24

25

2

1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                   SAN FRANCISCO DIVISION

4

5    SERGIO L. RAMIREZ,

     on behalf of himself

6    and all others similarly

     situated,

7                       Plaintiffs,

8        vs.                    No. 3:12-CV-00632-JSC

9    TRANS UNION, LLC,

10                      Defendant.

11       _____

12

13           Videotaped Deposition of SERGIO L. RAMIREZ,

14   Volume 1, taken on behalf of Defendant, at Anderson

15   Ogilvie & Brewer, 600 California Street, 18th Floor, San

16   Francisco, CA 94108, beginning at 12:43 p.m., and ending

17   at 2:06 p.m., on Monday, October 1, 2012, before KENNETH

18   T. BRILL, Certified Shorthand Reporter No. 12797.

19

20

21

22

23

24

25

13

1    Q.    -- could give your answer audibly.

2    A.    Okay.

3    Q.    Which you passed.

4    A.    All right.

5    Q.    At times I might ask you a question where I

6    might ask you for an estimate.  You know, I'm entitled

7    to ask you for an estimate, but I don't want you to

8    guess or -- or speculate.

9         Do you understand the difference between a --

10    a guess and an estimate?

11    A.    Yes, I do.

12    Q.    Okay.  For example, you could estimate the

13    length of this table because you can see it here, but if

14    I were to ask you, you know, what color is my dog, you

15    would be completely guessing; right?

16    A.    Correct.

17    Q.    Yes.

18         Okay.  Now, I notice in the documents provided

19    today in Exhibit 2, the date on many of these documents

20    is February 27th, 2011.  Do you see that?

21         And it's on the -- it's on the last page of

22    the -- of Exhibit 2, it's on the page before.  It's on

23    the page before that, do you see that February 27th,

24    2000 and --

25    A.    Yes, I do.

14

1  Q. And who signed -- whose signature is that at

2 the last page of Exhibit 2 and -- and some of the

3 pages --

4  A. That is my wife's signature.

5  Q. And what is your wife's name, for the record?

6  A. Liseth Villegas Ramirez.

7  Q. And did you -- did you and your wife leave

8 with the vehicle from the dealership that day?

9  A. No, we didn't.

10  Q. February 27th.  When did you actually take

11 possession of the vehicle?

12  A. We took possession, I think it was a couple,

13 like three days after.

14  Q. Okay.  And what was the reason for the delay?

15  A. The car wasn't in the lot yet.

16  Q. Oh, I see.

17  A. They had to get it from another dealership.

18  Q. Is there any particular reason why you chose

19 to deal with Dublin Nissan rather than some other

20 dealership?

21  A. No, just my wife was online shopping and that

22 was the best price we could get.

23  Q. And this -- was this a car for your wife to

24 drive?

25  A. Both of us.

Page 18

```
 1        A.   It was pretty late.  It was like around --
 2   maybe like 8:30.
 3        Q.   Okay.  And what happened after you -- you
 4   reached agreement as to the -- the price?
 5        A.   What happened?
 6        Q.   Yes.
 7        A.   Well, what happened, we had reached the price.
 8        Q.   Mm-hmm.
 9        A.   So that's when he went in and checked out for
10   our credit reports.
11        Q.   Okay.  And -- and did he ever show you your
12   actual credit report?
13        A.   Yes, he did.
14        Q.   Did he give you a copy of that report to keep?
15        A.   He wouldn't give me a copy.
16        Q.   And what do you recall seeing on that credit
17   report, your credit report?
18        A.   What I recall is he shows me what's -- that I
19   was on the OFAC list.  So I asked him if I could get a
20   copy of it, but he wouldn't give me a copy.
21        Q.   Was anyone else present when you were -- when
22   you were told this, other than you and Mr. Burns and
23   your wife, Liseth?
24        A.   My father-in-law was there.
25        Q.   And is his name Umberto?
```

```
                                              Page 19
  1        A.    Yes.

  2        Q.    Umberto Villegas?

  3        A.    Mm-hmm.

  4        Q.    You have to say "yes" or "no".

  5        A.    Yes.

  6        Q.    Yes.  And other than you, your father-in-law,

  7    your wife, Mr. Burns, was anyone else there for that

  8    encounter?

  9        A.    No.

 10        Q.    So he -- he showed you -- was it one piece of

 11    paper, two pieces of paper, three pieces of --

 12        A.    Four, yeah.

 13        Q.    -- paper?  What did the document look like

 14    that he showed you?

 15        A.    It just showed me -- I don't recall how many

 16    pieces of paper there were but I remember the front

 17    paper.

 18        Q.    Mm-hmm.

 19        A.    It just said what -- what was -- what was my

 20    credit score.

 21        Q.    Mm-hmm.

 22        A.    It said the OFAC list.  He just pointed it

 23    out, "You're on the OFAC list."  I don't recall what

 24    other -- what else on the piece of paper.

 25        Q.    Now, if you look at the first page of Exhibit
```

1    2, it says Dublin Acquisition Group, Inc., your credit

2    score and the price you pay for credit.

3                Did the document look -- look anything like

4    that, or did it --

5         A.   No.

6         Q.   -- it look different?

7         A.   It looked different.

8         Q.   In what way did it look different?

9         A.   It looked longer, it looked longer.

10        Q.   And what the typeface look like, what did the

11   printing look like?  Did it --

12        A.   I don't -- I don't remember.

13        Q.   You don't remember if it looked like it was

14   formatted in this way or if it looked like -- like a

15   different type of --

16        A.   I -- I don't remember.

17        Q.   Do you understand what I mean when I say

18   typeface?

19        A.   Well, just --

20        Q.   Like the way the letters look.

21        A.   The way the letters are, I don't -- I don't

22   remember.

23        Q.   You just don't know one way or the other?

24        A.   No.

25        Q.   Okay.  And -- and what specifically did

1   Mr. Burns tell you OFAC was?

2        A.    It's type of list where terrorists and money

3   laundries and other people who aren't -- they're not

4   allowed to sell them a car because they're on a

5   terrorist -- it's like a terrorist list.

6        Q.    What did you say to Mr. Burns when he provided

7   that information to you?

8        A.    I was shocked.  I just told him, "Are you

9   sure, can you double check?"

10             He says, "Well, yeah, this is your name, your

11  name is on the OFAC list."

12             I was just shocked.  And his other thing was,

13  "Can you put it under your wife's name?"

14       Q.    Did your wife at the time say anything to

15  suggest that she thought you were on a terrorist list or

16  anything like that?  In other words, did your wife

17  believe what Mr. Burns was saying?

18       A.    No.

19       Q.    What about your father-in-law, did he believe

20  that you were on a --

21       A.    Nope.

22       Q.    Okay.  And did they -- did they say anything

23  to Mr. Burns on that subject?

24       A.    Well, yeah, he just told us, can you double

25  check, I mean, I was concerned -- I was concerned.  I

1   was scared.  First of all, I was scared, I didn't know

2   what was going to happen.  And I just never been in that

3   situation before.

4         Q.   Did Mr. Burns double check?

5         A.   No, I don't believe he did.  My name was

6   actually on the piece of paper, so my Social Security

7   was on there.  It was me, so I think -- but it was me

8   that wasn't supposed to be on the OFAC list.

9         Q.   So -- so let me see if I understand your

10  testimony correctly.  Even though you asked him to

11  double check, Mr. Burns declined to do that?

12        A.   Yes.

13        Q.   But he did make an alternate suggestion to

14  you; right?

15        A.   Yes.

16        Q.   He suggested that the car only be listed

17  under -- under your wife's name; correct?

18        A.   My wife's name.

19        Q.   And did the terms of the deal change in any

20  way by listing the car only under your wife's name as

21  opposed to both of your names?

22        A.   No.  I think it was because she had good

23  enough credit, she could get it under her name.

24        Q.   So the price of the vehicle was the same?

25        A.   The price of the vehicle was the same.

Page 32

1      Q.   Oh, and what was said during that telephone

2  call?

3      A.   She just called -- called back and I just told

4  her what happened about the whole dealership stuff and

5  me being the OFAC list.  And she says that I -- I would

6  have to contact Trans Union.

7      Q.   The person at the Treasury Department --

8      A.   Yes.

9      Q.   -- said that you would have to contact Trans

10  Union.  And did she say why?

11      A.   That they're the ones that are going get me

12  off the OFAC list.

13      Q.   Did -- did she -- did you discuss whether

14  there was anyone named Sergio Ramirez on the OFAC list?

15      A.   No.

16      Q.   Did you ever -- the website here, www.TRE --

17  it's hard for me to read the website address, but is

18  that the government's website?

19      A.   Yes.

20      Q.   And there's a slash SDN.  Does that stand for

21  Specially Designated Nationals?

22      A.   I think, I'm not -- I don't -- I don't know.

23  I just typed that.  I got it from the internet.

24      Q.   And did you look on the Internet to see if you

25  were on the Treasury Department's list?

Page 33

1        A.    Yes.

2        Q.    And were you or weren't you?

3        A.    My name was on there, but it wasn't me.

4        Q.    Uh-huh.  And do you recall if the information

5    you saw when you went to the Treasury's website was any

6    different from the information that Mr. Burns showed

7    you?

8        A.    It's -- it was the same.

9        Q.    And -- and on the left-hand side of the first

10   page of Exhibit 4, there is something written where a

11   circle around it.  Can you read that?

12       A.    I can't read it.  I don't remember what it

13   was.

14       Q.    The second word might be "report", is that it?

15   I -- I don't want you to guess or speculate.

16       A.    I -- I don't know.

17       Q.    Okay.  And then below "press 2", there are

18   some other words.  It -- I can't read what those -- do

19   you know what those words say?

20       A.    I think it says "pay out of pocket."

21       Q.    Oh, what -- what does that mean?

22       A.    I -- I don't know.

23       Q.    Do you have any idea?

24       A.    No.

25       Q.    Wrote that?

47

1          Do you have any reason to believe that the

2    information, "We have removed your name from the OFAC

3    name screen alert list" is false?

4          A.   No.

5          Q.   So as far as you know, since March 22nd,

6    2011, Trans Union credit reports will not deliver OFAC

7    information about you if you apply for credit; correct?

8          A.   Correct.

9          Q.   And do you recall if you first contacted

10   Mr. Soumilas before or after March 22nd?

11         A.   Before.

12         Q.   How much before?

13         A.   I don't recall how much before, but it was

14   before this letter.

15         Q.   Okay.  And did you keep any notes or -- or

16   other information that -- that might indicate to us when

17   exactly you first spoke to Mr. Soumilas?

18         A.   No.

19         Q.   Do you understand what class action litigation

20   is?

21         A.   Yes.

22         Q.   And in -- in your own words, what do you

23   understand that to be?

24         A.   It's just a class action, not just one person,

25   it's multiple persons.

48

1      Q.    And do you understand that your attorneys have

2  filed a Complaint with the Court requesting that you be

3  appointed a class representative?

4      A.    Yes.

5      Q.    And -- and what is your understanding of -- of

6  your responsibilities as a class representative?

7      A.    Doing it so it won't happen to anybody else,

8  and that's -- that's it.

9      Q.    And -- and what do you expect to receive in

10 turn for your service as class representative, if

11 allowed?

12     A.    I mean, not that much.  I know it's not going

13 to be that much, but I just want to help out other

14 people.

15     Q.    When you say "not that much", what do you mean

16 by that?

17     A.    Well, I saw paperwork, it's not that much I'm

18 going to receive.

19     Q.    Mm-hmm.

20     A.    So I don't expect to receive -- what I'm

21 supposed to expect, it was 100 to $5,000, something like

22 that.

23     Q.    Uh-huh.  And -- and what paperwork are you

24 referring to about the 100 to $5,000?

25          MR. OGILVIE:   The Complaint.

67

## CERTIFICATE OF REPORTER

1

2

3     I, KENNETH T. BRILL, a Certified Shorthand

4  Reporter, hereby certify that the witness in the

5  foregoing deposition was by me duly sworn to tell the

6  truth, the whole truth, and nothing but the truth in the

7  within-entitled cause;

8     That said deposition was taken down in

9  shorthand by me, a disinterested person, at the time and

10  place therein stated, and that the testimony of the said

11  witness was thereafter reduced to typewriting, by

12  computer, under my direction and supervision;

13     I further certify that I am not of counsel or

14  attorney for either or any of the parties to the said

15  deposition, nor in any way interested in the event of

16  this cause, and that I am not related to any of the

17  parties hereto.

18

19

20

21     DATED:   October 12, 2012

22

23     _____

      KENNETH T. BRILL

24     CSR#12797

25