# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

# EXHIBIT A

1   STROOCK & STROOCK & LAVAN LLP
    JULIA B. STRICKLAND (State Bar No. 083013)
2   STEPHEN J. NEWMAN (State Bar No. 181570)
    BRIAN C. FRONTINO (State Bar No. 222032)
3   JASON S. YOO (State Bar No. 261114)
    2029 Century Park East
4   Los Angeles, CA 90067-3086
    Telephone: 310-556-5800
5   Facsimile: 310-556-5959
    Email: lacalendar@stroock.com
6
    SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
7   BRUCE S. LUCKMAN (Admitted Pro Hac Vice)
    308 Harper Drive, Suite 200
8   Moorestown, NJ 08057
    Telephone: 856-662-0700
9   Email: bluckman@shermansilverstein.com

10  Attorneys for Defendant
       TRANS UNION LLC

                        **CONFIDENTIAL: SUBJECT TO
                        PROTECTIVE ORDER**

11              **UNITED STATES DISTRICT COURT**

12           **NORTHERN DISTRICT OF CALIFORNIA**

13               **SAN FRANCISCO DIVISION**

14

15  SERGIO L. RAMIREZ, on behalf of himself     )   Case No. 3:12-cv-00632-JSC
    and all others similarly situated,          )
16                                              )   [Assigned to the Honorable Jacqueline Scott
                   Plaintiff,                   )   Corley]
17                                              )
           v.                                   )   **EXPERT WITNESS DISCLOSURES OF
18                                              )   DEFENDANT TRANS UNION LLC**
    TRANS UNION, LLC,                           )
19                                              )
                   Defendant.                   )
20                                              )
                                                )
21                                              )
                                                )
22                                              )
                                                )
23                                              )
                                                )
24

25

26

27

28

---

EXPERT WITNESS DISCLOSURES OF DEFENDANT TRANS UNION LLC - Case No. 3:12-cv-00632-JSC

LA 52020438

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

**EXPERT WITNESS DISCLOSURES OF DEFENDANT TRANS UNION LLC**

Defendant Trans Union LLC ("TransUnion") makes the following expert witness

disclosures pursuant to Federal Rule of Civil Procedure 26(a)(2):

> 1.    Jaco Sadie
>        FTI Consulting
>        Senior Managing Director - Forensic & Litigation Consulting
>        One Front Street
>        Suite 1600
>        San Francisco, CA 94111

Mr. Sadie may be contacted c/o Stroock & Stroock & Lavan LLP, 2029 Century

Park East, Suite 1800, Los Angeles, California 90067, (310) 556-5800.  Mr. Sadie is

expected to opine as set forth in Exhibit A hereto.  Mr. Sadie's experience testifying as

an expert also is set forth in Exhibit A.  His rate of compensation is $720 per hour.

> 2.    Francine Cronshaw, Ph.D.[1]
>        East Mountain Editing Services
>        P.O. Box 1895
>        Tijeras, New Mexico 87059

Dr. Cronshaw may be contacted c/o Stroock & Stroock & Lavan LLP, 2029 Century

Park East, Suite 1800, Los Angeles, California 90067, (310) 556-5800.  Dr. Cronshaw is

expected to opine as set forth in Exhibit B hereto.  Dr. Cronshaw has not testified as an

expert at trial or by deposition during the previous 4 years.  Her rate of compensation is

$400 per hour.

In addition to reserving the right to supplement these expert witness disclosures,

TransUnion reserves the right to designate rebuttal experts.

---

[1]  TransUnion previously disclosed Dr. Cronshaw as an expert witness on May 7, 2014.  Dr. Cronshaw's report remains unchanged since the date of that disclosure; TransUnion is simply re-disclosing Dr. Cronshaw for the sake of clarity and convenience.  Dr. Cronshaw's updated CV is attached hereto as Exhibit C.

- 1 -

LA 52020438

Case 3:12-cv-00632-JSC   Document 236-6   Filed 04/05/17   Page 4 of 70

Dated: November 14, 2016

STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND
STEPHEN J. NEWMAN
BRIAN C. FRONTINO
JASON S. YOO

SHERMAN, SILVERSTEIN, KOHL, ROSE &
PODOLSKY
BRUCE S. LUCKMAN (Admitted Pro Hac Vice)

By:          /s/ Stephen J. Newman
                  Stephen J. Newman

Attorneys for Defendant
    TRANSUNION LLC

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 2 -

EXPERT WITNESS DISCLOSURES OF DEFENDANT TRANS UNION LLC - Case No. 3:12-cv-00632-JSC

LA 52020438

**PROOF OF SERVICE**

STATE OF CALIFORNIA                    )
                                       )  ss
COUNTY OF LOS ANGELES                  )

I am employed in the County of Los Angeles, State of California, over the age of eighteen years, and not a party to the within action. My business address is: 2029 Century Park East, Los Angeles, CA 90067-3086.

On November 14, 2016, I served the foregoing document(s) described as: **EXPERT WITNESS DISCLOSURES OF DEFENDANT TRANS UNION LLC** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

☐   **(VIA PERSONAL SERVICE**  By causing the document(s), in a sealed envelope, to be delivered to the person(s) at the address(es) set forth above.

☑   **(VIA U.S. MAIL)**  In accordance with the regular mailing collection and processing practices of this office, with which I am readily familiar, by means of which mail is deposited with the United States Postal Service at Los Angeles, California that same day in the ordinary course of business, I deposited such sealed envelope, with postage thereon fully prepaid, for collection and mailing on this same date following ordinary business practices, addressed as set forth above.

☑   **(VIA E-MAIL)**  Based on a court order or an agreement of the parties to accept service by e-mail, I caused the documents to be sent to the persons at the e-mail addresses listed in the attached Service List.

☐   **(VIA FACSIMILE)**  By causing such document to be delivered to the office of the addressee via facsimile.

☐   **(VIA OVERNIGHT DELIVERY)**  By causing the document(s), in a sealed envelope, to be delivered to the office of the addressee(s) at the address(es) set forth above by overnight delivery via Federal Express, or by a similar overnight delivery service.

I declare that I am employed in the office of a member of the bar of this court, at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on November 14, 2016, at Los Angeles, California.

_____          _____
Patricia Bloom
[Type or Print Name]                     [Signature]

EXPERT WITNESS DISCLOSURES OF DEFENDANT TRANS UNION LLC - Case No. 3:12-cv-00632-JSC
LA 52020438

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

## SERVICE LIST

Andrew J. Ogilvie, Esq.                          Attorneys for Plaintiff
Carol McLean Brewer, Esq.                   SERGIO L. RAMIREZ
ANDERSON, OGILVIE & BREWER LLP
1736 Stockton Street, Ground Floor
San Francisco, CA 94133
Email: andy@aoblawyers.com
            carol@aoblawyers.com

James A. Francis, Esq.                           Attorneys for Plaintiff
John Soumilas, Esq.                              SERGIO L. RAMIREZ
Lauren Brennan, Esq.
FRANCIS AND MAILMAN, P.C.
Land Title Building
100 South Broad Street, 19th Floor
Philadelphia, PA 19110
Email: jfrancis@consumerlawfirm.com
            jsoumilas@consumerlawfirm.com
            lbrennan@consumerlawfirm.com

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 52020438

EXPERT WITNESS DISCLOSURES OF DEFENDANT TRANS UNION LLC - Case No. 3:12-cv-00632-JSC

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| SERGIO L. RAMIREZ, on behalf of himself and all others similarly situated,<br><br>      Plaintiff,<br><br>v.<br><br>TRANS UNION, LLC,<br><br>      Defendant. | Case No. 3:12-cv-00632-JSC |

## EXPERT REPORT OF JACO SADIE

---

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION**
**SUBJECT TO PROTECTIVE ORDER**

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



Table of Contents

A.   Qualifications ..............................................................................................................1

B.   Assignment .................................................................................................................1

C.   Information Considered ...............................................................................................2

D.   Summary of Allegations ..............................................................................................3

E.   Summary of Opinions .................................................................................................4

F.   Case Background ........................................................................................................6

G.   Actions Taken by Trans Union Subsequent to the Cortez Ruling ...............................8

H.   The Office of Foreign Assets Control and Specially Designated Nationals List...........10

I.   Practice by Financial Institutions ...............................................................................13

J.   Contract Language .....................................................................................................17

K.   Failure by Dublin Nissan Dealership ..........................................................................20

CONFIDENTIAL: SUBJECT TO PROTECTIVE OROER

FTI CONSULTING™

## A.  Qualifications

I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a financial consulting firm that provides valuation, financial consulting, and dispute analysis services. I am a member of FTI's Forensic and Litigation Consulting Segment. I have significant experience relating to anti-money laundering and OFAC sanctions consulting, including interacting with clients on anti-money laundering best practices, performing anti-money laundering and OFAC sanctions compliance reviews for financial institutions, performing anti-money laundering and OFAC sanctions investigations on behalf of financial institutions and as part of governmental investigations, conducting anti-money laundering due diligence reviews relating to the buying or selling of financial institutions, providing anti-money laundering training to banks and insurance companies, and I have spoken at venues about anti-money laundering best practices. I have also performed and led fraud investigations, forensic accounting investigations, accounting malpractice matters, and breach of contract damages analyses over a wide range of industries. I have practiced in the U.S.A., Luxembourg and South Africa. A complete copy of my curriculum vitae, which summarizes my qualifications, professional experience, and deposition and arbitration experience, is attached as Exhibit 1.

FTI Consulting charges $720 per hour for time I spend consulting and assessing documents and time that may be spent testifying related to my analysis. All fees resulting from my work are paid directly to FTI Consulting. Other professionals at FTI Consulting working under my direction on this matter have billing rates of between $465 and $570 per hour. FTI Consulting's compensation is not dependent on the outcome of this matter or my conclusions.

## B.  Assignment

I have been retained as an expert by Stroock & Stroock & Lavan LLP, counsel for Trans Union LLC ("Trans Union" or "TU"), to opine on whether, during the period January 2011 to July 26, 2011, it was reasonable and within industry practice for Trans Union to deliver credit reports with an Office of Foreign Assets Control ("OFAC") alert utilizing Trans Union's OFAC Name Screen product, which produces a potential

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



match on a single SDN entry, where any combination of at least two name elements (first, middle or last) of the consumer's name, matches on a letter-for-letter basis in any order of the names in a single SDN entry ("TU Exact Name Match").

### C. Information Considered

This expert report lists various documents and information I considered in order to reach my opinions. This includes information made available to me by counsel for Trans Union that was produced in the discovery process in this case, as well as information that was publicly available at the time of my report.

In addition to the information contained in this report, I have considered information provided from the following depositions of Trans Union, Dublin Nissan Dealership, and Accuity, Inc. employees: Michael O'Connell, Vice President of Product Development and Management at Trans Union, LLC; Robert Lytle, Senior Director, Consumer Relations Technology at Trans Union, LLC, Annette Coito, General Manager of Dublin Nissan; Clint Burns, former Internet Sales Manager of Dublin Nissan; and Brent Newman, Executive Vice President of Accuity, Inc. I have also reviewed various case filings including the Class Action Complaint, Plaintiff's Motion for Class Certification and documents in support thereof, Defendant's Opposition to Plaintiff's Motion for Class Certification and documents in support thereof, and Plaintiff's Reply in Further Support of Motion for Class Certification. I have also reviewed the following case filings: Cortez v Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010) and Safeco Insurance Company of America v. Burr, 551 U.S. 47 (2007). I also reviewed the Federal Trade Commission's December 2004 "Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003" ("FTC Report").

The opinions in this report are based on currently available documents and information. I reserve the right to supplement this report and my opinions herein based on any reports and opinions provided by experts for Plaintiff, including any rebuttal to this report, as well as any documents or information produced after the date of this report. I reserve the right to update my opinions based on any new information.

In connection with my anticipated trial testimony in this action, I may use various documents produced in this litigation that refer to, or relate to, the matters discussed in this report. Although I may cite to a

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



particular page or pages of documents in this report, such pinpoint cites are provided for clarification purposes only, and other portions of the documents and depositions cited may be relevant to my opinion in this matter. In addition, I may create or assist in the creation of certain demonstrative schedules to assist me in testifying. To date, I have yet to create such demonstrative schedules.

### D.  Summary of Allegations

In this consumer class action, Plaintiff Sergio L. Ramirez alleges that he was denied an auto loan after Defendant Trans Union mistakenly informed Dublin Nissan that Ramirez was on the federal government's OFAC list. Ramirez contends that Trans Union violated the Federal Credit Reporting Act ("FCRA") and the California Consumer Credit Reporting Agencies Act ("CCRAA") by failing to ensure "maximum possible accuracy"[1] of its credit reports, and failing to provide consumers with proper disclosures. Additionally, the complaint alleges that Trans Union failed to provide consumers with all information it sells about them to third parties, specifically, information about whether a given consumer is reported as purportedly included in OFAC's Specially Designated Nationals ("SDN") list.[2] Plaintiff also contends that Trans Union failed to maintain reasonable procedures to assure maximum possible accuracy by only using a name-only match to include an OFAC alert.[3]

The FCRA provides in 15 U.S.C. Section 1681e(b): "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." In 15 U.S.C. Section 1681n(a), the FCRA addresses civil liability for willful noncompliance stating that "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that

---

[1] 15 U.S.C.A., Section 1681e(b).
[2] Class Action Complaint, par. 1.
[3] Class Action Complaint, par. 41.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



consumer…" In the <u>Safeco</u>[4] matter, the Supreme Court held that "willful failure covers a violation committed in reckless disregard."

### E.  Summary of Opinions

Based on my analysis of documents and information produced in this matter, as well as my experience in assessing sanctions programs, practices and procedures and conducting forensic investigations, as described herein, I have concluded, to a reasonable degree of certainty, the following regarding Trans Union's use of its TU Exact Name Match logic to deliver OFAC results along with a consumer's credit report:

- It was reasonable and within financial industry practice for Trans Union to deliver OFAC potential match results along with a consumer's credit report to its customers based on the TU Exact Name Match logic by listing the results as a "Potential Match" during the period January 2011 to July 26, 2011. This is in-line with industry practices as many financial institutions perform only name matching against the SDN list, with potential matches further investigated through human review by comparing other data (i.e., date of birth, citizenship information, address, etc.) reflected in the OFAC listing against the identification documents provided by the client.

- Discontinuing the Synonyms File functionality was a reasonable and logical response to the <u>Cortez</u> ruling, evidencing Trans Union's desire to comply with the FCRA, given that it was the Synonyms File that caused Corte<u>s</u> to be matched with Corte<u>z</u>, and it was a reasonable step for Trans Union to take in order to reduce instances where the consumer's name did not exactly match the name on the SDN list.

- The contractual language, as well as OFAC's guidance, made it clear that a transaction should not be prohibited simply because a potential match against the SDN list was provided, but that

---

[4] <u>Safeco Insurance Company of America v. Burr</u>, 551 U.S. 47, 48 (2007).

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



the end-user of the data should take additional due diligence steps to verify whether the consumer is a true match to the SDN list.

- It was reasonable, during the period January 2011 to July 26, 2011, for Trans Union to expect the end-user of the data to make the final determination whether a consumer was or was not on the SDN list, because (1) Trans Union was not interacting directly with the consumer, but with the end-user of the data, (2) such an expectation was in-line with the contractual wording which made it clear that the end-user of the data should not take any adverse action against a consumer solely based on an OFAC alert until further due diligence was performed, (3) OFAC guidance anticipated that the user of the credit report would take additional due diligence steps, and (4) OFAC guidance specifically informed consumers that these entries on their credit reports were "merely a reminder to the person checking your credit that he or she should verify whether you are the individual on the SDN list by comparing your information to the OFAC information."

- It was reasonable, during the period January 2011 to July 26, 2011, for Trans Union to not limit the potential SDN list matches by electronically matching the date of birth of the consumer to the date of birth listed on the SDN list (to the extent the data is present on the SDN list), because Trans Union's vendor did not offer the option to match on date of birth. This is consistent with OFAC's own online SDN search tool, which does not provide a separate filter to limit results based on date of birth. Furthermore, in my experience, financial institutions typically would only search the name of the party against the SDN list and rely on a level of human review to compare the potential hits against other data. In other words, relying on the end-user of the data to perform human comparison of date of birth data, rather than machine comparison, was reasonable during the period January 2011 to July 26, 2011.

- The failure by Dublin Nissan to recognize that Ramirez was not a true match on the SDN list was due to insufficient or incorrect training and/or instructing of Clint Burns (and possibly other staff at the dealership) on the procedures required under the contractual agreements, as

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



well as the guidance provided by OFAC specifically for the credit reporting industry. Plaintiff Ramirez's alleged auto loan denial was not due to the information that Trans Union transmitted to the reseller of data with which Dublin Nissan transacted (i.e., potential matches based on the TU Exact Name Match logic), but instead was the result of Dublin Nissan not following the expected and proper procedures for investigating OFAC alerts.

- A system and process that relies upon both interdiction software (i.e., software that "rapidly rules out applicants who lack any potential first-name/last-name match to anyone on the"[5] SDN list) and human intervention at the end-user stage (i.e., to manually compare potential matches generated by the interdiction software to other relevant information), rather than solely relying on interdiction software, is preferable in order to best mitigate material risk of real harm to the consumer, while still achieving the overall goal of OFAC to prohibit any transaction with a person or entity on the SDN list.

## F. Case Background

Trans Union provides a service called OFAC Name Screen Alert ("OFAC Name Screen") which is sold by Trans Union, either directly or indirectly through a reseller, to certain credit report purchasers. Trans Union does not sell the OFAC Name Screen as a standalone product; customers must purchase a Trans Union product such as credit report services and the OFAC Name Screen is then sold as an add-on.[6] As described below, federal law provides that U.S. companies (such as the Nissan Dealership in this matter) are not allowed to transact with individuals or entities on the SDN list. Trans Union's OFAC Name Screen assists Trans Union's customers (i.e., the end-user of the data) in determining whether they are complying with sanction regulations. According to Michael O'Connell, Vice President of Product Development and Management at Trans Union, OFAC Name Screen is a:

---

[5] Declaration of Michael O'Connell in Support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification, par. 3.
[6] Cortez v Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010).

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



"...product which allows lenders to rapidly clear a potential transaction for compliance with federal anti-terror and anti-drug trafficking rules administered by the Treasury Department's Office of Foreign Assets Control ('OFAC'). [OFAC] Name Screen rapidly rules out applicants who lack any potential first-name/last-name match to anyone on the 'Specially Designated Nationals' ('SDN') list. For all applicants, [OFAC] Name Screen delivers specific SDN data which allow the user either to determine that the applicant is not an SDN on the basis of human review and judgment, or (if the user is not sure whether the applicant is or is not an SDN) to contact Treasury for further guidance."[7]

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████████████

_____

[7] Declaration of Michael O'Connell in Support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification, par. 3.
[8] Deposition of Brent Newman, the 30(b)(6) witness for Accuity, dated December 14, 2012, page 73.
[9] Deposition of Brent Newman, the 30(b)(6) witness for Accuity, dated December 14, 2012, pages 86 to 89.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**FTI**
CONSULTING

[REDACTED]

### G. Actions Taken by Trans Union Subsequent to the Cortez Ruling

Based on case materials reviewed, Trans Union made significant changes to its OFAC Name Screen in response to the Third Circuit's opinion[10] in Cortez v. Trans Union, LLC. In the Cortez matter, Sandra Cortez' name was matched against Sandra Cortes, an individual on the SDN list. At the time of the Cortez transaction, the OFAC Name Screen was using the Synonyms File to match names on the SDN list with alternative spellings.

[REDACTED]

---

[10] Sandra Cortez brought an action against Trans Union for violations of the FCRA, alleging that Trans Union confused Cortez's identity with the identity of someone with a similar name who was on the SDN list, failed to correct problems with her credit report, and failed to respond satisfactorily to her inquiries. The court held, among other issues, that (1) an alert on a credit report, indicating that a consumer's name matched a name on OFAC's SDN list, was subject to the FCRA's reporting requirements; (2) the evidence was sufficient to support a finding that the agency negligently failed to comply with the section of the FCRA requiring consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of the information in credit reports; (3) an OFAC alert was part of a consumer's "file" within the meaning of the section of the FCRA requiring consumer reporting agencies to disclose all information in a consumer's file upon request; (4) the agency was obligated under the FCRA to reinvestigate OFAC information in a consumer's credit report once a consumer disputed the accuracy of that information; and (5) the agency was obligated under the FCRA to include a notice in the consumer's credit report about his/her dispute of an OFAC alert. Cortez v Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010).

[11] Declaration of Michael O'Connell in Support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification, par. 6.

[12] Deposition of Michael O'Connell, dated December 13, 2013, page 135.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



[REDACTED]

Effective November 2010, Trans Union also replaced the word "match" with "potential match" when an OFAC alert message was provided by Trans Union.[16] Trans Union made available to all of its customers a Technical General Announcement in which Trans Union notified them of this change in wording. According to Colleen Gill, Director, Product Development and Management, for Trans Union, she was responsible for the implementation of this wording change from "INPUT NAME MATCHES NAME ON THE OFAC DATABASE" to "INPUT NAME IS POTENTIAL MATCH TO NAME ON THE OFAC DATABASE."[17] Plaintiff claims that the OFAC alert delivered by Trans Union reflected the word "match" and not "potential match," but according to the declaration of Lynn Romanowski, the form of alert and credit report for Mr. Ramirez, which was not delivered directly by Trans Union, but instead was delivered to the end-user of the data by a reseller, was not "in the

---

[13]Declaration of Michael O'Connell in Support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification, par. 6.
[14] Deposition of Brent Newman, the 30(b)(6) witness for Accuity, dated December 14, 2012, page 58.
[15] Denise Norgle letter to OFAC, February 7, 2011, Exhibit 4 to the deposition of Michael O'Connell, dated December 13, 2013.
[16] Trans Union Release Announcement November 2010, Exhibit 9 to the deposition of Robert Lytle, dated December 13, 2012.
[17] Declaration of Colleen Gill in Support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification, par. 5.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



format intended or approved by Trans Union"[18] and "the Nissan Credit Report [i.e., the credit report for Mr. Ramirez] is not a Trans Union credit report."[19] The format of the OFAC alert appears to be in contradiction of the Technical General Announcement made in November 2010.

Trans Union also addressed the disclosure of OFAC data to consumers and the process consumers can take to dispute OFAC alerts delivered with their credit reports. A letter, dated February 7, 2011, from Denise Norgle, Vice President and Divisional General Counsel, to OFAC stated:

> "In response to the *Cortez v Trans Union* decision, Trans Union initiated a practice under which a consumer obtaining his consumer report is notified if we would consider his name to be a potential match to the SDN file. That notification is accompanied by instructions on how the consumer can obtain further information from Trans Union about our OFAC Name Screen service, and how to request Trans Union [sic] block the return of a potential match message on future transactions. This practice allows a consumer to know of a potential OFAC Name Screen match before it happens, and to take steps to prevent it."[20]

Based on materials reviewed, I understand that it was not feasible for Trans Union to reconfigure its systems immediately following the <u>Cortez</u> ruling in order for the OFAC data to be incorporated into the existing consumer disclosure forms provided to consumers. Therefore, Trans Union implemented a temporary solution during the period January 2011 to July 26, 2011, by compiling an OFAC specific letter based on running OFAC Name Screen after the credit data was compiled, and sending the letter as soon as possible in a separate envelope.[21]

### H. The Office of Foreign Assets Control and Specially Designated Nationals List

The Office of Foreign Assets Control of the U.S. Department of the Treasury ("Treasury") administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against

---

[18] Declaration of Lynn Romanowski in support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification, par. 8.
[19] <u>Id.</u>
[20] Denise Norgle letter to OFAC, February 7, 2011, Exhibit 4 to the deposition of Michael O'Connell dated December 13, 2013.
[21] Deposition of Sean Walker, dated September 12, 2012, pages 51 to 52 and 67 to 68.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States.[22]

According to the Treasury and as part of its enforcement efforts, OFAC publishes the SDN list, which is a "list of individuals and companies owned or controlled by, or acting for or on behalf of, targeted countries."[23] The SDN list also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. SDN's have their assets blocked by the United States government and U.S. persons are generally prohibited from conducting business transactions and deals with them.[24] The SDN list is not a static list and is frequently updated by OFAC with entries either being added or removed.

All U.S. persons are responsible for ensuring that they do not transact with any person or entity on the SDN list. Treasury defines "U.S. persons" to include "all U.S. citizens and permanent resident aliens regardless of where they are located, all persons and entities within the United States, all U.S. incorporated entities and their foreign branches."[25] Therefore, this would include Dublin Nissan. There is no obligation on the "U.S. persons," as it relates to the SDN list, to call for the arrest or detain a person that is a match or even a potential match to the SDN list, but only (in the case the entity is not sure whether they can clear the person as a false positive) to contact OFAC, which will instruct the entity on the appropriate course of action – this could be to prohibit the potential transaction, block the assets of the person (usually in the case of a financial institution) or take some other action deemed appropriate by OFAC, which could include the application for a specific license that would authorize a particular transaction. OFAC usually has the authority by means of a specific license to permit a person or entity to engage in a transaction which otherwise would be prohibited.

---

[22] U.S Department of the Treasury – Terrorism and Financial Intelligence, Office of Foreign Assets Control. https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.
[23] U.S Department of the Treasury – Specially Designated Nationals List. https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.
[24] Id.
[25] In the cases of certain programs, foreign subsidiaries owned or controlled by U.S. companies also must comply. U.S Department of the Treasury – OFAC FAQs: General Questions. https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



In 2004, Treasury issued a brochure, entitled "OFAC Regulations for the Credit Reporting Industry", in which it, among other things, provided information to the credit reporting industry about the SDN list. The document identified the parties to whom this brochure would be useful, including "Requesters of credit information, including...car dealerships."[26] This brochure specifically addressed the question of "How to Determine if a Credit Report Contains an Exact Match"[27] stating:

> "Interdict software is a tool to help identify potential matches with OFAC's SDN list. Inevitably, there will be many 'false positives' with the use of this software. Therefore, certain 'due diligence' steps should be taken to ensure that a 'hit' is a 'good hit,' i.e., to determine whether an individual applying for credit approval is indeed an individual on the SDN list and whether a warning or 'red flag' on a credit report is appropriate."[28]

The brochure then describes five steps that the user of the credit report should take to determine if the potential match is a true hit. These steps include guidance to compare the complete SDN entry with all other available information gathered on the credit application such as address, nationality, place of birth, date of birth, etc., and if there are a number of similarities or exact matches to then call the OFAC hotline.

The above clearly indicates that it is expected that credit reports would "inevitably" have false positives associated with a consumer's name and that the user of the credit report is expected to perform certain due diligence steps in order to eliminate any false positive matches. The user of the credit report is the party that has direct interaction with the consumer and has the ability to review supporting documentation provided by the consumer (such as identification documents, evidence of address, etc.), not the credit bureau.

Treasury also issued a brochure entitled "OFAC Update for Consumers: What is this Information on My Credit Report?" This brochure states that if there is a "potential match, the credit bureaus are placing a 'red flag' or alert on the report" and that this potential match "is merely a reminder to the person checking your credit that he or she should verify whether you are the individual on the SDN list by comparing your

---

[26] OFAC Regulations for the Credit Reporting Industry, April 13, 2004.
[27] OFAC Regulations for the Credit Reporting Industry, April 13, 2004.
[28] OFAC Regulations for the Credit Reporting Industry, April 13, 2004.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



information to the OFAC information."[29] The brochure also states that if the consumer is not the individual on the SDN list, "the person checking your credit should disregard the OFAC alert..."[30] This indicates that OFAC expected that the use of interdiction software will create false positive entries and that the user of the credit report should perform verification steps to confirm whether the consumer is a true match, and if not, disregard that false positive.

The federal government has the ability to impose severe penalties on anyone who transacts with an individual or entity on the SDN list. In 2008, OFAC issued a final rule, "Economic Sanctions Enforcement Guidelines," that sets forth enforcement guidelines that OFAC will follow in determining an appropriate enforcement response to apparent violations of U.S. economic sanctions programs that OFAC enforces.[31] Active enforcement of these programs is a "crucial element in preserving and advancing the national security, foreign policy, and economic objectives that underlie these initiatives."[32] Among other things, penalties, both civil and criminal, are intended to serve as a deterrent to conduct that undermines the goals of sanctions programs.

### I.   Practice by Financial Institutions

Due to the nature and associated inherent risks of their business, financial institutions, especially banks, tend to have OFAC compliance programs in place. The Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual ("BSA Manual") states that "[w]hile not required by specific regulation, but as a matter of sound banking practice and in order to mitigate the risk of noncompliance with OFAC requirements, banks should establish and maintain an effective, written OFAC compliance program that is commensurate with their OFAC risk profile (based on products, services, customers, and geographic locations)." OFAC encourages financial institutions to take a risk-based approach

---

[29] OFAC Update for Consumers: What is this Information on My Credit Report.
[30] OFAC Update for Consumers: What is this Information on My Credit Report.
[31] U.S Department of the Treasury. Economic Sanctions Enforcement Guidelines. https://www.treasury.gov/resource-center/sanctions/Documents/fr74_57593.pdf.
[32] U.S Department of the Treasury. Economic Sanctions Enforcement Guidelines. https://www.treasury.gov/resource-center/sanctions/Documents/fr74_57593.pdf.



CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

to designing and implementing an OFAC compliance program.[33] Typically the financial institution screens party names against the SDN list at the account opening stage as part of the financial institution's Know-Your-Customer ("KYC") procedures and again during the renewal phase.[34]

The KYC process typically encompasses two components: a Customer Identification Program ("CIP") and Customer Due Diligence Procedures ("CDD"). The CIP process "is intended to enable the bank to form a reasonable belief that it knows the true identity of each customer."[35] This process requires the gathering of identification information of the customer, such as name, date of birth, address, nationality or residence. The CDD process is another key element used to gain a better understanding of the expected transaction activities for customers and to verify the customer's identity.[36]  The BSA Manual specifically addresses procedures that include comparison of names with government lists, which includes the SDN list.[37] Financial institutions, especially banks, also have to monitor daily transactions for any OFAC violations by cross-checking party names against the SDN list. Per the BSA Manual: "Transactions such as funds transfers, letters of credit, and noncustomer transactions should be checked against OFAC lists prior to being executed."[38]

It is common practice for financial institutions to use interdiction software in order to screen customer and party names against the SDN list. The BSA Manual states that a financial institution's "policies, procedures, and processes should address how the bank will identify and review transactions and accounts for possible OFAC violations, whether conducted manually, through interdiction software, or a combination of

---

[33] Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Office of Foreign Assets Control - Overview. https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_037.htm.
[34] Financial institutions typically create a written policy and procedures document that would specify how often account information of their customers should be re-reviewed (i.e., a renewal of the KYC procedures is performed). Financial institutions' renewal periods are entity specific and usually take into consideration the inherent risks of the customer base.
[35] Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Core Examination Overview and Procedures for Regulatory Requirements and Related Topics, Customer Identification Program - Overview. https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_011.htm.
[36] Id.
[37] "Comparison with Government Lists - The CIP must include procedures for determining whether the customer appears on any federal government list of known or suspected terrorists or terrorist organizations. Banks will be contacted by the U.S. Treasury in consultation with their federal banking agency when a list is issued. At such time, banks must compare customer names against the list within a reasonable time of account opening or earlier, if required by the government, and they must follow any directives that accompany the list." Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Core Examination Overview and Procedures for Regulatory Requirements and Related Topics, Customer Identification Program – Overview.
[38] Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Office of Foreign Assets Control - Overview. https://www.ffiec.gov/bsa_aml_infobase/pages_manual/olm_037.htm.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



both."[39] The BSA Manual's chapter on OFAC examination procedures includes a section on the review of the financial institution's OFAC compliance program. This section states that the examiner should consider, among other issues, (1) the appropriateness of the filtering criteria used to identify OFAC matches, e.g., "the extent to which the filtering or search criteria includes misspellings and name derivations,"[40] and (2) "the process used to investigate potential matches, including escalation procedures for potential matches."[41] It is common for financial institutions' KYC groups or Compliance groups to use name-only matching search criteria when performing account opening or account renewals. In some cases, depending on the risk profile of the financial institution, the nature of the specific transaction or the nature of the party names, a non-exact name matching might be applied (i.e., where there is not a need for the name to match on a letter for letter basis – sometimes referred to as "fuzzy logic"). OFAC's own online search tool, Sanctions List Search, provides for this type of "fuzzy" search logic by incorporating a sliding scale between 0-100 that can be adjusted by the user to determine to what extent the name entered is to be searched using an exact match or not (i.e., 100 being an exact letter for letter match).[42]

The alerts generated by searching on the name of a party are then further investigated through human intervention to eliminate false positives by using supplemental information provided by CIP documents, such as date of birth, address, etc. It is not common for financial institutions to limit their initial electronic matches by date of birth as some software databases do not even allow that as a search option. In fact, OFAC's own online search tool does not have a date of birth search function, nor does it have a function to exclude or filter potential matches based on date of birth. However, it is customary practice that trained human analysts review and use supplemental information (i.e., identification documents, date of birth, relevant invoices and

---

[39] Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Office of Foreign Assets Control - Overview. https://www.ffiec.gov/bsa_aml_infobase/pages_manual/olm_037.htms.
[40] Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Office of Foreign Assets Control - Overview. https://www.ffiec.gov/bsa_aml_infobase/pages_manual/olm_037.htm.
[41] Id.
[42] OFAC provides its own online search tool free of charge, called Sanctions List Search. The OFAC Sanctions List Search tool is a resource that can be used to determine whether a person or entity is on the SDN list, among other sanctions programs.  The online tool provides for several search criteria including Type (i.e., Aircraft, Vessel, Entity, and Individual), Name, Identification Number, Program, Address, Country and List. OFAC discloses that the use of Sanctions List Search is not a substitute for undertaking appropriate due diligence. Refer to: https://sanctionssearch.ofac.treas.gov.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



contracts, etc.) to ensure they have a reasonable belief to know their customer and clear false positives,[43] without the consumer's knowledge that he/she was even a potential match. This process of creating OFAC alerts based on a name-only match and then providing for human intervention to eliminate false positives takes place on a daily basis at financial institutions and this process is considered an appropriate and reasonable process by financial institutions to ensure that they do not engage with a party on the SDN list.  As mentioned above, the SDN list is not a static list and is frequently updated by OFAC with entries either being added or removed. As a result, financial institutions are required to re-screen customer names and in many cases, related parties to the customer, on a regular basis.

Many financial institutions would also subject the parties mentioned in their daily transactions to an OFAC filter based on a non-exact name-only matching logic. Any potential matches would then have to be manually reviewed by personnel, in many cases on the same day in order to release the transactions for processing.

In my opinion, it was reasonable for Trans Union to deliver OFAC potential match results (either directly to an end-user of the data or indirectly, via a reseller of data) based on the TU Exact Name Match logic during the period January 2011 through July 26, 2011, as Trans Union's systems were designed to deliver a message that the results constituted a "potential match." As discussed above, this is in-line with industry practices at financial institutions as many perform name-only matching against the SDN list, with potential matches further investigated through human review by comparing other data (i.e., date of birth, citizenship information, address, etc.) reflected in the SDN listing against the identification documents provided by the client.

---

[43] "Verification Through Documents - The CIP rule gives examples of types of documents that have long been considered primary sources of identification. The rule reflects the federal banking agencies' expectations that banks will review an unexpired government-issued form of identification from most customers. This identification must provide evidence of a customer's nationality or residence and bear a photograph or similar safeguard; examples include a driver's license or passport. However, other forms of identification may be used if they enable the bank to form a reasonable belief that it knows the true identity of the customer. Nonetheless, given the availability of counterfeit and fraudulently obtained documents, a bank is encouraged to review more than a single document to ensure that it has a reasonable belief that it knows the customer's true identity." Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Core Examination Overview and Procedures for Regulatory Requirements and Related Topics, Customer Identification Program – Overview. https://www.ffiec.gov/bsa_aml_infobase/pages_manual/OLM_011.htm.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER





As explained above, the material I have reviewed, establishes the concept that Trans Union took reasonable steps in an attempt to comply with the FCRA.

### J.   Contract Language

Purchasers of Trans Union's credit reports who wanted to subscribe to the OFAC Name Screen were required to sign an addendum to their agreement with Trans Union in order to subscribe to the OFAC Name Screen.[47] In this matter, Trans Union and Open Dealer Exchange ("ODE") entered into an OFAC Advisor Amendment to Reseller Service Agreement which states:

---

[44] Deposition of Brent Newman, Accuity, dated December 14, 2012, pages 100 to 101.
[45] Deposition of Michael O'Connell, dated December 13, 2013, pages 195 to 196.
[46] Declaration of Michael O'Connell in Support of Reply in Support of Defendant Trans Union, LLC's Motion to Stay the Action or, in the Alternative, to Continue the Trial Date by 90 Days, dated May 27, 2015, par. 3.
[47] Cortez v Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010).

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



> "In the event Subscriber obtains Trans Union's OFAC Advisor service in conjunction with a consumer report, Subscriber shall be solely responsible for taking any action that may be required by federal law as a result of a match to the OFAC File, and shall not deny or otherwise take any adverse action against any consumer based solely on Trans Union's OFAC Advisor services."[48]

Further, the February 7, 2011 letter from Denise Norgle stated that "Trans Union contracts have always prohibited our customers from taking any adverse action on the basis of a Trans Union OFAC Name Screen search." The letter also states that Trans Union reminds "customers of their responsibility to take steps to ascertain whether the consumer is the person on the SDN file, rather than simply decline an application."[49]

Furthermore, Dublin Nissan entered into a Credit Report (And Ancillaries) Service Agreement with ADP Dealer Services Group ("ADP"), which included a section on OFAC Service Additional Terms. This section states the following:

> "...Client acknowledges that such an indicator is merely a message that the consumer may be listed on one or more U.S. government-maintained lists of persons subject to economic sanctions, and Client further certifies that in the event that a consumer's name matches a name contained in the information, it will contact the appropriate government agency for confirmation and instructions. Client understands that a 'match' may or may not apply to the consumer whose eligibility is being considered by the Client, and that in the event of a match, Client should not take any immediate adverse action in whole or in part until Client has made such further investigations as may be necessary (i.e., required by law) or appropriate (including consulting with its legal or other advisors regarding Client's legal obligations)."

The above makes it clear that a "match" may or may not apply to the consumer and that the Dublin Nissan dealership should not take any "adverse action" until steps were taken "to ascertain whether the

---

[48] OFAC Advisor Amendment To Reseller Service Agreement, dated June 30, 2010, Exhibit A to the Declaration of Peter Turek in Support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification.
[49] Denise Norgle letter to OFAC, February 7, 2011, Exhibit 4 to the Michael O'Connell deposition, dated December 13, 2013.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



consumer is the person on the SDN file." The contractual language places the responsibility on Dublin Nissan to make the final determination.

Mr. O'Connell also confirmed this by testifying as follows:

> "Q: Okay. So when the OFAC comes back with a match or a possible match, as you described it, what does Trans Union do to determine whether or not that person is actually the person on the OFAC list?
>
> ...
>
> The Witness: That's not our role in the regulatory process."[50]

This is in line with my experience at other financial institutions, where the responsibility for the ultimate decision about whether a customer of the financial institution is on the SDN list or not lies with that financial institution, even if that financial institution makes use of a third party to perform its check. Per the BSA Manual: "If a bank uses a third party, such as an agent or service provider, to perform OFAC checks on its behalf, as with any other responsibility performed by a third party, the bank is ultimately responsible for that third party's compliance with the OFAC requirements."[51]

As discussed above, OFAC issued a brochure in which it states that the use of interdiction software would invariably lead to the creation of false positives. In my experience, a well-functioning interdiction software system will typically deliver some amount of false positives, and it is implausible that the use of interdiction software would completely eliminate all false positives and, at the same time, ensure that a true match would not go un-alerted.[52] According to the guidance presented in the "OFAC Update for Consumers," potential matches are a reminder to "the person checking your credit that he or she should verify whether you are the individual on the SDN list by comparing your information to the OFAC information."[53] These guidelines,

---

[50] Deposition of Michael O'Connell, dated December 13, 2013, page 66.
[51] Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, Office of Foreign Assets Control - Overview. https://www.ffiec.gov/bsa_aml_infobase/pages_manual/olm_037.htm.
[52] Even in the context of the delivery of traditional credit reports, perfect matching rules are not necessarily mandated. The FTC Report states that a match may be deemed sufficient if seven of nine digits of a social security number match and that variations in name spelling may also be tolerated. "Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003," dated December 2004, pages 39, 40, 47, 49 and 51.
[53] http://www.treas.gov/offices/enforcement/ofac/faq/answer.shtml#consumer1.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



in addition to the contract language, provide further support that human intervention is necessary to verify the information presented, which ultimately lies on the end user of the product, the Dublin Nissan dealership.

According to the testimony of Clint Burns, the Ramirez OFAC alert and credit report were his first and only instance of a potential match against the SDN list and according to the testimony of Annette Coito, General Manager of Dublin Nissan, she only had one instance where a credit report contained a potential match[54] - indicating that receiving credit reports along with OFAC alerts on potential customers was very infrequent. Furthermore, on the Ramirez OFAC alert, only two SDN potential name matches were reported based on the TU Exact Name Match methodology applied by the OFAC Name Screen. The full details of the SDN list for the potential matches were provided – i.e., full names, date of birth, etc. The number of "hits" were very few and it would have taken a trained person a very short period of time to eliminate both entries as false positives, by performing the necessary due diligence as contemplated in the contractual language and as discussed by OFAC in its brochures. Therefore, given the limited number of instances and the fact that both the contractual language and OFAC's own brochures anticipate the user to take additional due diligence steps, it was reasonable for the OFAC Name Screen to deliver potential matches based on the TU Exact Name Match logic.

### K.  Failure by Dublin Nissan Dealership

Clint Burns was the Internet Sales Manager at Dublin Nissan during the period July 2010 to May 2011 and was the employee that interacted with Ramirez. Mr. Burns stated that as "part of my employment at Dublin Nissan, I received training on, and became familiar with, Dublin Nissan's obligations to comply with various laws prohibiting transactions with customers who are included on a list maintained by the United States Treasury Department's Office of Foreign Assets Control."[55] According to Mr. Burns' testimony, he has been employed at several different auto dealerships and received training at Dublin Nissan and at these other

---

[54] Deposition of Dublin Nissan (by Annette Coito), dated January 16, 2013, pages 34 and 35.
[55] Declaration of Clint Burns, dated December 28, 2012, par. 2.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



dealerships, but stated that some of the dealership's trainings specifically mentioned OFAC, "while others didn't mention it by name, but they were all different trainings."[56]

When Mr. Burns was asked whether he should inform his sales manager in the case where an OFAC alert is received, he stated: "Yes, I was – I do remember being under the impression that I couldn't sell a car to somebody who was on the OFAC, but that I should – any – any suspicious activity, we were supposed to report to the sales manager..."[57]

In a declaration Mr. Burns signed on December 28, 2012 (the "Burns declaration"), which pre-dates the deposition testimony, Mr. Burns stated that: "I was also trained by Dublin Nissan that, if OFAC information appeared on a customer's credit report, the loan application process should be shut down. I was not trained to take any further steps to verify whether the customer was actually the person appearing on the OFAC list, or otherwise advised of any obligation to do so. For example, I was never trained to compare the customer's driver's license against the OFAC data to attempt to rule out the customer as the person on the OFAC list."[58]

Mr. Burns, upon noticing the Ramirez OFAC alert, informed Ramirez and his wife, Ms. Villegas, that their joint credit application would not be accepted for financing – apparently without performing any further due diligence as contemplated in the contractual language discussed above or as indicated in OFAC's brochures. In fact, the Burns declaration states that at "Dublin Nissan, the policy was that we would not review the OFAC data, but simply would terminate the application process"[59] even though Mr. Burns "did not believe that Mr. Ramirez was actually a terrorist, money launderer or any other kind of criminal included on the OFAC list."[60]

The contractual language discussed above makes it clear that a transaction should not be prohibited simply because there is a potential match against the SDN list for the name provided and that the end-user of the Trans Union data is expected to take additional steps. Furthermore, the guidance by OFAC provides

---

[56] Deposition of Clint Burns, dated May 7, 2015 page 36.
[57] Deposition of Clint Burns, dated May 7, 2015, page 39.
[58] Declaration of Clint Burns, December 28, 2012, par. 3.
[59] Declaration of Clint Burns, December 28, 2012, par. 8.
[60] Declaration of Clint Burns, December 28, 2012, par. 8.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



specific steps for clearing a potential match, none of which were followed in this case by Mr. Burns or by Dublin Nissan.

In my opinion, the failure by the Dublin Nissan dealership to recognize that Ramirez was not a true match on the SDN list was due to insufficient or incorrect training and/or instructing of Mr. Burns (and potentially other staff at the dealership) in the procedures that were required under contractual agreements, as well as the guidance provided by OFAC specifically for the credit reporting industry. Plaintiff Ramirez's alleged auto loan denial was not due to the information that Trans Union presented (i.e., potential matches based on the TU Exact Name Match logic), but instead was the result of Dublin Nissan not following the expected and proper procedures for investigating OFAC alerts.

Had Mr. Burns applied the normal and typical procedures for investigating a potential OFAC alert – comparing Mr. Ramirez's identification documentation against the OFAC alert data – Mr. Burns would have disregarded the alert in line with OFAC guidance and Mr. Ramirez would not even have been aware of the potential SDN match. This is consistent with practice in the financial institutions industry where false positive OFAC alerts are cleared on a daily basis without the customer even knowing about it.

Therefore, I am of the opinion that a system and process that relies upon both interdiction software (i.e., software that "rapidly rules out applicants who lack any potential first-name/last-name match to anyone on the"[61] SDN list) and human intervention (i.e., to manually compare potential matches generated by the interdiction software to other relevant information), rather than solely relying on interdiction software, is consistent with financial industry practice and preferable in order to best mitigate material risk of real harm to the consumer, while still achieving the overall goal of OFAC to prohibit any transactions with a person or entity on the SDN list.

---

[61] Declaration of Michael O'Connell in Support of Defendant Trans Union LLC's Opposition to Plaintiff's Motion for Class Certification, par. 3.

CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER



I reserve the right to expand upon the opinions expressed here or to amend these opinions based upon additional information received.

I declare under penalty of perjury under the laws of the United States that this document is true and correct.

Executed this 14th day of November 2016, San Francisco, California.

Jaco Sadie

# EXHIBIT 1

# Jaco Sadie

Senior Managing Director – Forensic & Litigation Consulting

Jaco.sadie@fticonsulting.com



**One Front Street**

**Suite 1600**

**San Francisco, CA 94111**

Tel: +1 414 283 4230

## EDUCATION

B.A. in Accounting (honors),
Stellenbosch University, South Africa

## CERTIFICATIONS

Certified Public Accountant, California
(Inactive)

Chartered Accountant (South Africa)

Certified in Fraud and Forensic

Certified Fraud Examiners

## PROFESSIONAL AFFILIATIONS

American Institute of Certified Public
Accountants

South African Institute of Chartered
Accountants

Mr. Sadie is a senior managing director in the FTI Forensic and Litigation Consulting segment in San Francisco. He has over 20 years of experience providing forensic accounting, investigative and litigation services. Mr. Sadie provides AML investigative services to financial institutions and regulators. His services include historical look-back transaction reviews to identify suspicious transactions, sanctions compliance reviews, compliance testing of AML/BSA programs, and AML training. Mr. Sadie is the west coast leader of the Business Insurance Consulting practice and focus on the preparation and resolution of complex Business Interruption, Property Damage, Product Recall, Fidelity and Cyber Crime claims. He has practiced in the U.S, Europe, Asia, Latin America and Africa. His financial consulting experience also includes technical GAAP accounting consulting, fraud investigations, forensic accounting investigations, accounting malpractice, and breach of contract damages analysis over a wide range of industries.

Select Professional Experience

Anti-Money Laundering Consulting

- Providing an AML and OFAC lookback review as part of a regulatory monitorship that involves a two year historical look-back period for a large international European bank. The project includes a full compliance review and testing of the current BSA/AML and OFAC program. The review included the collection of various SWIFT messages processed through the New York branch that originated worldwide and identifying transactions for further in-depth review and potential SAR filings.

- Performed an AML and OFAC review as part of a regulatory monitorship of an international bank. Efforts include the review and testing of the BSA/AML compliance program over a multi-year period and performing transaction testing on those areas where compliance weaknesses have been identified.

- Performing an OFAC look-back review for a money service business. Efforts include the collection of historical transactional data and comparing it against current sanctions lists and a review of the OFAC compliance program.

- Performing an AML and OFAC lookback review and compliance review as part of a regulatory monitorship of the US branch of a middle-eastern bank. Efforts include the review of the local compliance function, extraction of transactions and alerts relating to the relevant period, and analyzing transactions for suspicious patterns.

- Performed an anti-money laundering forensic investigation for a large national U.S. bank relating to a selection of accounts. Efforts include the review of account opening documentation, interviews of the bank personnel and an analysis of account activity to identify suspicious activity.



# Jaco Sadie

Senior Managing Director – Forensic & Litigation Consulting

Jaco.sadie@fticonsulting.com

- Assisted in a due diligence review of a Luxembourg single premium life insurance company on behalf of a French bank. Responsible for evaluating the adequacy of the controls and risks related to anti-money laundering. Efforts included the review of a large sample of client files for any suspicious client relationships or transactions.

- Performed a review and benchmark project for a global Swiss bank of their global AML and anti-corruption Risk Assessment. Efforts include the review of the Risk Assessment questionnaire, evaluation of the risk ratings and the application of the risk ratings in determining the overall risk assessment of the various business units.

- Led an anti-money laundering investigation of a Luxembourg subsidiary of a large American life insurance company. A large US based life insurance company acquired a Luxembourg cross-border single premium life insurance company. After the close of the acquisition, certain money laundering risks were identified by the US life insurance company. The investigation involved a "look-back" review of the Luxembourg subsidiary involving the selection of a large sample of customer accounts based on stratifying the customer account population into relevant strata (e.g. geography, source of investment, etc.), comparing the selected customer list against OFAC list, the review of customer account information and transactions for suspicious activity and reporting the results to corporate.

- Provided advisory services to a large cross-border life insurance company, headquartered in Luxembourg on anti-money laundering issues. The project focused on analyzing the company's AML policies and procedures in terms of current and draft law, ensuring compliance of customer list against OFAC list and providing recommendations in order to reduce their money laundering risks.

- Assisted in a due diligence review of a private bank in the Netherlands on behalf of a Luxembourg bank. Responsible for evaluating the adequacy of the controls and risks related to anti-money laundering and a review and evaluation of assets under management as presented by the bank.

- Assisted in the due diligence process of a global Dutch bank selecting the appropriate AML software to be implemented world-wide.

- Provided numerous training sessions for banks and life insurance companies, as well as internal AML training for public accountants.

### Business Interruption and Property Damage Insurance Claims

- Prepared the business interruption claim for an international electronics and entertainment company relating to a network security breach. The claim involved the calculation of lost revenues and extra expenses incurred due to the data breach of two separate networks. We prepared the claims for both the US and UK companies as it relates to the impact of the data breaches.

- Prepared a fidelity claim relating to a former employee's alleged fraud and theft of spare parts. The policyholder operated a manufacturing business for the refurbishment of printer cartridges. The claim included the calculation of the amount of money allegedly stolen by the former employee by colluding with a vendor to manipulate the supporting documentation of the purchases of printer cartridges.

- Preparing the property damage and business interruption claim for a hotel that was damaged by an earthquake. The hotel also suffered significant water damage. The majority of the hotel rooms are owned by an investment company, but the remaining rooms are owned by a number of individual owners similar to a condominium arrangement. The claim involves the allocation of damage between earthquake and water damage.

- Prepared a multi-million dollar property and business interruption claim for an international manufacturer of glass substrates for flat screen televisions and computer monitors relating to:



# Jaco Sadie
## Senior Managing Director – Forensic & Litigation Consulting

Jaco.sadie@fticonsulting.com

- – an earthquake in Japan which damaged its large tanks and other production equipment.
- – an equipment failure damaged production equipment at its plant in Taichung, Taiwan.
- – an equipment breakdown at its plant in Tainan, Taiwan.

- Prepared the business insurance and property damage claim for a US based fiber optic component manufacturer whose contract manufacturer in Thailand was flooded. The claim involved the estimation of lost sales directly related to the flood, computing of property damage for equipment at the contract manufacturer and coordinating with the contract manufacturer and its insurance companies and adjusters.

- Prepared the property damage and business insurance claim for an international company specializing in the sale of industrial chemicals relating to a fire at a plant in Angola. The claim involved issues dealing with lost sales of certain chemicals, off-set by mitigation by other chemicals, determining the period of liability as it relates to the reconstruction of the damaged equipment and extra expenses.

- Prepared the property damage and business interruption claim for a chemical manufacturing company that suffered a fire at their main manufacturing plant that also destroyed the head offices. The company lost all company records and the claim had to be prepared by pulling documents and information from various sources. The claim involved significant issues dealing with co-insurance.

- Prepared the business interruption claim relating to water damage at an apartment complex. The property was damaged after water from a fire hydrant flooded the building leaving a number of the units damaged. The claim involved the calculation of lost rents, but off-set by moving some of the tenants to other vacant units.

- Prepared the insurance claim under a crime coverage policy relating to a company that was defrauded by one of its employees. The claim had to be property documented to show the methodology of the fraud and the calculation of the lost amount.

- Prepared the contingent business insurance claim for an international company specializing in the sale of industrial chemicals relating to the Great East Japan Earthquake of March 11, 2011. The claim consisted of computing the lost sales to hundreds of customers, determining the appropriate period of indemnity for each customer and extra expenses.

- Prepared and assisted in mediating a business interruption claim for a large manufacturer of hard disk drives after a water pipe burst and damaged several key manufacturing tools on the production line. The analysis included a calculation of lost production both upstream and downstream at the assembly plants in Asia.

- Prepared the business interruption and property damage claims for an international high-end fashion retail company relating to the Great East Japan Earthquake of March 11, 2011. Claims were prepared for over twelve different brands. The claim consisted of computing the lost retails sales during the period of restoration, the property damage and extra expenses.

- Prepared the business interruption claim for a multinational company specializing in retail center development, ownership, operation and management after a fire at one of its shopping gallerias. Efforts included the computation of lost rent and related revenues, adjusting for the various movements of tenants after the fire, for the duration of the reconstruction of the galleria.

- Prepared and assisted in negotiating a property and business interruption claim for an international manufacturer that suffered a fire in its plant in southern Brazil. The claim involved the analysis of increased production costs, large exchange rate fluctuations, and the interrelationship between the local and global insurance policies.



CRITICAL THINKING AT THE CRITICAL TIME™

# Jaco Sadie
## Senior Managing Director – Forensic & Litigation Consulting

Jaco.sadie@fticonsulting.com

- Provided litigation consulting services regarding business interruption losses sustained by an international financial markets services firm that suffered one of the largest losses of any company due the event of September 11, 2001. The analysis involved quantifying damages incurred over multiple years.

- Assisted as financial advisor to a large French retail company in their Business Insurance claim issued to the insurance company as result of losses incurred relating to the September 11, 2001 events. Assistance included analysis and preparation of the claim and negotiating with the insurance brokers.

### Forensic and Technical Accounting Consulting

- Led a large investigation on behalf of a global financial institution relating to allegations that a Financial Advisor stole significant amounts from a number of clients. Efforts include the review of client statements and other banking records to compute the total amount allegedly stolen. The individual was ultimately arrested and admitted to the crime.

- Provided technical accounting support relating to a SEC investigation of the CEO of a construction company and its restatement. Efforts included the review of financial and accounting records to determine whether the proper accounting was applied.

- Led a multi-year project, serving as the technical GAAP accounting expert, providing assistance to counsel on a number of litigation matters involving accounting fraud allegations against the former CEO of one of the world's largest global insurance companies. The primary counterparties to these litigations included the New York Attorney General, the Securities and Exchange Commission, several shareholder class actions and the company itself. The accounting issues include among other:

  - risk transfer of insurance/reinsurance contracts;

  - special purpose entity consolidation;

  - recognition of investment income;

  - post-closing adjustments;

  - substance of reinsurance structures; and

  - foreign currency accounting.

  Efforts relating to these accounting issues include providing expert advice on the technical accounting treatment that was subject to a restatement, providing and summarizing relevant accounting literature, a forensic investigation of the record produced regarding the restatement issues and a review of the independent auditor's work papers.

- Provided technical accounting assistance to counsel involving the arbitration of the sale of a regional bank in Florida. Efforts included advising counsel on the correct GAAP accounting treatment relating to certain issues identified by the seller.

- Provided litigation consulting services for the rebuttal of fraud allegations relating to a sale transaction of a remediation construction company. Efforts include preparing an expert report addressing various fraud allegations.

- Provided forensic accounting and litigation consulting services related to an auditor malpractice lawsuit on a multi million-dollar construction company. Matters to be addressed included adequacy of financial statement disclosures, adequacy of projections, the valuation of the projects at certain dates and whether the auditors complied with the accounting and auditing standards in the construction industry.



CRITICAL THINKING AT THE CRITICAL TIME™

# Jaco Sadie
Senior Managing Director – Forensic & Litigation Consulting

Jaco.sadie@fticonsulting.com

- Provided litigation consulting in a matter involving an insolvent computer leasing company dispute with a financing company. Efforts included the review of various contracts and determine the correct accounting treatment in terms of US GAAP, as well as performing solvency analysis of the computer leasing company.

- Provided litigation consulting services to a local software company relating to its investigation by the SEC. Efforts included the review and analysis of company documentation relating to revenue recognition.

- Provided forensic accounting and special investigative services in connection with revenue recognition and other restatement issues for the audit committee of a publicly traded food distributor.

- Served as financial advisor in an engagement involving the bankruptcy of a leading information technology services and products supplier with annual revenues of $6 billion. Efforts included forensic accounting and special investigative services regarding transactional entries and schedules for bankruptcy filings.

- Conducted a forensic accounting investigation into a large medical insurance company. Efforts included the investigation of various operational and accounting transactions and assessing the solvency and financial viability of the insurer.

## Litigation Consulting

- Provided expert litigation consulting services involving a matter where an internal water pipe in a large commercial building burst resulting in large quantities of water flooding several floors. The matter involved assessing the damages being claimed by various constituents of the building, including the building owner, master tenant, and sub-tenant.

- Provided litigation consulting services in a matter involving allegations of false advertising under the Lanham Act in the pomegranate juice industry. Efforts included the calculation of plaintiff's lost sales and related profits and compiling a Rule 26 expert report relating to the damages calculation.

- Provided forensic and litigation services in a matter involving allegations of the theft of trade secrets between two Taiwanese companies. Efforts included the calculation of lost profits and other damages and the rebuttal of opposing expert damage report.

- Provided litigation consulting services in a matter involving allegations of fraud and misconduct in the recycling business. Efforts included an analysis of the alleged fraudulent activity and possible alter ego issues relating to the plaintiff.

- Provided forensic and litigation services in a matter involving breach of contract allegations relating to a chip defect in the semiconductor industry. Efforts included analysis of revenue and cost structures, analysis of warranty, return and shipping databases, analysis of damages model regarding returns of product from customers and the preparation of rebuttal report to damages model.

- Performed a valuation report of potential future litigation regarding asbestos insurance for counsel in terms of a specific tax matter. Efforts included evaluation of the potential outcomes of various future litigations against insurance carriers in relation to total future asbestos-related liability.

- Provided litigation services in a matter involving breach of contract and anti-competitive behavior allegations in the video retail industry. Efforts included analysis of plaintiff and defendant revenue and cost structures, analysis of contracts between parties in dispute and the analysis of audit workpapers performed by the plaintiff's internal audit department.



# Jaco Sadie

Senior Managing Director – Forensic & Litigation Consulting

Jaco.sadie@fticonsulting.com

- Performed risk and liability analysis on behalf of the parent company of a free Internet provider. Efforts included the analysis of contracts to determine the potential wound down liabilities.
- Defined and quantified the market share as well as developed a strategic plan for a company specializing in controlled atmosphere containers.

**Testifying and Speaking Engagements**

- Deposition as damages expert in a matter relating to a water leak in a high rise office building.
- Testified in arbitration on the accounting costs related to projects by a landscaping and construction company.
- Adjunct professor at the Golden Gate University teaching an online course on allegations of audit failures.
- Spoke at Anti-Money Laundering conferences in Luxembourg and made presentations at offshore and cross border life insurance industry associations in the United Kingdom.
- Provided numerous AML trainings for the personnel of banks and insurance companies
- Presented numerous in-house AML training events
- Forensic Accounting Investigations, Tools and Technologies, Silicon Valley Institute of Management Accountants, November 18, 2010
- Presented accounting training courses at law firms.
- Presented on a panel at RIMS on the topic of Insurance Law 101

**Work History**

- LECG – Principal
- Deloitte & Touche (South Africa, Luxembourg and USA) – Senior Manager



**EXHIBIT B**

STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND (State Bar No. 083013)
STEPHEN J. NEWMAN (State Bar No. 181570)
BRIAN C. FRONTINO (State Bar No. 222032)
JASON S. YOO (State Bar No. 261114)
2029 Century Park East
Los Angeles, CA 90067-3086
Telephone: 310-556-5800
Facsimile: 310-556-5959
Email: *lacalendar@stroock.com*

Attorneys for Defendant
TRANS UNION LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SERGIO L. RAMIREZ, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>    vs.<br><br>TRANS UNION, LLC<br><br>    Defendant. | Case No. 3:12-cv-00632-JSC<br><br>[Assigned to the Honorable Jacqueline Scott Corley]<br><br>**DECLARATION OF FRANCINE CRONSHAW** |

DECLARATION OF FRANCINE CRONSHAW
Case No. 3:12-cv-00632-JSC

LA 51749511

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

## DECLARATION OF FRANCINE CRONSHAW

I, FRANCINE CRONSHAW, hereby declare and state as follows:

1.      I submit this Declaration in support of defendant Trans Union LLC's ("Trans Union") Opposition to plaintiff Sergio L. Ramirez's ("Plaintiff") Motion for Class Certification. The facts set forth herein are true as of my own personal knowledge, except where based on a review of the pleadings and records in this action.  If called as a witness, I could and would competently testify thereto.

## I.    QUALIFICATIONS

2.      I am currently the owner and manager of East Mountain Editing Services, a position I have held full time from 1992 through the present.  During the 2012-2014 academic years, I have served as a Visiting Associate Professor at the Latin American and Iberian Institute at the University of New Mexico.

3.      I have significant experience in Spanish language indexing, including in-depth  and longstanding research experience with Spanish language materials.  I also have spoken and written academically regarding indexing and on historical subjects in both Spanish and English.  I have published several articles in professional publications regarding Spanish (and Portuguese) language indexing.  In 2014, I plan to publish a book regarding Spanish language editorial and translation-related usages in U.S. publishing, titled "Publishing in Spanish: A Guide for Editors and Authors." I also have participated in several major indexing conferences -- I was a member of the International Indexing panel at the American Society of Indexing meeting in Toronto in 2006 and was a presenter regarding indexing in Spanish at the national conference of the American Society of Indexers in Indianapolis in 1999.

4.      I have served as indexer of more than eighty-four Spanish language publications, more than three hundred scholarly and trade titles in English, more than one hundred and twenty college-level textbooks in both Spanish and English, and also have indexed eight French and three Italian language textbooks.

LA 51749511

5.      I am member of the American Society for Indexing (ASI), and the founding president of the A To Zia Indexers Chapter of ASI.  I also am a member of the New Mexico Translators and Interpreters Association and the Rocky Mountain Conference of Latin American Studies.

6.      I obtained my bachelor of arts degree in sociology from the University of North Dakota in 1971, earned my master of arts degree in history from the University of Houston in 1976, earned my Ph.D. in history from the University of New Mexico in 1986, and completed postdoctoral studies at the University of Florida in 1987.

7.      A more complete description of my qualifications is set forth in my attached curriculum vitae.

## II.    ASSIGNMENT

8.      I have been asked by counsel for Trans Union to opine on the following subjects:

(a)      Whether it was appropriate for Trans Union to return, in response to a name screen request, potential matches between a data input containing a first name of Sergio and a last name of Ramirez with the names Sergio Humberto Ramirez Aguirre and Sergio Alberto Ramirez Rivera, who are identified as being born outside the United States, in light of traditional Spanish naming conventions and their uses among the U.S. Hispanic population, and the U.S. Treasury Department's stated purpose for the use of its Office of Foreign Assets Control ("OFAC") list of Specially Designated Nationals ("SDNs").

(b)      Whether it is possible to determine, on a common basis, whether Trans Union's name screening protocols will predictably or consistently lead to erroneous returns of Spanish-derived names.

(c)      Whether the outcomes of any name screening on Spanish-derived names can be reliably generalized to determining error rates with respect to non-Spanish derived names on a common basis.

(d)      What individualized issues may result from name screens applied to Spanish-derived names.

- 2 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

III.   **SUMMARY OF OPINIONS**

9.      (a)  It was appropriate for Trans Union to return potential matches between a data input containing a first name of Sergio and a last name of Ramirez with the SDN names Sergio Humberto Ramirez Aguirre and Sergio Alberto Ramirez Rivera, who are identified as being born outside the United States.  Traditional Spanish naming conventions consist of a compound first name (two names treated as one, with no middle name), a patronymic last name, and a matronymic last name.  Spanish speaking individuals living in English speaking societies may, out of convenience and to harmonize their names with English standards, use only a single first name and single last name.  In Spanish naming conventions, the patronymic last name is the dominant last name.  Accordingly, when a Spanish name is anglicized, the second last name, the matronymic, may be dropped and only the patronymic used.  Here, that would mean that the individuals named Sergio Humberto Ramirez Aguirre and Sergio Alberto Ramirez Rivera might use only the patronymic, Ramirez, as their last name in an English language transaction.  Similarly, in an English speaking society, a Spanish speaker might use the first name of his or her compound first name.  Thus, Sergio Humberto Ramirez Aguirre and Sergio Alberto Ramirez Rivera might go by Sergio.  Thus, either of the two individuals with whom Plaintiff potentially matched could go by the name Sergio Ramirez in the United States.  Given the varying ways in which Spanish speakers residing in the U.S. identify themselves, it was appropriate to return the data Sergio Humberto Ramirez Aguirre and Sergio Alberto Ramirez Rivera in response to the input first name of Sergio and input last name of Ramirez.

(b)      It is not possible to determine on a common basis that the name screen product will result in erroneous output of Spanish derived names.  This is because there are myriad ways in which Spanish named individuals living in the United States might choose to present their names in a transaction.  They might anglicize them or they might use the traditional format for Spanish names, or use one format in consumer transactions and another in legal documents.  Similarly, there are inherent challenges relating to indexing Spanish names in Anglocentric consumer databases.  It is not inherently or consistently clear which portions of a Spanish derived

- 3 -

LA 51749511

multi-part name (that traditionally has a compound first name and two last names, but no middle name as that concept is understood in Anglo culture) should be treated as the true last name, first name or middle name (which does not exist in Spanish naming conventions).  Each transaction will depend on how a particular database indexes a particular Spanish name, as well as how the individual consumer engaged in the transaction uses his or her name.

(c)     Even where the name is not of Spanish derivation, name screening cannot be calibrated to avoid all unintended matches.  This is because not all names are of Anglo origin and many non-Anglo names are formatted in a manner very different from English.  This presents problems for an English language database, where names derived from non-English languages might not fit the indexing format.  Each instance of whether a name could return an appropriate result from the database must be analyzed on an individual basis, taking into consideration the name's origin or other factors that might not be contained within the database.

(d)     Numerous individual issues are likely to result from applying the name screen product to Spanish derived names.  These include, for example, how assimilated the individual consumer is in terms of using Anglo naming conventions, his or her familiarity with the English language, how long he or she (or his or her ancestors) has lived in the U.S., his or her marital status, the degree to which he or she prefers to use traditional Spanish naming conventions, and his or her modification of a Spanish name for expediency and convenience in English language transactions (and if so, the type of modification).

## IV.    MATERIALS REVIEWED

10.    In preparing my Declaration, I reviewed the following materials:  the Complaint in this action; Trans Union's Answer to the Complaint; the transcripts of the depositions of Sergio L. Ramirez, Liseth Villegas, Dublin Nissan, Sean L. Walker, Steven R. Katz, Robert Lytle, Accuity, Colleen Gill, Bharat Acharya, and Michael O'Connell, and the exhibits thereto; Trans Union's Supplemental Interrogatory Responses; Plaintiff's Motion for Class Certification and the exhibits thereto; the concurrently-filed Declarations of Colleen Gill, Denise Briddell, Michael O'Connell, Lynn Romanowski, and Clint Burns in support of Trans Union's Opposition to Plaintiff's Motion

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 4 -

LA 51749511

1  for Class Certification, and the exhibits thereto; the OFAC Advisor Amendment to Reseller Service

2  Agreement signed in June 2010 (the "OFAC Agreement"); and the Federal Trade Commission

3  Report Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003.

## V.     BACKGROUND

11.     According to the materials I have reviewed, Trans Union provides a service known
as "OFAC Name Screen Alert" ("Name Screen"), which is sold by Trans Union, a credit bureau, to
certain credit report purchasers, either directly or indirectly through a reseller.  The case materials
indicate that Name Screen is a post-9/11 USA PATRIOT Act compliance product, and allows
lenders to rapidly clear a potential transaction for compliance with federal anti-terror and anti-drug
trafficking rules administered by the Treasury Department's Office of Foreign Assets Control
("OFAC").  It appears from the case materials that the purpose of Name Screen is to rapidly rule
out applicants who lack any potential first-name/last-name match to anyone on OFAC's "Specially
Designated Nationals" ("SDN") list.  For all other applicants (with names that potentially match an
SDN), Name Screen delivers specific SDN data which will allow the user either to determine that
the applicant is not an SDN on the basis of human review and judgment, or (if the user is not sure
whether the applicant is or is not an SDN) to contact Treasury for further guidance.

12.     According to the testimony of Trans Union employees, including Michael
O'Connell and Robert Lytle, Trans Union made significant changes to Name Screen in response to
the Third Circuit's opinion in Cortez v. Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010), including
implementing federal Fair Credit Reporting Act compliance procedures for matching, disclosure
and reinvestigation.  According to the Cortez ruling, Trans Union negligently described Sandra
Cortez as a match to Sandra Cortes. ████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

13.     Plaintiff's materials assert that he was denied credit as a result of information within
a Trans Union credit report.  (Compl., ¶ 52.)  Plaintiff alleges that on February 27, 2011, he applied

- 5 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

1   for an auto loan from the Dublin Nissan auto dealership.  (Id., ¶ 48.)  He alleges that the credit

2   report obtained for the transaction contained two individuals' names that appear on the SDN list.

3   (Id., ¶ 49, 53.)  Plaintiff claims that Dublin Nissan denied him credit because he shares a first and

4   last name with the two individuals who appeared on the OFAC list.  (Id., ¶¶ 49-55.)

5

6

7

8

9

10

11

12       15.     Trans Union's witnesses also testified that Trans Union modified its Name Screen

13  product after the Cortez ruling to indicate that Name Screen only advises of a "potential match."

14  (Deposition of Michael O'Connell at 61:3-62:4, 82, 99:17-25, 160:3-164:16, 175:3-20.)  Plaintiff

15  claims that in his case, a report was delivered with the single word "match" (omitting the word

16  "potential"), but the Trans Union witnesses assert that this report format was not an approved Trans

17  Union format at the time and was not in general use.  I have no opinion on this specific issue.

18  **VI.     THE RESULTS DELIVERED HERE WERE CONSISTENT WITH THE UNIQUE**
         **NAMING CONVENTIONS INHERENT IN SPANISH LANGUAGE NAMES.**
19

20       16.     The format for entries on the government's OFAC list and the delivery results for

21  Trans Union's OFAC Name Screen product follow the format of traditional naming conventions in

22  Spanish-speaking Latin American countries:  compound first name, paternal surname, maternal

23  surname.  The traditional usage of Spanish surnames, more common among recent immigrants than

24  among long-established Hispanic populations, requires the use of both the father and the mother's

25  surnames (two last names instead of one); this is known as the "apellidos."  In addition, the

26  baptismal name (all names preceding the surnames) is seen as a single unit; this is known as the

27  "nombres."  Although the "nombres" often consists of two names, neither is considered a "middle

28                                          - 6 -

LA 51749511

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1  name" as in Anglo culture; there is no concept of a middle name in traditional Spanish speaking

2  cultures.  A traditional Spanish speaker might use either or both components of the "nombres."

3  Thus, "Maria Elena" may be known as "Maria Elena," "Maria" or "Elena."  Accordingly,

4  throughout Latin America, legal forms often ask for both components of each part of the name by

5  using the plural words "appellidos" and "nombres."  It would be unusual in most parts of Latin

6  America to see a legal form that used the singular words "appellido" and "nombre."

7       17.    It is also worth noting that the number of Spanish surnames used frequently is much

8  smaller than is the case for non-Spanish surnames.  There are far more family names of

9  "Rodríguez" than "Jones."  Finally, Hispanics born in this country (ranging from the descendants

10  of first-generation immigrants to those families residing here for 300 years or more) tend to adjust

11  their naming practices over time to conform to the practices used by the dominant, English-

12  speaking culture.

13       18.    In this case, two SDNs were identified in connection with Plaintiff's credit report.

14  Both SDNs had "Sergio" as a component of the "nombres" and "Ramirez" as a component of the

15  "apellidos."  The SDNs delivered listed Ramirez as the second name after Sergio.  One of the SDN

16  items listed the name Sergio Humberto Ramirez Aguirre, and the other listed the name Sergio

17  Alberto Ramirez Rivera.  In most everyday settings, each of these individuals would be called

18  Sergio Ramirez -- his given first name and his father's family name.  Because the credit application

19  used by the auto dealer here was Anglocentric, Plaintiff was not asked for a maternal last name, and

20  none was delivered to Trans Union.  Trans Union therefore appropriately identified Plaintiff as a

21  potential match to this SDN item based on the limited given name and surname data obtained by

22  the dealership, which used an application formatted for a typical English language first name-

23  middle initial-last name.  (See Deposition of Dublin Nissan ("Dublin Nissan Depo."), Exs. 6 and

24  7.)  Trans Union's OFAC Name Screen product outputted appropriate data based on sound

25  linguistics.

26       19.    There are many varying ways in which Hispanics in the U.S. might choose to

27  identify themselves.  Even if they are named with the traditional Spanish naming convention –

28

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

-7-

LA 51749511

compound first name-paternal surname-maternal surname – an individual might choose to use either part of his compound first name, the entire compound first name, none of it, or a nickname. There is no systematic way to determine which part an individual uses, given the variances in individuals' preferences, the degree of assimilation, and the region of the country.  Returning Name Screen results for any combination of letter-for-letter matching names that are entered into an English language database such as the one here is appropriate.  Not returning a "potential match" result would ignore the complexity of Spanish-derived names and their varied usage in the U.S.

reviewer to use to inquire further whether some other factor could clear Plaintiff for the transaction.

21.    The OFAC report generated here did not result from spelling errors or a failure to identify the correct language, but rather reflected an effective application of accepted and longstanding Spanish naming conventions.  Moreover, because Anglo applications involve only one surname, unlike in Spanish-speaking Latin American countries, there would be no way to determine systematically if a potential Spanish name match is erroneous even if the system relied simply on a single surname.  Based on the Treasury Department's instructions to further verify whether a potential match is indeed on the list, as well as the contract with the reseller of the Name Screen product (and the reseller's contract with the end user), Dublin Nissan here could have requested further identifying or biographical information from Plaintiff to clear him without incident.  (See U.S. Dep't of Treas., Resource Center, Frequently Asked Questions And Answers, visited Apr. 4, 2014 at http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx#hotline; see also Dublin Nissan Depo. Ex. 5; OFAC Agreement.)

- 8 -

DECLARATION OF FRANCINE CRONSHAW
Case No. 3:12-cv-00632-JSC

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

**VII.   THE FREQUENCY OF A SMALL NUMBER OF SPANISH SURNAMES IN THE HISPANIC POPULATION INCREASES THE LIKELIHOOD OF A POTENTIAL MATCH WHEN A CONSUMER HAS A COMMON SURNAME, AND BECAUSE OF SPANISH NAMING CONVENTIONS, THE PRESENCE OF A MATRONYMIC AND SECOND BAPTISMAL NAME WOULD NOT DISQUALIFY A POTENTIAL MATCH.**

22.     Since the 1980 Census, the population of the U.S. speaking a language other than English at home has increased by 140%. Of the 281 million people living in the United States in 2007, 20% of the total reported speaking a language other than English at home. The largest numeric increase was among Spanish speakers. In 2007, there were 23.4 million more Spanish speakers than in 1980, an increase of 211%. The 2010 Census counted 50.5 million Hispanics in the U. S. The states with the highest percentages of Spanish speakers are Texas, California and New Mexico (Census Bureau, 2007).

23.     Not all of these Spanish speakers are recent immigrants. Nearly as many were native-born as foreign-born, 17 million born in the U.S. versus 17.5 million foreign-born. Language skills tend to follow that trend, with 53 percent reporting that they speak English "very well." (Census Bureau, 2007).[1]

24.     The Mexico-origin population led all other Hispanic national origin groups by a large margin, representing 63 percent of the total in 2010. The growth rate of residents of Mexican origin increased by 54 percent, and reflecting their numeric leadership among Hispanic groups, accounted for about three quarters of the total Hispanic population increase. Of the South American Hispanic population, those of Colombian origin were the largest group, at 909,000 persons.

25.     Added to the 31.8 million persons of Mexican origin (Census Bureau, 2010), it is clear that Spanish surnames common in these two countries will appear frequently in U.S. government and consumer databases.

---

[1]     According to a 2011 Census Bureau report examining languages spoken at home, of 291.5 million people aged 5 and over, about 21 percent spoke a language other than English at home. Sixty percent or over 37 million of that group were Spanish speaking (Census Bureau, 2011).

- 9 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

26.     A small number of the surnames repeat themselves frequently within the U.S. Hispanic population, as they do in the Spanish and Latin American populations. This means that there will be a high number of individuals with the same Spanish surname. That alone increases the likelihood of returning data indicating a potentially similar name when using the OFAC Name Screen product. The potential for a match is made even stronger because of the presence of ancillary names, such as a second baptismal name and a matronymic after the patronymic surname. Because of the possibility that an individual has these traditional names, though he might anglicize his name to just a first name and single surname, a match cannot automatically be discounted.

27.     Many Hispanics use only a first name and patronymic surname in the U.S., although they may have a legal name that incorporates a second baptismal name and matronymic surname. Failing to account for these unique factors of Spanish naming and usage would cause the OFAC Name Screen product to miss numerous potential matches. Conversely, due to this significant demographic, delivering output based on either portion of the "appellidos" or the "nombres" improves the effectiveness of the product in light of Treasury's stated goals.

28.     Particular lenders' differing requirements for application information also may well lead to different results. In this case, it would be error to assume, based solely on the Dublin Nissan application material, that the name Sergio Ramirez was Plaintiff's full and inclusive name. There was a possibility that, given Spanish naming conventions, Plaintiff was using an anglicized version of his name in an Anglo-dominant language society. Dublin Nissan's application material did not rule out the possibility that Plaintiff might also have a matronymic and/or a second baptismal name. Because Plaintiff did not provide his full middle name, only a single middle initial, it would not be appropriate to definitively rule out the two SDN names as potential matches, without further information (such as human review of Plaintiff's driver's license). Simply inserting a middle initial would not prevent a first name match-last name match in the database, nor should it. (O'Connell Depo. at 61:3-62:4.)

29.     Differing frequency of surnames also may lead to atypical results. There is a high level of correspondence between common surnames in Spain and in its New World colonies such

- 10 -

LA 51749511

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

as Colombia and New Spain (later Mexico).  For instance, there is significant overlap between the most common surnames in Spain and Colombia:

### Table 1

### MOST COMMON SURNAMES IN SPAIN AND COLOMBIA

| Spain | Colombia |
|-------|----------|
| García | Rodríguez |
| Fernández | Gómez |
| González | González |
| López | Martínez |
| Martínez | García |
| Rodríguez | |
| Sánchez | |
| Pérez | |
| Martín | |
| Gómez | |

Sources: "José y María, Rodríguez y Gómez…."

www.registraduria.gov.co/rev_electro/.../jose_maria.htm. . . .

30.　　About 20 percent of the Spanish surnamed population in the United States is concentrated in a dozen names, according to a Census Bureau working paper (1996).  The ranking of the first dozen names changed only slightly between 1977 and 1990.  Even though the Hispanic origin population increased by 70 percent over that thirteen-year period, surname position rankings were remarkably stable (Word & Perkins, 1996).

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 11 -

LA 51749511

31.     The table below shows the top Spanish and Anglo surnames:

**Table 2**

**MOST COMMON U.S. SURNAMES, 1990 CENSUS**

| Spanish Surnames | | Non-Spanish Surnames | |
|---|---|---|---|
| 1 | Garcia | 1 | Smith |
| 2 | Martinez | 2 | Johnson |
| 3 | Rodriguez | 3 | Williams |
| 4 | Lopez | 4 | Brown |
| 5 | Hernandez | 5 | Jones |
| 6 | Gonzalez | 6 | Davis |
| 7 | Perez | 7 | Miller |
| 8 | Sanchez | 8 | Wilson |
| 9 | Rivera | 9 | Anderson |
| 10 | Ramirez | 10 | Moore |
| 11 | Torres | 11 | Taylor |
| 12 | Gonzales | 12 | Thomas |

Source: Word & Perkins, 1996.

32.     As the above table shows, Ramirez is the tenth most common Spanish surname in the U.S. It is reasonable that a Name Screen search for a consumer with a highly common name would more likely return potentially matching results than for a consumer with a less common or unusual name. The appropriateness of any particular Name Screen result may, in some cases, depend in part on how frequently a person's name occurs in the U.S. population, and this may be require highly-individualized inquiry. For example, I note that Cortez does not appear within the list of the 12 most common Spanish surnames above.

33.     As shown in Table 3, it is clear that the Hispanic population, about 17% of the total population, contributes a disproportionate number of frequently used U.S. surnames to the overall figures:

- 12 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

**Table 3**

**MOST COMMON U.S. SURNAMES, 2000 CENSUS**

| Name | Rank | Count |
|------|------|-------|
| Smith | 1 | 2,376,206 |
| Johnson | 2 | 1,857,160 |
| Williams | 3 | 1,534,042 |
| Brown | 4 | 1,380,145 |
| Jones | 5 | 1,362,755 |
| Miller | 6 | 1,127,803 |
| Davis | 7 | 1,072,335 |
| Garcia | 8 | 858,289 |
| Rodriguez | 9 | 804,240 |
| Wilson | 10 | 783,051 |
| Martinez | 11 | 775,072 |
| Anderson | 12 | 762,394 |

Source: http://www.census.gov/genealogy/www/data/2000surnames/

34.     The most frequently used surnames of Spanish origin such as the Garcias and Rodriguezes appear in the overall U.S. population at high rates. If the figures are adjusted for the numerical weight of the Hispanic population, they would appear far more often than the Johnsons or Williamses and may well rival the Smiths. That only two "Ramirez" results were returned here further supports the reasonableness of the procedure. A recent search of the OFAC website on the

- 13 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

VIII.   **BASED ON HISPANIC NAMING CONVENTIONS AND THE STRUCTURE OF TRADITIONAL HISPANIC NAMES, IT WAS APPROPRIATE TO RETURN, IN RESPONSE TO THE INPUT NAME SERGIO RAMIREZ, DATA FOR SIMILAR NAMES CONTAINING "SERGIO" AND "RAMIREZ" THAT APPEARED ON THE OFAC LIST.**

35.     Traditional Spanish and Latin American usage which emerged during the modern era (1600–1800) presents a person's lineage through the use of two last names, a paternal last name (patronymic) followed by a maternal last name (matronymic).  The order of the two last names is invariable and using only the second last name as the "surname" of record is an error.  This is different from the traditional naming conventions in English, where the final name in a sequence would be treated as the true surname of record.

36.     If only one surname is used, it must be the paternal last name.  A relevant example would be Sergio Humberto Ramirez Aguirre.  Thus, there are two first names (or a "composite first name" in terms of Spanish/Latin American naming practices).  The composite first name "Sergio Humberto" is followed by his father's surname "Ramírez" which precedes his mother's surname "Aguirre."  To illustrate the concept graphically, we can say that a Spanish/Latin American name has three elements:  Composite first name (two names) / Patronymic surname / Matronymic surname. For example, the children born to Señor Enrique Montoya and Señora María Luisa Rivera de Montoya take both their parents' surnames to form a new compound surname.  Their children's names might be listed as:  First names: Ana Margarita; Last names:  Montoya Rivera; First names: Luis Miguel; Last names: Montoya Rivera.

37.     If one wanted to distinguish between two people with similar names, by referring only to surnames, it would be appropriate to indicate "Ramírez Aguirre" on the one hand and "Ramírez Rivera" on the other.  Sole use of the maternal surname in any case would be incomprehensible to a native speaker (Lemon; Music Cataloging at Yale/AACR2; Pérez Quiñones; Cronshaw, 2007, 2012).  As an example, references to Nobel prize-winning novelist Gabriel García Márquez as "Mr. Márquez" are in error.  The correct reference would be "Mr. García Marquez."[2]

---

[2]   Argentina is the only Latin American nation to show a distinct preference for a single surname, reflecting the prevalent naming practices of its European immigrants, especially those from Italy, Great Britain and later, the post-1930s Jewish diaspora.

- 14 -

DECLARATION OF FRANCINE CRONSHAW
Case No. 3:12-cv-00632-JSC

LA 51749511

38.     Thus, Spanish naming conventions differ sharply from Anglo-American usages. Most English-language names look like: "Firstname Lastname." Personal names in English consist of two elements. The first unit of the name is a single-word given or "first" or forename. The second unit is a single-word capitalized family name or surname.[3] Although middle initials are sometimes used, on standard forms such as credit applications, only first and last names are standard name information (Maislin, 2012).

39.     By contrast, each name preceding the surnames in Spanish is known as a *nombre de pila* or "baptismal name" (alternatively known as the "Christian name"). Thus, composite first names, generally made up of two names, are treated as a single unit in both verbal and written usages, according to Spanish naming practices (Real Academia Española, 2011). Some Hispanics in the United States who want to be known by both paternal and maternal last names have found that hyphenating the two last names (in effect, making them a single last name) will fit well within the name information requirements on standard forms. An example of that practice is: First name: Jorge; Last name: Rengifo-Morales.

40.     Hispanics in the U.S. often use one surname out of expediency and as an accommodation to the norms of the dominant English-speaking culture. Thus, in determining whether a potential Name Screen result was reasonable will depend on individual issues unique to that consumer, such as when a particular consumer's family (or the consumer) immigrated to the United States, how far removed he or she is generationally from his or her ancestors' country of origin, whether he or she grew up in a Hispanic family or married into it, or whether his or her parents, grandparents, etc. are all of Hispanic heritage or some are of Anglo heritage.

41.     In places like New Mexico where Spanish presence dates back to the sixteenth century, single surnames are the general rule for Hispanics. A recent exception that proves the rule:  Albuquerque's former mayor, Martin Chávez, and his former wife, Margaret Aragón de

---

[3] Exceptions to standard two-term English language names are: initials and abbreviations; names with more than two words (van, etc.); names with one word; honorifics, titles and suffixes; grammatical variations, including plurals and possessives; variances in capitalization; variances in punctuation use; nicknames and name variations; and prepositions ("of") and articles (often "the") (Maislin, 2012).

- 15 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

Chávez, choose to use diacriticals in their names and the traditional "de" naming practice to show her married status, likely as a statement of pride in their Hispanic heritage and language. Nevertheless, Anglicized first names (Rosalie for Rosalía, etc.) and last names without accent marks (Gutierrez, Sanchez, Lopez, etc.) are often seen. Thus, the appropriateness of any Name Screen result also might depend on the region of the U.S. in which the consumer lives.

42.     Marital status creates further complexity. An exception to surname use was the practice of name changes when a woman married. This too may lead to individualized differences when analyzing whether a Name Screen result was or was not correctly delivered. A married woman traditionally took her husband's name associated with her patronymic, linked together with "de." However, it is the father's family name which leads in the surname order. In the first example below, the surname of María Luisa's father is Rivera and her husband's family name is Montoya (Lemon; Music Cataloging at Yale/AACR2; Pérez Quiñones; Cronshaw, 2007, 2012). The article *de* (meaning "of") is commonly used to show possession (*el libro de Juanita*). In the present case of a married woman it firmly communicates her role and position in society, as a possession of her husband, or at least as an appendage of the husband's family name. Nonetheless, it is the patronymic family name she inherits from her own father that determines the sort arrangement for indexing and bibliographic purposes.[4]

43.     As *Chicago Manual of Style 16th Edition* indicates, even if the telephone directory lists the woman under her husband's family name, it does not necessarily reflect her legal name. First names: María Luisa; Last names: Rivera de Montoya. A related example reflects widowhood status (*viuda* is "widow"): First name: Constanza; Last names: Pérez viuda (or abbreviated as "vda.") de Turvey.

44.     In other parts of the U.S., recent immigrants may choose to follow practices current in their country of origin. However, data about how recently a consumer or his or her ancestors

---

[4]     Naming practices among same-sex couples in the U.S. at this point do not follow any discernible pattern (nethelper.com/article/Family_name).

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

immigrated to the U.S. would not exist within a credit bureau's database or be requested in connection with a credit application.

45.     As discussed above, Spanish naming conventions do differ significantly from the traditional format of non-Spanish names, which is first name/last name. When analyzing a Spanish language name presented as a single baptismal name and a single surname, it can be appropriate to consider whether the name might potentially include a second baptismal name and matronymic surname. This is particularly important in a transaction in an Anglo-dominant society, such as the transaction with Dublin Nissan at issue in this case, where convenience and expediency might encourage a consumer to use a more recognizably Anglo version of his or her name.

46.     Here, when Plaintiff completed his application on the form provided by Dublin Nissan, he appeared to have conformed the format to typical Anglo usage by supplying only a

IX.   **EVEN IN SPANISH SPEAKING COUNTRIES, INDEXING SPANISH NAMES TO CORRECTLY IDENTIFY THE APPROPRIATE INDIVIDUAL PRESENTS SIGNIFICANT CHALLENGES.**

47.     Trans Union's method of delivering Name Screen results here was no less rigorous than what is applied in Spanish-speaking countries themselves.

48.     For example, in a study of indexing of professional publications by the School of Medicine of the University of Granada (Spain), retrievability on the basis of author's name was poor in all three databases examined (Science Citation Index (SCI), MEDLINE, and Índice Médico

- 17 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

Español (IME).  The study concluded that the lack of consistency or coherence for specific name entries were most likely caused by: (1) use by authors of variants of their names during their publication careers, (2) lack of authority control in all three databases, (3) the use of an inappropriate indexing method for Spanish names in SCI, (4) authors' inconsistent behaviors, and (5) possible editorial interventions by some journals.  In this context as well, human review and judgment is necessary to ensure proper outcomes.  Overall, the fewer the number of publications by a specific author, the more likely variants of their personal name would occur.

49.     In MEDLINE and IME, names were indexed correctly as "first surname second surname, first name initial middle name initial" (if present) in 41.7% and 49.5% of the records, respectively.  However, in SCI, the most frequent method was "first surname, first name initial second name initial" (48.0% of the records) and first surname and second surname run together, first name initial (18.3%).

50.     An example of the possible variants on a single name, taken from the three databases, is as follows:

Full name:  Antonia Emelia Aránega Jiménez

Database Entries:

Aránega Jiménez, Antonia

Aranegajimenez, A. E.

Aranega Jimenez, A. E.

51.     Because Spanish personal names are more complex than English personal names, the greater the potential for different combinations of first and "middle" names and surnames, especially in international databases, such as SCI, in which English is the dominant language.  However, significant problems of retrievability also occurred in the Spanish medical database, IME.

52.     Given the complexity associated with harmonizing complex Spanish personal names with English language dominant and international databases, it cannot be said, without considering many individualized factors, that Trans Union's Name Screen product systematically delivers

- 18 -

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

LA 51749511

1  inappropriate output. Nothing I have seen suggests that any alternative system would deliver better

2  output, in light of all the variations present in Spanish naming conventions in the U.S., particularly

3  since the stated purpose of Name Screen is as an initial screening tool.

4      53.     It is worth noting that OFAC's own SDN search tool on its website is not calibrated

5  to consider Spanish naming conventions and may not recognize distinctions in which a Spanish

6  derived name is presented. For example, entering the name "Sergio Ramirez" into the OFAC's

7  online search tool (set to require 100% confidence in the result and to search across all countries),

8  still returns a result of "Sergio Humberto Ramirez Aguirre." (See U.S. Dep't of Treas., Resource

9  Center, SDN Search Tool, Specially Designated Nationals and Blocked Persons List Search, visited

10  Apr. 23, 2014 at http://sdnsearch.ofac.treas.gov/.)[5]

16  I declare under penalty of perjury under the laws of the United States that the foregoing is

17  true and correct. Executed this 24th day of April, 2014, at Tijeras, New Mexico.

19  _Francine Cronshaw_
    Francine Cronshaw

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

---

5   The second entry returned in 2011, Sergio Alberto Ramirez Rivera, no longer appears
27  anywhere on the list. Treasury apparently ceased considering him an SDN at some point after
    Plaintiff's transaction. No present search returns this other name.

- 19 -

LA 51749511

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

## Appendix I: Surname concentrations in Spain (contemporary)



Spanish provincial surname concentrations: Percentage of population with the ten most common surnames.  (Source: Instituto Nacional de Estadística, 2006).



Surname distribution: the most common surnames in Spain, by province of residence.

Source: Faure et al., *Diccionario de apellidos españoles* (Madrid: Calpe Espasa, 2009).

-1-

# APPENDIX II:  REFERENCES

*Albuquerque Journal*, July 28, 2013.

Arana de Love, Francisca. *Nombres propios españoles*. Barcelona: Editorial Vosgos, 1982.

*The Chicago Manual of Style 16e.* Chicago and London: The University of Chicago Press, 2010.

Cronshaw, Francine. Spanish Personal Names. *The Indexer* (United Kingdom) , Vol. 25, No. 4 (Oct. 2007).

_____. Spanish and Portuguese Names. In Noeline Bridge, (Ed.), *Indexing Names*. Information Today and American Society for Indexing, 2012.

Faure, Roberto, et al. *Diccionario de apellidos españoles* 5e. Madrid: Espasa Calpe, S.A., 2009.

Lemon, Deborah R. Traditional Hispanic Last Names. http://www.drlemon.com/Grammar/names.html#.UfvD921Cojw 8/2/2013

José y María, Rodríguez y Gómez: los nombres y apellidos más comunes de los colombianos… www.registraduria.gov.co/rev_electro/.../jose_maria.htm

Maislin, Seth. The Hurdles of Automated Name Indexing.  In Noeline Bridge, (Ed.), *Indexing Names*. Information Today and American Society for Indexing, 2012.

Music Cataloging at Yale/AACR2. Entry element for Spanish and Portuguese Surnames. http://www.library.yale.edu/cataloging/music/spanport.htm

http://nethelper.com/article/Family_name 7/21/2103

Pérez Quiñones, M. Hispanic Last Names: Why Two of Them? http://www.ece.uprm.edu/~mperez/personal/apellidos.html 3/5/2007

Platt, Lyman D.  *Hispanic Surnames and Family History*. 2e. Baltimore: Genealogical Publishing Co., Inc., 1997.

Real Academia Española. *Nueva gramática de la lengua española*. México, D. F.: ESPASA, 2010.

_____. *Ortografía de la lengua española.* México, D. F.: ESPASA, 2011.

Rodríguez, Ricardo J. *Spanish First and Last Names, 1400 – Present.* CreateSpace Independent Publishing Platform (December 22, 2010).

Ruiz-Pérez, R., E. Delgado López-Cózar, E. Jiménez-Contreras. Spanish personal name variations in national and international biomedical databases: Implications for information retrieval and bibliometric studies.  *Journal of the Medical Library Association*, (2002) 90 (4):411–430.

Smith, Elsdon C. *American Surnames*. 4e. Baltimore: Genealogical Publishing Co., Inc., 2003.

U.S. Census Bureau, The Hispanic Population: 2010. 2010 Census Briefs. 7/17/13

-1-

LA 51746743v2
LA 51749511

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

_____. Language Use in the United States: 2007. www.census.gov/prod/2010pubs/acs-12.pdf 7/17/13

_____. Language Use in the United States: 2011. www.census.gov/prod/2013pubs/acs-22.pdf 8/22/13

_____. http://www.census.gov/genealogy/www/data/2000surnames/

Univisión. 10 Hispanic Fast Facts. corporate.univision.com/the-hispanic-consumer/reports/research/ 7/17/13

Woods, Richard D. and Grace Alvarez-Altman. *Spanish Surnames in the Southwestern United States: A Dictionary*. Boston: G. K. Hall & Co., 1978.

Word, David L. and R. Colby Perkins. *Building a Spanish Surname List for the 1990's: A New Approach to an Old Problem: Population Division Working Paper No.* 13. U.S. Census Bureau, 1996.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 2 -

LA 51749511

# EXHIBIT A

Francine Cronshaw, PhD
East Mountain Editing Services
Tijeras, New Mexico
(505) 281-8422 **cronshaw@nmia.com**
**Website: www.spanishindexing.com**

**Languages**: Bilingual in English and Spanish
Diploma Superior de Español como Lengua Extranjera, Government of Spain
Excellent skills in French
Good skills in Portuguese and Italian

**Owner and Manager,** East Mountain Editing Services, 1992 to the present (full time)

Visiting Associate Professor, University of New Mexico
Latin American and Iberian Institute

**Education**

| | | |
|---|---|---|
| Postdoctoral | University of Florida | 1986–1987 |
| PhD History | University of New Mexico | 1986 |
| MA History | University of Houston | 1976 |
| BA Sociology | University of North Dakota | 1971 |

**Writing and speaking in Spanish:**
"La modernización agraria en Colombia y México," *Memoria y Sociedad* (Universidad Javeriana), Vol. 3, No. 5 (Aug. 1998), pp. 77-102.
"El problema indígena y el usuario de las drogas tradicionales en los países andinos en la primera mitad del siglo XX," *Memoria y Sociedad,* Vol. 1, No. 1 (Nov. 1995), pp. 61-75
"Jornales agrícolas y la movilidad económica, 1930–1954", XI Congreso de Historia, Bogotá, 2000
"El problema social en Colombia, 1918–1948", VIII Congreso de Historia de Colombia, Tunja, 1995
"El significado del golpe militar de 1944", VII Congreso de Historiadores Colombianos, Bucaramanga, Colombia, 1992

**Writing and speaking about indexing and academic matters in English:**
*Publishing in Spanish: A Guide for Editors and Authors*, forthcoming 2014
*Patronage Politics in Colombia*, forthcoming, 2015
\* "Spanish and Portuguese Names," in Noeline Bridge, ed., *Indexing Names* (Information Today and American Society for Indexing, 2012)
\* "From A to Zeta: A Brief Guide to Spanish-language Entries," *Keywords* (April-June 2008)
\* "Indexing Spanish Personal Names," *The Indexer* (United Kingdom), October 2007
International Indexing panel, American Society of Indexing (international) meeting, Toronto, 2006
"Reconceptualizing the Old West: A Tale of Two Indexes," in *Keywords* (journal of the American Society of Indexers) Vol. 11, No. 4 (Dec. 2003)

"Indexing Latin American History," in Towery, ed. *Indexing Specialties: History* (Medford, NJ: Information Today, Inc., 1998)
Presenter of roundtable on Indexing in Spanish, national conference of the American Society of Indexers, Indianapolis, 1999
Chair, session on Rural Culture, Western Social Science Association, Albuquerque, 1994
"The *Problema indígena* and Traditional Drug Use in the Andean Countries, 1920–1950," International Congress of Americanists, New Orleans, 1991
"Drug Billionaires and Narcopolitics in Colombia," Association of North American Colombianists, Lawrence, Kansas, 1989
"Quantifying History with Computers: An Introductory Workshop Using Peasant Wages," Southeastern Council on Latin American Studies (SECOLAS), Myrtle Beach, SC, 1989
"Teaching about Latin America using Cross-cultural Methods," Rocky Mountain Conference for Latin American Studies (RMCLAS), Fort Collins, Colorado, 1988
Chair, "Historical Population Determinants in the Valley of Mexico," Southwestern Social Science Association, Houston, 1985
 "Agrarian Modernization and Violence: A Comparison of Colombia and Mexico," XLIII International Congress of Americanists, Vancouver, 1979
 "The Problem of Agrarian Modernization in pre-Violencia Colombia," Latin American Studies Association, Houston, 1977
"Exporting Ideology: T. Lynn Smith in Colombia," *North/South, Canadian Journal of Latin American Studies*, Vol. VII, No. 13 (1982), pp. 95-109
"Political and Cultural Survey of Colombia," monograph-length study produced for Canadian International Development Agency, 1982. Headquarters rating = excellent.
Book reviews, print and online

**Professional Associations**
 American Society for Indexing (ASI)
A To Zia Indexers Chapter of ASI—founding president
Alliance Française d'Albuquerque
New Mexico Translators and Interpreters Association
Rocky Mountain Conference of Latin American Studies

**Indexing – a selected list of Spanish titles**
Argov, *Por qué los hombres se casan con cabronas* (Adams Media, 2014)
Baumeister, *Hiperactivo, impulsivo, distraído: Guía acerca del déficit atencional (TDAH) para padres, maestros y profesionales* (New York: Guilford Press, 2013)
Davis, *El humor en las novelas de García Márquez* (Edwin Mellen Press, 2012)
Restrepo, *Computadoras para todos* (New York: Vintage Español, Random House, 3e 2008, 4e 2011)
Hesperian Foundation, *Una guía comunitaria para la salud ambiental* (Berkely, CA: Hesperian, 2011)
Doyle, *Éxito comercial: Prácticas administrativas y contextos culturales* (Cengage/Heinle, 2010)
Carney, *Entre socios: Español para el mundo profesional* (McGraw-Hill, 2010)
Gutiérrez-Olmos & Jacobus, *Bienes raíces: Introducción a la profesión* 11e (Mason, OH: South-Western Cengage Learning, 2009)

Oxfam Great Britain, *El derecho a sobrevivir: el informe. El reto humanitario del siglo XXI* 1e (London: Oxfam GB, 2009)

Restrepo, *Computadoras para todos* 3e (New York: Vintage Español, Random House, 2008)

Oxfam Great Britain, *Por un mañana más seguro: Proteger a los civiles en un mundo multipolar* 1e (London: Oxfam GB, 2008)

Goldwyn, ed., *Iluminado las profundidades de las industrias extractivas: Guía para la sociedad civil sobre los ingresos de las industrias extractivas* 1e (New York: Revenue Watch International, 2008)

Chilton, *Gane la guerra interna* (Emmaus, PA: Rodale Inc., 2007)

Eisenberg et al., *Qué se puede esperar cuando se está esperando* (New York: Workman, 2006)

Faber & Mazlish, *Cómo hablar para que los adolescentes escuchen y cómo escuchar para que los adolescentes hablen* (New York: HarperCollinsRayo, 2006)

Atkins et al., *La revolución diabética del Dr. Atkins* (New York: Harper Collins Rayo Imprint, 2005)

Agatston, *El recetario de la dieta South Beach* (Emmaus, PA: Rodale, 2005)

Canfield, *Principios del éxito* (New York: Simon & Schuster, 2005)

Vázquez, Carmen Inoa, *Criando a su niño con orgullo latino* (New York: Harper Collins Rayo Imprint, 2004)

International Red Cross, *Carta Humanitaria y normas mínimas de respuesta humanitaria en casos de desastre* (Geneva, Switzerland: Project Sphere, 2004)

Olivera (ed.),  *Relatos y relaciones de Hispanoamérica colonial* (Austin: University of Texas Press, 2004)

Malesky et al., *La conexión hormonal* (Emmaus, PA: Rodale, 2004)

Agatston, *La dieta South Beach* (Emmaus, PA: Rodale, 2003)

Levy-Konesky and Daggett, *Así es*, 4e (Heinle, 2003)

Copeland et al., *Conversación y repaso: Intermediate Spanish* 7e (for Clarinda)

King and Suñer, *Gramática española: Análisis y práctica* (McGraw-Hill College, 2003)

Colina, *Translation Teaching: From Research to Classroom*  1e (McGraw-Hill, 2003)

Ávila, *El don de la timidez* (New York: Simon & Schuster, 2002)

Pinstrup-Andersen and Pandya-Lorch, *La agenda inconclusa: Perspectivas para superar el hambre, la pobreza y la degradación ambiental* (Washington, DC: International Food Policy Institute, 2002)

Van Patten et al., *Destinos*, alternative edition, 2e Workbook/Study Guides 1 & 2 (McGraw-Hill, 2002)

Stavans, Ilan, *La condición hispánica: Vistas al futuro de un pueblo* (HarperCollins Rayo imprint, 2e, 2001)

*Bautista, *Latino Wedding Planner/Viva el amor: La guía para las bodas latinas* (Simon & Schuster Firestone edition, 2001). Indexes for both English and Spanish editions.

Cobb, *Hablando de trapos sucios con la reina de la limpieza* (New York: Pocket Books, 2000)

Yeager, *La guía médica de remedios alimenticios* (Emmaus: Rodale Press, 2000)

Loeffler, *La música de los viejitos: Hispano Folk Music of the Río Grande del Norte* (Albuquerque: University of New Mexico Press, 1999). Bilingual edition

*Rodriguez, *Criando a nuestros niños: Educando a niños latinos en un mundo bicultural* (New York: Simon & Schuster, 1999). Indexed both English and Spanish editions
Foerster, *Punto y aparte* (San Francisco, CA: McGraw-Hill, Inc., 1998) R
Rodale, *Su peso ideal* (Emmaus, PA: Rodale Press, 1999)
Duke, *La farmacia natural* (Emmaus, PA: Rodale Press, 1998)
Sosa, *El sueño americano: Como los latinos pueden triunfar en los Estados Unidos* (New York: Penguin USA, 1998)
Barton, *Cocine saludablemente* (New York: Simon & Schuster, Libros en Español, 1998)
U.S. Catholic Conference, *Compartiendo la fe en el hemisferio* (Washington, DC: U.S. Catholic Conference, 1997)
Vélez, *Sigamos,* 2 vol. (San Francisco: McGraw-Hill College Div., 1997)
Spock and Rothenberg, *El cuidado de su hijo del Dr. Spock*, 6th Sp. ed. (Simon & Schuster, 1997)
Bretz et al., *Lengua* (San Francisco: McGraw-Hill, 4e, 1997)
Zolar, *El libro de reencarnación de Zolar* (New York: Simon & Schuster, 1996)
Lee, *¿Cómo te parece?* (San Francisco: McGraw Hill, 1995)
Lee and Van Patten, *¿Sabías que?* (San Francisco: McGraw Hill, 1e, 1995; 2e, 1999)
*Evangelización de la juventud hispana*, 4 vol. series in English and Spanish (Winona, Minn.: St. Mary's Press, 1994–1995)
*parallel editions in English and Spanish

**French textbooks:**
Allen & Dubreil, *Alliages culturelles* (Heinle, 1e 2013)
St. Onge, *Interaction, Langue et culture* (Heinle, 9e 2013)
Tufts, *Sur le vif* (Heinle, 6e 2013)
Anderson, *En avant* (San Francisco: McGraw-Hill, 1e 2011)
Meghardi, *Pause Café* 1e (an Francisco: McGraw-Hill, 2008)
Williams et al., *Bien vu, bien dit* 1e (San Francisco: McGraw-Hill, 2008)
Oukada et al., *Controverses* 1e (Heinle, 2005)
Terrell et al., *Deux mondes: A Communicative Approach* 5e (San Francisco: McGraw-Hill Inc., 2004)

**Scholarly and related trade titles – a selected list**
Bowles et al., *Understanding Capitalism: Competition, Command, and Change* (New York, Oxford: Oxford University Press, 2005)
Chinea, *Race and Labor in the Hispanic Caribbean* (Gainesville: University of Florida Press, 2005)
Lange and Ahlhorn, *Mission San Xavier del Bac: A Guide to Its Iconography* (Tucson: University of Arizona Press, 2004)
Pitti, *The Devil in Silicon Valley: Northern California, Race, and Mexican Americans* (Princeton and Oxford: Princeton University Press, 2003)
Dubofsky and Miller, *Derivatives: Valuation and Risk Management* (New York: Oxford University Press, 2003)
*New Catholic Encyclopedia* (2002), vols. 8 and 13
Kahler, *Leadership Selection in the Major Multilaterals* (Washington, DC: Institute of International Economics, 2001) [and many other economics titles for same publisher]
Hahn, ed., *Regional Russia in Transition* (Washington, DC: Woodrow Wilson

International Center for Scholars, 2001) [plus several dozen other titles]

Andreason, *Ethics in Social Marketing* (Washington, DC: Georgetown University Press, 2000)

Kowalski, ed. *Mesoamerican Architecture as Cultural Symbol* (New York, London: Oxford University Press, 1999)

Arnson, ed., *Comparative Peace Processes in Latin America* (Washington, DC and Stanford: Woodrow Wilson Center Press, 1999)

*Hemisfile, Perspectives on Political and Economic Trends in the Americas* (Institute of the Americas, La Jolla), vol. 1–7 cumulative index (1990–1996)

Whalley and Hamilton, *The Trading System after the Uruguay Round* (Washington, DC: Institute for International Economics, 1996)

Witt and Gonzales, *Spirit Ascendant: A Biography of Patrociño Barela* (Santa Fe, NM: Red Crane Books, 1996)

Wahlstrom and Williams, *Learning Success: Being Your Best at College & Life* (Wadsworth Publishing Company, 1995)

DiTella, *National Popular Politics in Early Independent Mexico, 1820–1847* (University of New Mexico Press, 1995)

*Belarus and Moldova* (Washington, DC: Library of Congress Country Studies, 1995)

Balderrama and Rodríguez, *Decades of Betrayal* (Albuquerque: UNM Press, 1995)

Chasteen, *Heroes on Horseback: A Life and Times of the Last Gaucho Caudillos* (UNM Press, 1995)

Jackson and Castillo, *Indians, Franciscans, and Spanish Colonization: The Impact of the Mission System on California Indians* (Albuquerque: UNM Press, 1995)

Kinsbruner, *Independence in Spanish America* (Albuquerque: UNM Press, 1994)

Andrien and Johnson, *The Political Economy of Spanish America in the Age of Revolution, 1750–1850* (Albuquerque: UNM Press, 1994)

Gómez-Quiñones, *Chicano History: A Political History of the Mexican People North of the Río Bravo from the 1600s to the 1940s* (Albuquerque: UNM Press, 1994)

López Austin, *The Myths of the Opossum: Pathways of Mesoamerican Mythology* (Albuquerque: UNM Press, 1993)

**College-level Textbooks Indexed: A Very Brief and Selected List**

Ponte & Cavenagh, *Cyberjustice: Online Dispute Resolution (ODR) for E-Commerce* (Prentice-Hall, 2004)

Tushman and Anderson, eds., *Managing Strategic Innovation and Change* (New York, Oxford: Oxford University Press, 2004)

Nemeth, *Law and Evidence: A Primer for Criminal Justice, Criminology, Law and Legal Studies* (Upper Saddle River, NJ: Prentice-Hall, 2000)

Nicholas, *Motivos de conversación: Essentials of Spanish* (San Francisco: McGraw-Hill, 2000)

Jerris, *Human Resource Management for Hospitality* (Prentice-Hall, 1998)

Schmalleger, *Criminal Law Today: An Introduction with Capstone Cases* (Prentice-Hall, 1998)

Langworthy & Davis, *Policing in America* (Prentice-Hall, 2e, 1998)

Carter & Radelet, *The Police and the Community* (Prentice-Hall, 6e, 1998)

Werner, *Interactions Access: A Communicative Grammar* (McGraw-Hill, 2e, 1997)

Medina, *Nuevos destinos* (San Francisco: McGraw-Hill, 1997)

Rosoff, *Profit without Honor: White Collar Crime and the Looting of America* (Prentice-Hall, 1997)
Bretz et al., *Lengua* (San Francisco: McGraw-Hill, 4e, 1997)
Savignon, *Communicative Competence* (McGraw-Hill, 2e, 1997)
Vélez, *Sigamos,* 2 vol. (San Francisco: McGraw-Hill, 1997)
Guiltinan, Paul & Madden, *Marketing Management* (McGraw-Hill, Inc., 6e, 1996)
*Finance* (Simon & Schuster, 1e, 1996)
Heyck, *Tradición y cambio* 1e (San Francisco: McGraw-Hill, 1e, 1996; 3e, 2004)
Wahlstrom and Williams, *Learning Success: Being Your Best at College & Life* (Wadsworth Publishing Company, 1995)
Lee and Van Patten, *¿Sabías que?* (San Francisco: McGraw Hill, 1e, 1995; 2e, 1999)

Prize Winning Books Indexed:
- ***Herbert E. Bolton Memorial Prize for best book in Latin America history 1994:*** Enrique Tandeter, *Coercion and Market: Silver Mining in Colonial Potosí, 1692–1826* (Albuquerque: University of New Mexico Press, 1993)
- ***Choice Prize for Non-fiction*** Ignacio Avellaneda, *The Conquerors of the New Kingdom of Granada* (Albuquerque: University of New Mexico Press, 1995)
- ***Spur Award for Best Western Nonfiction Biography*** Alan Rosenus, *General M.G. Vallejo and the Advent of the Americans: A Biography* (Albuquerque: University of New Mexico Press, 1995)
- ***Choice Prize for Academic Titles*** Robert H. Jackson, *Race, Caste and Status: Indians in Colonial Spanish America* (Albuquerque: University of New Mexico Press, 1997)
- ***Ralph Emerson Twitchell Award–History*** Margaret Cesa, *The World of Flower Blue: Pop Chalee* (Santa Fe: Red Crane Books, 1998)
- Natalie Milaneso, *Workers Go Shopping in Argentina: The Rise of Popular Consumer Culture* (Albuquerque: University of New Mexico Press, 2012)