**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

**EXHIBIT B**

CONFIDENTIAL: SUBJECT TO
PROTECTIVE ORDER

STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND (State Bar No. 083013)
STEPHEN J. NEWMAN (State Bar No. 181570)
BRIAN C. FRONTINO (State Bar No. 222032)
JASON S. YOO (State Bar No. 261114)
2029 Century Park East
Los Angeles, CA 90067-3086
Telephone: 310-556-5800
Facsimile: 310-556-5959
Email: lacalendar@stroock.com

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
BRUCE S. LUCKMAN (Admitted Pro Hac Vice)
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Email: bluckman@shermansilverstein.com

Attorneys for Defendant
    TRANS UNION LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SERGIO L. RAMIREZ, on behalf of himself and all others similarly situated,<br><br>              Plaintiff,<br><br>       v.<br><br>TRANS UNION, LLC,<br><br>              Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:12-cv-00632-JSC<br><br>[Assigned to the Honorable Jacqueline Scott Corley]<br><br>**REBUTTAL EXPERT WITNESS DISCLOSURE OF DEFENDANT TRANS UNION LLC** |

LA 52035113

1  **REBUTTAL EXPERT WITNESS DISCLOSURE OF DEFENDANT TRANS UNION LLC**

2      Defendant Trans Union LLC ("TransUnion") makes the following rebuttal expert witness

3  disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2):

4      1.    Jaco Sadie
       FTI Consulting
5      Senior Managing Director - Forensic & Litigation Consulting
       One Front Street
6      Suite 1600
7      San Francisco, CA 94111

8      Mr. Sadie was previously identified in TransUnion's Expert Witness Disclosures

9

10 dated November 14, 2016. Mr. Sadie may be contacted c/o Stroock & Stroock & Lavan

11 LLP, 2029 Century Park East, Suite 1800, Los Angeles, California 90067, (310) 556-5800.

12 Mr. Sadie is expected to opine as set forth in Exhibit A hereto. His rate of compensation

13 is $720 per hour.

14

15

16 Dated: January 20, 2017        STROOCK & STROOCK & LAVAN LLP
           JULIA B. STRICKLAND
17         STEPHEN J. NEWMAN
           BRIAN C. FRONTINO
18         JASON S. YOO

19         SHERMAN, SILVERSTEIN, KOHL, ROSE &
           PODOLSKY
20         BRUCE S. LUCKMAN (Admitted <u>Pro</u> <u>Hac</u> <u>Vice</u>)

21

22         By:        */s/ Stephen J. Newman*
                          Stephen J. Newman

23         Attorneys for Defendant
24             TRANSUNION LLC

25

26

27

28

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

SERGIO L. RAMIREZ, on behalf of himself and all others similarly situated,

     Plaintiff,

v.

TRANS UNION, LLC,

     Defendant.

Case No. 3:12-cv-00632-JSC

## REBUTTAL EXPERT REPORT OF JACO SADIE

_____

## CONTAINS CONFIDENTIAL BUSINESS INFORMATION
## SUBJECT TO PROTECTIVE ORDER

I.     INTRODUCTION ................................................................................................ 1

      A.     Qualifications ................................................................................ 1

      B.     Assignment .................................................................................... 1

      C.     Information Considered ................................................................ 2

      D.     Summary of Opinions ................................................................... 2

II.    BACKGROUND MATTERS ............................................................................ 4

III.   DISCUSSION OF THE FERRARI REPORT .................................................. 4

      A.     Trans Union Applied Reasonable Practices Using TU Exact Name
            Methodology During January 2011 to July 26, 2011. ....................... 4

      B.     Name-Only Matching Does Not Inevitably Lead to an Unduly High
            Number of False Positives. ............................................................. 8

      C.     The Consumer Reporting Agency's Responsibilities as it Relates to
            OFAC Compliance ......................................................................... 9

      D.     Screening Processes of Other Consumer Reporting Agencies ........ 11

      E.     End-User Responses to Potential Matches ..................................... 12

      F.     Contractual Language and Failure by Dublin Nissan ..................... 14

# I.    INTRODUCTION

## A.    Qualifications

I am a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a financial consulting firm that provides valuation, financial consulting, and dispute analysis services. I am a member of FTI's Forensic and Litigation Consulting Segment. I have significant experience relating to anti-money laundering and OFAC sanctions consulting, including interacting with clients on anti-money laundering best practices, performing anti-money laundering and OFAC sanctions compliance reviews for financial institutions, performing anti-money laundering and OFAC sanctions investigations on behalf of financial institutions and as part of governmental investigations, conducting anti-money laundering due diligence reviews relating to the buying or selling of financial institutions, providing anti-money laundering training to banks and insurance companies, and I have spoken at venues about anti-money laundering best practices. I have also performed and led fraud investigations, forensic accounting investigations, accounting malpractice matters, and breach of contract damages analyses over a wide range of industries. I have practiced in the U.S.A., Luxembourg and South Africa. This report incorporates Exhibit 1 of my Expert Report dated November 14, 2016 ("Initial Report"), which is a complete copy of my curriculum vitae, summarizing my qualifications, professional experience, and deposition and arbitration experience.

FTI Consulting charges $720 per hour for time I spend consulting and assessing documents and time that may be spent testifying related to my analysis. All fees resulting from my work are paid directly to FTI Consulting. Other professionals at FTI Consulting working under my direction on this matter have billing rates of between $465 and $570 per hour. FTI Consulting's compensation is not dependent on the outcome of this matter or my conclusions.

## B.    Assignment

I have been retained as an expert by Stroock & Stroock & Lavan LLP, counsel for Trans Union LLC ("Trans Union" or "TU"), to opine on whether, during the period January 2011 to July 26, 2011, it was reasonable and within then industry practice for Trans Union to deliver credit reports with an Office of Foreign Assets Control ("OFAC") alert utilizing Trans Union's OFAC Name Screen product, which

produces a potential match on a single SDN entry, where any combination of at least two name elements (first, middle or last) of the consumer's name, matches on a letter-for-letter basis in any order of the names in a single SDN entry ("TU Exact Name Match").

I have been asked to review the Expert Report of Mr. Erich C. Ferrari, Esq. ("Mr. Ferrari") dated November 14, 2016 (the "Ferrari Report"), and to provide an assessment and critique of his opinions and statements in this report.

## C. Information Considered

This rebuttal expert report lists various documents and information I considered in order to reach my opinions. This includes information made available by counsel for Trans Union that was produced during the discovery process in this case, as well as information that was publicly available at the time of my report, as well as the Ferrari Report.

The opinions in this report are based on currently available documents and information. I reserve the right to supplement this report and my opinions herein based on any reports and opinions provided by experts for Plaintiff, as well as any documents or information produced after the date of this report. I reserve the right to update my opinions based on any new information.

In connection with my anticipated trial testimony in this action, I may use various documents produced in this litigation that refer to, or relate to, the matters discussed in this report and my Initial Report. Although I may cite to a particular page or pages of documents in this report, such pinpoint cites are provided for clarification purposes only, and other portions of the documents and depositions cited may be relevant to my opinion in this matter. In addition, I may create or assist in the creation of certain demonstrative schedules to assist me in testifying. To date, I have yet to create such demonstrative schedules.

## D. Summary of Opinions

Below I include certain rebuttal opinions to the Ferrari Report. I discuss these in further detail under Section III of this report.

- Mr. Ferrari does not conclude that Trans Union's practice of using the TU Exact Name Match methodology during the period from January 2011 to July 26, 2011, was unreasonable.

- Mr. Ferrari incorrectly infers that the reliance on a name-only matching search methodology will inevitably lead to an unduly high number of false positives. He does not provide any analysis or statistical data to support this assertion. Mr. Ferrari provides no quantification or industry standard basis of what is considered a high number of false positives nor what would be considered an "unduly" high number of false positives.

- Mr. Ferrari incorrectly implies or concludes that OFAC literature places a responsibility on Trans Union to take certain due diligence steps to clear potential matches against the SDN list before delivering these results, along with a credit report, to the end-user of the data.

- Mr. Ferrari provides no factual support with respect to his statements that other consumer reporting agencies utilize more intensive screening algorithms or that other consumer reporting agencies are conducting manual searches of OFAC's SDN List.

- Mr. Ferrari's statement that many companies would forgo transactions with the customer rather than manually review the potential OFAC match and take the matter up to management to make a determination as to whether or not the hit was a true hit or a false positive is contradicted not only by the facts in the current matter, but also by guidance from OFAC and industry practice.

- Mr. Ferrari does not address the responsibilities of the end-user of the data under the contractual agreements or guidance provided by OFAC to clear a potential match to the SDN list, nor the failure by Dublin Nissan to take the steps as outlined in the contractual agreements and OFAC guidance as it pertains to the Ramirez transaction.

## II.    BACKGROUND MATTERS

I provided a summary of the allegations in this matter and an overview of the case background in my Initial Report.

## III.    DISCUSSION OF THE FERRARI REPORT

I have been asked to review the Ferrari Report and provide an assessment of his opinions and statements in this report. Though not meant to be all-inclusive, below are certain observations regarding Mr. Ferrari's statements and opinions. Lack of specific commentary on any of the Ferrari Report statements and opinions thereof should not be construed as agreement with opinions and statements contained therein.

### A.    Trans Union Applied Reasonable Practices Using TU Exact Name Methodology During January 2011 to July 26, 2011.

Mr. Ferrari opines that it was "incumbent upon Trans Union, LLC to utilize an algorithm that searched amongst a number of identifiers rather than solely based on a customer's name."[1] However, Mr. Ferrari does not conclude that Trans Union's practice of utilizing a TU Exact Name Match methodology during the period January 2011 to July 26, 2011, was unreasonable.

As mentioned in my Initial Report, around August 2010, Trans Union inquired whether Accuity's software could perform matching to other data elements beyond just the name[2] in the OFAC record, such as date of birth. At the time, Accuity informed Trans Union that its software could not perform this function. Accuity launched a new product, Compliance Link, in September 2011, after the close of the class period, which was capable of "multi-criteria matching."[3] ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[1] Ferrari Report, par. 28.

[2] According to the testimony of Brent Newman, the Accuity system created stop descriptors for passport numbers, cedula numbers and social security numbers. Deposition of Brent Newman, Accuity, dated December 14, 2012, pages 79 to 80.

[3] Deposition of Brent Newman, Accuity, dated December 14, 2012, pages 100 to 101.

████████████████████████████████████

████████████████████████████████████

Mr. Ferrari simply states that it was "incumbent upon Trans Union to utilize an algorithm that searched amongst a number of identifiers rather than solely based on a customer's name,"[5] but fails to address the fact that Trans Union did evaluate a tool that would search "amongst a number of identifiers" – however, Trans Union concluded that this tool would not lead to less false positives. Furthermore, Mr. Ferrari makes no mention of OFAC's own online search tool, the "Sanctions List Search," which, as mentioned in my Initial Report, does not have a date of birth search function, nor does it have a function to exclude or filter potential matches based on date of birth. This supports my conclusion that using the TU Exact Name Match methodology was a reasonable practice during the period January 2011 to July 26, 2011.

Mr. Ferrari makes a series of generalized observations regarding industry practice and appears to implicitly acknowledge that industry practice provides for instances where parties use a name-only matching methodology as part of its interdiction software. However, these statements are made with no reference to any timeframe nor does Mr. Ferrari indicate whether these products were available during the class period. Mr. Ferrari states:

- "Typically, U.S. persons will utilize algorithms in their screening software – above and beyond mere name-matching…"[6]

- "Popular screening techniques include name-matching technologies designed to compare names, aliases, dates of birth, addresses, passport numbers…"[7]

- "Generally, most third-party screening software programs employed by U.S. companies utilize a mix of identifiers…"[8]

---

[4] Deposition of Michael O'Connell, dated December 13, 2013, pages 195 to 196.

[5] Ferrari Report, par. 28.

[6] Ferrari Report, par. 26.

[7] Ferrari Report, par. 24.

Mr. Ferrari only goes as far as stating "typically," "popular" and "generally." He does not say **all** – i.e., **all** "U.S. persons…" or **all** "screening techniques…" or **all** "third-party screening software…" Thus, it appears that Mr. Ferrari would have to agree that some U.S. persons do utilize a "mere name-matching"[9] algorithm.

As I have stated in my Initial Report and based on my experience, it was reasonable and within financial industry practice for Trans Union to deliver OFAC potential match results along with a consumer's credit report to its customers based on the TU Exact Name Match logic by listing the results as a "Potential Match" during the period January 2011 to July 26, 2011.[10] This is in-line with then current industry practices as many financial institutions perform only name matching against the SDN list, with potential matches further investigated through human review by comparing other data (i.e., date of birth, citizenship information, address, etc.) reflected in the OFAC listing against the identification documents provided by the client.

Furthermore, Mr. Ferrari admits that OFAC "does not require U.S. persons to use any particular screening tool or service providers"[11] and that there are "many service providers offering a wide range of products to assist in the OFAC compliance effort."[12] Therefore, it seems that Mr. Ferrari is not suggesting that Trans Union's practice of utilizing a TU Exact Name Match methodology during the period January to July 26, 2011, was unreasonable.

Furthermore, as mentioned in my Initial Report, Trans Union wrote a letter, dated February 7, 2011, to OFAC ("OFAC Letter") in response to an inquiry from OFAC, laying out in detail the

---

[8] Ferrari Report, par. 25.

[9] Ferrari Report, par. 26.

[10] As stated in my Initial Report, Plaintiff claims that the OFAC alert delivered by Trans Union reflected the word "match" and not "potential match," but according to the declaration of Lynn Romanowski, the form of alert and credit report for Mr. Ramirez, which was not delivered directly by Trans Union, but instead was delivered to the end-user of the data by a reseller, was not in the format intended or approved by Trans Union and she concluded that the Nissan Credit Report [i.e., the credit report for Mr. Ramirez] is not a Trans Union credit report. The format of the OFAC alert appears to be in contradiction of the Technical General Announcement made in November 2010. It is my understanding that the "potential match" language would have been consistently included during the class period.

[11] Ferrari Report, par. 30.

[12] Ferrari Report, par. 30.

functionality and operation of the OFAC Name Screen product.[13] I have not seen any information to suggest that OFAC ever responded to this letter. The Ferrari Report does not address this letter.

In his general description of the types of algorithms used by screening software programs to flag potential matches against the SDN list, Mr. Ferrari states that some screening software programs use "probabilistic matching" technologies. He defines these as "technologies [that] include phonetic matching (where two different words with similar pronunciation are matched against each other) and fuzzy logic matching (where near but not exact matches are generated as hits)."[14] █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ ████████ ██

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

---

[13] February 7, 2011 letter to OFAC, Exhibit 4 to the Michael O'Connell deposition, December 13, 2013.

[14] Ferrari Report, par. 24.

[15] As stated in my Initial Report, according to testimony, OFAC Name Screen matches the text string entered by the user – usually the first, middle and last name of the consumer – to machine readable "stop descriptors" created by Accuity from the entries on the SDN list.

███████████████████████████████████████████████████

further supports my conclusion that using the TU Exact Name Match methodology was a reasonable practice during the period January 2011 to July 26, 2011.

**B.     Name-Only Matching Does Not Inevitably Lead to an Unduly High Number of False Positives.**

Mr. Ferrari incorrectly makes the inference that "[r]eliance on name-only matching on consumer credit reports will inevitably lead to an unduly high number of false positives."[16] Mr. Ferrari points to no factual support nor produced any statistical data to support this inference. Mr. Ferrari provides no quantification of what is considered a high number of false positives or even what would be considered to be an "unduly" high number of false positives. Mr. Ferrari provides no factual support or quantification that Trans Union's hit rate was higher than some industry standard. Furthermore, he provides no reference of any time frame and fails to put the statement in context of this matter and the actions Trans Union has taken subsequent to Cortez, such as eliminating the use of the Synonyms File, which reduced false positives. The evidence in this matter belies the above mentioned statement by Mr. Ferrari. In fact, as stated in my Initial Report, according to the testimony of Clint Burns, the Ramirez OFAC alert was his first and only instance of a potential match against the SDN list and according to the testimony of Annette Coito, General Manager of Dublin Nissan, she only had one prior instance where a credit report contained a potential match[17] - indicating that receiving credit reports along with OFAC alerts on potential customers was very infrequent. Furthermore, on the Ramirez OFAC alert, only two SDN potential name matches were reported based on the TU Exact Name Match methodology applied by the OFAC Name Screen. Additionally, the OFAC Letter reflects that 99.5% of Trans Union's OFAC Name Screen searches do not result in a possible match.[18] Therefore, the facts that I have reviewed in this matter do not

---

[16] Ferrari Report, par. 27.

[17] Deposition of Dublin Nissan (by Annette Coito), dated January 16, 2013, pages 34 and 35.

[18] February 7, 2011 letter to OFAC, Exhibit 4 to the Michael O'Connell deposition, December 13, 2013, pg. 3.

support the position that the TU Exact Name Match methodology resulted in an "unduly high number of false positives" during the period January 2011 to July 26, 2011.

**C.    The Consumer Reporting Agency's Responsibilities as it Relates to OFAC Compliance**

Mr. Ferrari discusses a brochure published by OFAC entitled, "OFAC Regulations For the Credit Reporting Industry," dated April 13, 2004, and states that this brochure provides guidance that "describe the responsibilities and the <u>due diligence steps that credit reporting agencies should follow</u> for the most appropriate and effective use of such information for OFAC compliance purposes."[19] (Emphasis added.) This statement is not clear, because it would be incorrect for Mr. Ferrari to imply or conclude that the "due diligence steps" as outlined in the section of the brochure, "How to Determine if a Credit Report Contains an Exact Match," is targeted at the consumer reporting agency rather than the end-user of the data provided by the consumer reporting agency. The brochure indicates that this document will be useful to credit bureaus, consumer reporting agencies, and requesters of credit information (i.e., the users of the OFAC information along with the credit reports). The brochure refers to the "due diligence steps" as the "steps outlined in this brochure [that] should be taken to verify whether it is an actual match <u>before</u> contacting OFAC…"[20] (Emphasis in original.) – making it clear that the party performing the due diligence steps is the "requester[] of credit information" (i.e., Dublin Nissan in this case).

Under the heading "How to Determine if a Credit Report Contains an Exact Match," the brochure makes it clear that the use of interdiction software, such as the Accuity software, will inevitably create "many 'false positives'." The brochure further states that, as a result, certain due diligence steps should be taken to clear the potential hit or confirm it to be a true hit, or, in other words, "to determine whether an individual applying for credit approval is indeed an individual on the SDN list and whether a warning or 'red flag' on a credit report is appropriate." This refers to the end-user of the credit report and OFAC data

---

[19] Ferrari Report, par. 33.

[20] Foreign Assets Control Regulations for the Credit Reporting Industry: How to Determine if a Credit Report Contains an Exact Match; https://www.scribd.com/document/1194632/US-Treasury-faccr

(i.e., Dublin Nissan) since Trans Union is not the party determining whether credit should be approved. Furthermore, the above statement makes it clear that OFAC expects that results from credit bureaus to the end-user of the data would include red flags. Additionally, the brochure states that "a credit bureau decides to put the text of a potential SDN 'hit' on an actual credit report…" – clearly indicating that it is expected that potential hits will be reported and therefore, it is not expected that the credit bureau clears all false positives. Indeed, Mr. Ferrari appears to acknowledge this fact in the Ferrari Report where he states that "the full text of the entry should be used (including information such as dates of birth, aliases, etc.) so that the <u>recipient</u> of the report can compare the OFAC information with that of the credit applicant."[21] (Emphasis added.)

This is further supported by another brochure issued by OFAC, "OFAC Update for Consumers: What is this Information on My Credit Report," stating:

> If there is a potential match, the credit bureaus may place a "red flag" or alert on the report. This does not necessarily mean that someone is illegally using your social security number or that you have bad credit. It is merely a reminder to the <u>person checking your credit</u> that he or she should verify whether you are the individual on one of OFAC's sanctions lists by comparing your information to the OFAC information. If you are not the individual on the sanctions list, the <u>person checking your credit</u> should disregard the OFAC alert, and there is no need to contact OFAC. However, if the <u>person checking your credit</u> believes you are the person on one of OFAC's sanctions lists, then he or she should call the OFAC Hotline to verify and report it.[22] (Emphasis added.)

Again, this makes it clear that it is the end-user of the data that would be performing the due diligence steps. Therefore, it would be incorrect for Mr. Ferrari to imply or conclude that Trans Union was responsible for determining whether Mr. Ramirez was on the SDN list or not, since that responsibility lies with Dublin Nissan.

Mr. Ferrari also states that "…U.S. companies - particularly those involved in the financial service industry, including consumer reporting agencies - utilize some form of screening process to

---

[21] Ferrari Report, par. 34.

[22] OFAC FAQ, OFAC Information on a Credit Report: What Is This OFAC Information On My Credit Report, April 11, 2005; https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_general.aspx#credit.

prevent dealings with parties listed on the SDN List and thus avoid potential civil liabilities."[23] Although this statement is factually correct, it should be clarified that the consumer reporting agency's responsibility as it relates to its compliance with OFAC and entities on the SDN list is to ensure that the consumer reporting agency itself does not engage a customer (e.g., a car dealership) that is on the SDN List. As described above, it is the entity or person who is checking the individual's credit history (i.e., Dublin Nissan, not Trans Union) who should ensure that it is not dealing with an individual or entity on the SDN list. The guidance cited by Mr. Ferrari above makes it clear that the end-user of the data has the responsibility to perform the necessary due diligence in order to confirm a hit or clear it as a false positive.

### D.     Screening Processes of Other Consumer Reporting Agencies

Mr. Ferrari provides no factual support for his statements that other consumer reporting agencies (presumably referring to Experian) "clearly" utilize "more intensive screening algorithms." [24] Simply because Experian's credit report did not reflect a potential match for Mr. Ramirez, Mr. Ferrari seems to speculate that it confirms that Experian utilizes "more intensive screening algorithms." Without further facts, one could as easily conclude that Experian's search criteria is substandard to that of Trans Union, since Experian did not even match to any name. Mr. Ferrari provided no evidence of the specific search criteria or functionality of Experian's interdiction software.

Additionally, included in the statement about other consumer reporting agencies utilizing more intensive screening algorithms, Mr. Ferrari states that "those conducting a manual search of OFAC's SDN List"[25] discovered that Mr. Ramirez was not a match to individuals listed on the SDN list. If Mr. Ferrari is implying that Experian conducted a manual search of OFAC's SDN list, he provides no factual support that Experian has done that or what search methodology would be employed by Experian.  That would be a highly unlikely scenario, since it is expected that consumer reporting agencies deliver results within

---

[23] Ferrari Report, par. 22.

[24] Ferrari Report, par. 38.

[25] Ferrari Report, par. 38.

seconds after the request was made electronically – in fact, the OFAC Letter explains that Trans Union's system "enables high volume, <u>sub-second searches</u>."[26] (Emphasis added.) Mr. Ferrari does not provide references or evidence that any party (whether Dublin Nissan, Trans Union, Experian, etc.) performed a manual search of the SDN list nor does he make it clear how conducting a manual search is relevant to Experian's search methodology. As I have explained in my Initial Report, the TU Exact Name Match search methodology automatically reduced the potential hits for Mr. Ramirez to only two individuals on the SDN list and the contractual language and the OFAC guidance ask for a manual review of this limited number of potential hits. If such a review was performed in Mr. Ramirez's case, it would have been found that the two potential hits were false positives. Therefore, Mr. Ferrari provides no basis for implying that Trans Union's TU Exact Name Match search methodology, in contrast to that of Experian during the period January 2011 to July 26, 2011, was unreasonable.

### E.     End-User Responses to Potential Matches

Mr. Ferrari makes the following broad statement for which no factual support is provided:

> As such, false positives found in broad and inaccurate reporting can cause businesses to turn away consumers because of a mistaken belief that the consumer is an SDN and that transactions with the individual are prohibited. In other words, it has been my experience that many companies would rather forgo transactions with the customer than manually review the transaction and take the matter up to management to make a determination as to whether or not the hit was a true hit or a false positive.[27]

This problematic statement includes a number of misleading, and unfounded, statements regarding how end-users deal with potential OFAC matches in credit reports, which is completely contradicted by the facts in this matter and is belied by industry practice.

First, Dublin Nissan did not turn away the business of Mr. Ramirez. In fact, Dublin Nissan continued with the sale of the car to Mr. Ramirez' wife – despite the failure by Dublin Nissan, as described in my Initial Report, to recognize that the potential matches delivered along with the credit

---

[26] February 7, 2011 letter to OFAC, Exhibit 4 to the Michael O'Connell deposition, December 13, 2013, pg. 2.

[27] Ferrari Report, par. 39.

report were false positives and should have been ignored, as described in the guidance provided by OFAC and the contractual language.

Second, this statement is completely in contrast with my experience dealing with financial institutions. Financial institutions regularly make use of credit reports and rely upon the information contained in credit reports to assess the creditworthiness of an individual. As stated in my Initial Report, it is common for financial institutions to use name-only matching search criteria when performing account opening or account renewals, as well as when reviewing daily transactions (which typically are subjected to a non-exact name-only matching logic). As a result, the financial institutions' interdiction software would generate potential hits to investigate, many of which would ultimately be determined to be false positives. If we were to believe Mr. Ferrari, financial institutions would decline to conduct further investigations upon the generation of a potential hit and instead simply walk away from a new customer or, as it relates to daily transactions, refuse to process transactions for their customers, just because the customer or party name had a potential match to the SDN list. Such a scenario is inconceivable. The materials I reviewed in this matter further belie Mr. Ferrari's statement that businesses would rather forgo a transaction with the customer than manually review the transaction and take the matter up to management to make a determination as to whether or not the hit was a true hit or a false positive. Dublin Nissan (and the other dealerships where Mr. Burns worked) incurred a cost in order to provide specific training to Mr. Burns and other employees – therefore, it is illogical to conclude that companies like Dublin Nissan, as well as financial institutions, would train their employees simply then to forgo transactions if there is a potential match against the SDN list.

Third, Mr. Ferrari provides no factual support of "broad and inaccurate reporting" of false positives – Mr. Burns testified that the Ramirez OFAC alert and credit report were his first and only instance of a potential match against the SDN list and, according to the testimony of Annette Coito, General Manager of Dublin Nissan, she only had one prior instance where a credit report contained a potential match.

Fourth, there is a reasonable expectation that any interdiction software will generate false positives. There are a number of reasons that false positives are unavoidable, but one of them is to ensure that true hits (or matches) do not go undetected because of a too stringent search methodology. In fact, the OFAC brochure "OFAC Regulations For The Credit Reporting Industry" states that there will inevitably "be <u>many</u> 'false positives'."[28] (Emphasis added.)

Fifth, many end-users of credit reports are financial institutions that are in fact experienced in reading and assessing credit reports and OFAC alerts. Many financial institutions have dedicated compliance functions where the staff receives mandatory training relating to OFAC, how to perform the necessary due diligence (or manual review) to address any potential SDN matches, and the steps to be taken to escalate instances where there appears to be a true hit against the SDN list. Mr. Ferrari provides no other instances during the class period where a consumer was denied a transaction because the TU Exact Name Match methodology delivered a false positive result.

The above reasons contradict Mr. Ferrari's statement that companies would rather forgo a transaction and not perform a manual review of a potential hit, just because the parties to a transaction potentially match to the SDN list.

### F.    Contractual Language and Failure by Dublin Nissan

In my Initial Report, I discussed the failure of Dublin Nissan and the contractual requirements as it pertains to the Ramirez transaction.[29] My Initial Report describes the requirements and responsibilities under the contractual language and makes it clear that a transaction should not be prohibited simply because there is a potential match against the SDN list, but that the end-user of the Trans Union data is expected to take additional due diligence steps. My Initial Report also makes it clear that the guidance by OFAC provides specific steps for clearing a potential match, none of which appeared to have been followed in this case by Dublin Nissan. The Ferrari Report does not address the responsibilities of Dublin

---

[28] OFAC Regulations For The Credit Reporting Industry, April 13, 2004.

[29] Initial Report sections J and K.

Nissan under the contractual language and does not address the specific steps Dublin Nissan was expected, but failed, to take as detailed in the OFAC guidance.

I reserve the right to expand upon the opinions expressed here or to amend these opinions based upon additional information received.

I declare under penalty of perjury under the laws of the United States that this document is true and correct.

Executed this 19th day of January 2017, San Francisco, California.

_____

Jaco Sadie

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

1                                  **PROOF OF SERVICE**

2     STATE OF CALIFORNIA          )

                                         )    ss

3     COUNTY OF LOS ANGELES    )

4

5          I am employed in the County of Los Angeles, State of California, over the age of eighteen years, and not a party to the within action. My business address is: 2029 Century Park East, Los Angeles, CA 90067-3086.

6

7          On January 20, 2017, I served the foregoing document(s) described as: **REBUTTAL EXPERT WITNESS DISCLOSURE OF DEFENDANT TRANS UNION LLC** on the interested parties in this action as follows:

8                                **SEE ATTACHED SERVICE LIST**

9

10    ☐    **(VIA PERSONAL SERVICE)** By causing the document(s), in a sealed envelope, to be delivered to the person(s) at the address(es) set forth above.

11

12    ☑    **(VIA U.S. MAIL)** In accordance with the regular mailing collection and processing practices of this office, with which I am readily familiar, by means of which mail is deposited with the United States Postal Service at Los Angeles, California that same day in the ordinary course of business, I deposited such sealed envelope, with postage thereon fully prepaid, for collection and mailing on this same date following ordinary business practices, addressed as set forth above.

13

14

15    ☑    **(VIA E-MAIL)** Based on a court order or an agreement of the parties to accept service by e-mail, I caused the documents to be sent to the persons at the e-mail addresses listed in the attached Service List.

16

17    ☐    **(VIA FACSIMILE)** By causing such document to be delivered to the office of the addressee via facsimile.

18

19    ☐    **(VIA OVERNIGHT DELIVERY)** By causing the document(s), in a sealed envelope, to be delivered to the office of the addressee(s) at the address(es) set forth above by overnight delivery via Federal Express, or by a similar overnight delivery service.

20

21          I declare that I am employed in the office of a member of the bar of this court, at whose direction the service was made.

22          I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

23

24          Executed on January 20, 2017, at Los Angeles, California.

25            Regina Harcourt                        */s/ Regina Harcourt*

                [Type or Print Name]                        [Signature]

26

27

28

---

REBUTTAL EXPERT WITNESS DISCLOSURE - Case No. 3:12-cv-00632-JSC

LA 52035113

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067–3086

## SERVICE LIST

Andrew J. Ogilvie, Esq.                          Attorneys for Plaintiff
Carol McLean Brewer, Esq.                   SERGIO L. RAMIREZ
ANDERSON, OGILVIE & BREWER LLP
1736 Stockton Street, Ground Floor
San Francisco, CA 94133
Email: andy@aoblawyers.com
          carol@aoblawyers.com

James A. Francis, Esq.                            Attorneys for Plaintiff
John Soumilas, Esq.                             SERGIO L. RAMIREZ
Lauren Brennan, Esq.
FRANCIS AND MAILMAN, P.C.
Land Title Building
100 South Broad Street, 19th Floor
Philadelphia, PA 19110
Email: jfrancis@consumerlawfirm.com
          jsoumilas@consumerlawfirm.com
          lbrennan@consumerlawfirm.com