STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND (State Bar No. 083013)
STEPHEN J. NEWMAN (State Bar No. 181570)
DAVID W. MOON (State Bar No. 197711)
BRIAN C. FRONTINO (State Bar No. 222032)
JASON S. YOO (State Bar No. 261114)
2029 Century Park East
Los Angeles, CA 90067-3086
Telephone: 310-556-5800
Facsimile: 310-556-5959
Email: lacalendar@stroock.com

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
BRUCE S. LUCKMAN (Admitted *Pro Hac Vice*)
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: 856-662-0700
Email: bluckman@shermansilverstein.com

Attorneys for Defendant
TRANS UNION LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| SERGIO L. RAMIREZ, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANS UNION, LLC,<br><br>Defendant. | Case No. 3:12-cv-00632-JSC<br><br>[Assigned to the Honorable Jacqueline Scott Corley]<br><br>**DEFENDANT TRANS UNION LLC'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, MOTION FOR REMITTITUR OR, IN THE ALTERNATIVE, MOTION TO ALTER OR AMEND THE JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br><u>Hearing</u><br>Date: September 28, 2017<br>Time: 9:00 a.m.<br>Place: Courtroom F |

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

**TO THE COURT, PLAINTIFF AND HIS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT**, on September 28, 2017, at 9:00 a.m., or as soon thereafter as counsel may be heard before the Honorable Jacqueline Scott Corley in Courtroom F of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, defendant Trans Union LLC ("TransUnion") will and hereby does move the Court pursuant to Federal Rules of Civil Procedure 50 and 59 for an Order granting, in whole or in part, TransUnion's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial or, in the Alternative, Motion for Remittitur or, in the Alternative, Motion to Alter or Amend the Judgment.

This Motion is made on the alternative grounds that: a reasonable jury would not have a legally sufficient evidentiary basis to find in favor of Plaintiff Sergio Ramirez ("Plaintiff") on the claims presented, or to award the statutory or punitive damages that were awarded, and so TransUnion is entitled to judgment as a matter of law, to a new trial or to a remittitur; the verdict was against the clear weight of the evidence, and so TransUnion is entitled to judgment as a matter of law, to a new trial or to a remittitur; the verdict was the result of passion and prejudice, and the improper argument of counsel, in violation of law, and so TransUnion is entitled to judgment as a matter of law, to a new trial or to a remittitur; the statutory and punitive damages were excessive, against the clear weight of the evidence and in violation of law and constitutional limitations on such damages, and/or were the result of passion and prejudice, the improper argument of counsel and/or instructional error, and so TransUnion is entitled to judgment as a matter of law, to a new trial or to a remittitur; the judgment was entered in violation of Federal Rule of Civil Procedure 23 and constitutional limitations on class actions, such as in regard to the standing of Plaintiff and class members, and in regard to sending notice to class members, and so the judgment must be altered or amended to state that it is not a class judgment, and/or otherwise to comply with the Federal Rules of Civil Procedure.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently-filed Declarations of Jason S. Yoo and David Gilbert and exhibits thereto, the pleadings and records on file herein, all matters of which the

Court may take judicial notice and such other evidence and arguments as may be presented to the Court prior to or at the hearing of this Motion.

Dated: July 19, 2017

STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND
STEPHEN J. NEWMAN
DAVID W. MOON
BRIAN C. FRONTINO
JASON S. YOO

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
BRUCE S. LUCKMAN (Admitted Pro Hac Vice)

By: */s/ Stephen J. Newman*
Stephen J. Newman

Attorneys for Defendant
TRANS UNION LLC

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........ 1
II. FACTS ........ 2
  A. TransUnion's Name Screen Product ........ 2
  B. TransUnion's Response to the Cortez Decision ........ 4
  C. The Dublin Nissan Credit Report ........ 6
  D. Disclosure of OFAC Information to Plaintiff ........ 7
  E. Damages ........ 8
  F. The Verdict and Its Relationship to TransUnion's Economic Activity ........ 9
III. ARGUMENT ........ 9
  A. Legal Standards ........ 9
    1. Standard on a Motion for Judgment as a Matter of Law ........ 9
    2. Standard on a Motion for New Trial or to Alter or Amend a Judgment ........ 10
  B. Plaintiff Failed to Present Sufficient Evidence That TransUnion Willfully Violated the Requirement of § 1681e(b) to Employ Reasonable Procedures to Assure Maximum Possible Accuracy of the Information in Class Members' Credit Reports ........ 10
  C. Plaintiff Failed to Present Sufficient Evidence That TransUnion Willfully Violated the Requirement of § 1681g(a) and (c)(2) to Provide All Information in Class Members' Credit Files and a Statement of Their FCRA Rights ........ 16
  D. A New Trial Should Be Ordered Because of Counsel's Improper Arguments ........ 19
  E. The Jury's Awards of Statutory and Punitive Damages Are Excessive and Should Be Reduced Significantly, or a New Trial Should Be Ordered ........ 22
    1. Statutory Damages Are Excessive in Light of the Lack of Evidence of Harm to the Class and the Lack of Evidence That the Legal Requirements for Post-Cortez Compliance Were Abundantly Clear ........ 22
    2. The Jury's Award of Punitive Damages Is Excessive and Should Be Eliminated or Reduced Significantly, or a New Trial Should Be Ordered ........ 24
      a. Any Award of Punitive Damages Here Would Be Excessive ........ 24

- i -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

b. A New Trial on Punitive Damages Should Be Ordered Because the Jury Was Not Properly Instructed on the Proper Legal Standard .......... 27

c. The Punitive Damages Should At Least Be Reduced Substantially, Or a New Trial on Punitive Damages Should Be Ordered .......... 28

F. The Judgment Should Be Altered or Amended to Conform to Rule 23 .......... 31

a. The Evidence Does Not Support Entry of Any Class Judgment .......... 31

b. Persons Known With Certainty Never to Have Received Notice Should Be Omitted From the Class, and the Judgment Should be Corrected to Reflect the Proper Number of Class Members .......... 34

c. The Judgment Does Not Comply With Rule 23(c)(3)(B) .......... 35

IV. CONCLUSION .......... 35

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Acton v. Bank One Corp.,
293 F. Supp. 2d 1092 (D. Ariz. 2003) ........ 28

Amchem Prods., Inc. v. Windsor,
521 U.S. 591 (1997) ........ 34

Anheuser-Busch, Inc. v. Nat'l Beverage Distribs.,
69 F.3d 337 (9th Cir. 1995) ........ 19

Ashby v. Farmers Ins. Co.,
592 F. Supp. 2d 1307 (D. Or. 2008) ........ 23, 26

Bach v. First Union Nat'l Bank,
486 F.3d 150 (6th Cir. 2007) ........ 1, 11, 24, 29

Bakker v. McKinnon,
152 F.3d 1007 (8th Cir. 1998) ........ 28

Bateman v. Am. MultiCinema, Inc.,
623 F.3d 708 (9th Cir. 2010) ........ 25

Beeman v. Burling,
216 Cal. App. 3d 1586 (Cal. App. Ct. 1990) ........ 25

Benton v. United States,
188 F.2d 625 (D.C. Cir. 1951) ........ 9

BMW of N. Am., Inc. v. Gore,
517 U.S. 559 (1996) ........ 25

Boerner v. Brown & Williamson Tobacco Co.,
394 F.3d 594 (8th Cir. 2005) ........ 25

Byrd v. Blue Ridge Rural Elec. Co-op., Inc.,
356 U.S. 525 (1958) ........ 10

Carvalho v. Equifax Info. Servs., LLC,
629 F.3d 876 (9th Cir. 2010) ........ 12

Cortez v. Trans Union, LLC,
617 F.3d 688 (3d Cir. 2010) ........ *passim*

Cortez v. Trans Union, LLC,
No. CIV.A.05-CV-05684JF, 2007 WL 2702945 (E.D. Pa. Sept. 13, 2007) ........ 4

Cox v. TeleTech@Home, Inc., No. 1:14-CV-00993, 2015 WL 500593 (N.D. Ohio Feb. 5, 2015) ....................................32

Davenport v. Sallie Mae, Inc., 124 F. Supp. 3d 574, 584 (D. Md. 2015)....................................28

Davis v. Chase Bank U.S.A., N.A., No. CV 06-04804 DDP PJWX, 2013 WL 169868 (C.D. Cal. Jan. 16, 2013)....................................32

Del Monte Dunes v. City of Monterey, 95 F.3d 1422 (9th Cir. 1996) ....................................10

In re Del-Val Fin. Corp. Sec. Litig., 154 F.R.D. 95 (S.D.N.Y. 1994)....................................35

Dickens v. Trans Union Corp., 18 F. App'x 315 (6th Cir. 2001)....................................13

DirecTV, Inc. v. Cantu, No. SA-04-CV-136-RF, 2004 WL 2623932 (W.D. Tex. Sept. 29, 2004) ....................................25

Dreher v. Experian Information Solutions, Inc., 856 F.3d 337 (4th Cir. 2017) ....................................33

Edeh v. Equifax Info. Servs., LLC, 974 F. Supp. 2d 1220 (D. Minn. 2013) ....................................28

Educ. Testing Servs. v. Katzman, 670 F. Supp. 1237 (D.N.J. 1987)....................................25

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) ....................................34

Exxon Shipping Co. v. Baker, 554 U.S. 471 (2008) ....................................24, 31

In re Farmers Ins. Co., Inc., FCRA Litig., 738 F. Supp. 2d 1180 (W.D. Okla. 2010)....................................23

Fuges v. Sw. Fin. Servs., Ltd., 707 F.3d 241 (3d Cir. 2012) ....................................18

Gathers v. CAB Collection Agency, Inc., No. 3:17CV261-HEH, 2017 WL 2703686 (E.D. Va. June 22, 2017)....................................34

Globefill, Inc. v. Elements Spirits, Inc., 640 F. App'x 682 (9th Cir. 2016)....................................19

Gohman v. Equifax Info. Servs., LLC, 395 F. Supp. 2d 822 (D. Minn. 2005) ....................................27

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147 (9th Cir. 2009) .......... 12

Halo Elecs., Inc. v. Pulse Elecs., 136 S. Ct. 1923 (2016) .......... 15

Hanson v. Shell Oil Co., 541 F.2d 1352 (9th Cir. 1976) .......... 10

Henderson v. Trans Union, LLC, No. 3:14-CV-00679-JAG, 2017 WL 1734036 (E.D. Va. May 2, 2017) .......... 16, 18

Hern v. Intermedics, Inc., 210 F.3d 383, 2000 WL 127123 (9th Cir. 2000) .......... 21

Holmes v. Contract Callers, Inc., No. 3:17CV148-HWH, 2017 WL 2703685 (E.D. Va. June 22, 2017) .......... 33

In re Hulu Privacy Litig., No. C 11-03764 LB, 2014 WL 2758598 (N.D. Cal. June 17, 2014) .......... 23

Jones v. United Parcel Serv., Inc., 674 F.3d 1187 (10th Cir. 2012) .......... 29

Kehr v. Smith Barney, Harris Upham & Co., 736 F.2d 1283 (9th Cir. 1984) .......... 19

Lambert v. Nutraceutical Corp., No. ED CV 13-05942-AB, 2015 WL 12655392 (C.D. Cal. June 24, 2015) .......... 35

Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365 (9th Cir. 1987) .......... 10

Leathers v. Gen. Motors Corp., 546 F.2d 1083 (4th Cir. 1976) .......... 19

Leavey v. Unum Provident Corp., 295 F. App'x 255 (9th Cir. Oct. 6, 2008) .......... 31

Lee ex rel. Lee v. Borders, 764 F.3d 966 (8th Cir. 2014) .......... 31

Marcus v. BMW of N. Am., LLC, 687 F.3d 583 (3d Cir. 2012) .......... 32

Maricopa Cty. v. Maberry, 555 F.2d 207 (9th Cir. 1977) .......... 21

Masson v. New Yorker Magazine, Inc., 85 F.3d 1394 (9th Cir. 1996) .......... 10, 27

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- v -

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

Maynard v. City of San Jose,
37 F.3d 1396 (9th Cir. 1994) .......... 9

Medellin v. IKEA U.S.A. West, Inc.,
672 F. App'x 782 (9th Cir. 2017) .......... 33

Minneapolis, St. P. & S. S. M. Ry. Co. v. Moquin,
283 U.S. 520 (1931) .......... 19

Morgan v. New York Life Ins. Co.,
559 F.3d 425 (6th Cir. 2009) .......... 25

Murray v. GMAC Mortg. Corp.,
434 F.3d 948 (7th Cir. 2006) .......... 22

Murray v. New Cingular Wireless Servs., Inc.,
523 F.3d 719 (7th Cir. 2008) .......... 16

Nicklaw v. Citimortgage, Inc.,
839 F.3d 998 (11th Cir. 2016) .......... 33

O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,
420 F. Supp. 2d 1070 (N.D. Cal. 2006) .......... 10

On Davis v. The Gap, Inc.,
246 F.3d 152 (2d Cir. 2001) .......... 26

Ondrisek v. Hoffman,
698 F.3d 1020 (8th Cir. 2012) .......... 31

Parker v. Time Warner Entm't Co., L.P.,
331 F.3d 13 (2d Cir. 2003) .......... 22, 25

Phillips Petroleum Co. v. Shutts,
472 U.S. 797 (1985) .......... 34

Phillips v. Grendahl,
312 F.3d 357 (8th Cir. 2002) .......... 27, 28

Phillips v. Netblue, Inc.,
No. C05-4401 SC, 2006 WL 3647116 (N.D. Cal. Dec. 12, 2006) .......... 25

Pinner v. Schmidt,
805 F.2d 1258 (5th Cir. 1986) .......... 22, 27

In re Prudential-Bache Energy Income P'ships Sec. Litig.,
No. MDL 888, 1995 WL 263879 (E.D. La. May 4, 1995) .......... 35

Riley v. Equifax Credit Info. Servs.,
194 F. Supp. 2d 1239 (S.D. Ala. 2002) .......... 27

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Roy v. Volkswagen of Am., Inc., 896 F.2d 1174 (9th Cir. 1990) .......... 10

S.E.C. v. Todd, 642 F.3d 1207 (9th Cir. 2011) .......... 9

Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47 (2007) .......... 11, 15, 18, 27

Shaw v. Experian Info. Sols., Inc., No. 13-CV-1295 JLS (BLM), 2016 WL 5464543 (S.D. Cal. Sept. 28, 2016) .......... 13

Silberman v. Innovation Luggage, Inc., No. 01 CIV. 7109 (GEL), 2003 WL 1787123 (S.D.N.Y. Apr. 3, 2003) .......... 26

Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301 (9th Cir. 1990) .......... 22, 24

Smith v. Bank of Am., N.A., No. 15-55674, 2017 WL 631696 (9th Cir. Feb. 16, 2017) .......... 33

Smith v. LexisNexis Screening Sols., Inc., 837 F.3d 604 (6th Cir. 2016) .......... 11

Soutter v. Equifax Info. Servs., LLC, 498 F. App'x 260 (4th Cir. 2012) .......... 32

Spokeo, Inc. v. Robins, 136 S. Ct. 1540 (2016) .......... 34

St. Louis, Iron Mt. & S. Ry. Co. v. Williams, 251 U.S. 63 (1919) .......... 22

Standard Oil Co. v. Perkins, 347 F.2d 379 (9th Cir. 1965) .......... 20

State Farm Mut. Auto. Ins. Co v. Campbell, 538 U.S. 408 (2003) .......... 24, 29

Toliver v. Experian Info. Solutions, Inc., 973 F. Supp. 2d 707 (S.D. Tex. 2013) .......... 13

Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645 (2017) .......... 32, 33

In re Toys R Us-Del., Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig., 295 F.R.D. 438 (C.D. Cal. 2014) .......... 22

Turley v. ISG Lackawanna, Inc., 774 F.3d 140 (2d Cir. 2014) .......... 31

- vii -

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

TVT Records & TVT Music, Inc. v. The Island Def Jam Music Grp., 262 F. Supp. 2d 185 (S.D.N.Y. 2003) ........ 26

United States v. Citrin, 972 F.2d 1044 (9th Cir. 1992) ........ 22

Vanderbilt Mortg. & Fin., Inc. v. Flores, 692 F.3d 358 (5th Cir. 2012) ........ 25

Wallace v. City of San Diego, 479 F.3d 616 (9th Cir. 2007) ........ 9

Zimmerman v. City of Oakland, 255 F.3d 734 (9th Cir. 2001) ........ 10

**Statutes**

15 U.S.C. § 1681(b) ........ 1

15 U.S.C. § 1681e(b) ........ *passim*

15 U.S.C. § 1681g ........ 33

15 U.S.C. § 1681g(a) ........ 16, 17, 18, 19

15 U.S.C. § 1681g(c) ........ 17

15 U.S.C. § 1681g(c)(2) ........ 16, 17

15 U.S.C. § 1681h(a)(2) ........ 8, 17

15 U.S.C. § 1681h(b)(2)(B) ........ 8

15 U.S.C. § 1681i ........ 8

15 U.S.C. § 1681k ........ 16, 18

15 U.S.C. § 1681m ........ 16

15 U.S.C. § 1681n(a)(1)(A) ........ 31

15 U.S.C. § 1681n(a)(2) ........ 9

15 U.S.C. § 1681n(b) ........ 31

15 U.S.C. § 1681s(a)(2)(A) ........ 31

17 U.S.C. § 504(c)(2) ........ 26

Fair Credit Reporting Act ........ *passim*

- viii -

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Fair Debt Collection Practices Act ........................................ 33

USA PATRIOT Act ........................................ 2, 6

**Rules**

Fed. R. Civ. P. 23 ........................................ 2, 31, 34, 35

Fed. R. Civ. P. 23(a) ........................................ 32

Fed. R. Civ. P. 23(a)(3) ........................................ 31

Fed. R. Civ. P. 23(b)(3) ........................................ 33

Fed. R. Civ. P. 23(c) ........................................ 34

Fed. R. Civ. P. 23(c)(2) ........................................ 34, 35

Fed. R. Civ. P. 23(c)(3)(B) ........................................ 35

Fed. R. Civ. P. 23(d) ........................................ 34

Fed. R. Civ. P. 24(a)(2) ........................................ 32

Fed. R. Civ. P. 50(a) ........................................ 9

Fed. R. Civ. P. 50(a)(1) ........................................ 9

Fed. R. Civ. P. 50(b) ........................................ 10

Fed. R. Civ. P. 59 ........................................ 10

Fed. R. Civ. P. 59(a) ........................................ 10

Fed. R. Civ. P. 59(c) ........................................ 9

Fed. R. Civ. P. 59(e) ........................................ 10, 31

Fed. R. Civ. P. 60 ........................................ 9

Fed. R. Evid. 103(d) ........................................ 21

Fed. R. Evid. 403 ........................................ 7, 21

**Constitutional Provisions**

U.S. Const. Art. III ........................................ 32, 33

**Other Authorities**

40 Years of Experience with the Fair Credit Reporting Act, FTC Staff Summary of Interpretations of the Fair Credit Reporting Act (July 2011) ........................................ 17

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

CFPB Examination Procedures: Consumer Reporting Larger Participants, Sept. 2012, http://files.consumerfinance.gov/f/201209_cfpb_Consumer_Reporting_Examination_Procedures.pdf ..... 17

FTC Franchise Rule Compliance Guide, https://www.ftc.gov/system/files/documents/plain-language/bus70-franchise-rule-compliance-guide.pdf ..... 18

FTC Issues Final Rule Amendments Related to the E-Warranty Act, https://www.ftc.gov/news-events/press-releases/2016/09/ftc-issues-final-rule-amendments-related-e-warranty-act ..... 17

FTC, Report to Congress Under Sections 318 and 319 Under the Fair and Accurate Credit Transactions Act of 2003 (Dec. 2004) ..... 12

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Defendant TransUnion LLC ("TransUnion") requests that the Court set aside or amend the judgment in favor of plaintiff Sergio Ramirez ("Plaintiff") and the class, which awards an unprecedented sum to a class that sustained no measurable harm from the practices at issue here. The evidence supports neither the massive verdict nor the liability findings underlying it.

***First***, the evidence does not support a finding that TransUnion willfully violated the Fair Credit Reporting Act ("FCRA"). TransUnion's witnesses testified in detail and without contradiction that prior to the class period they made objectively reasonable efforts to comply with the FCRA, in response to the appellate ruling in Cortez v. Trans Union, LLC, 617 F.3d 688 (3d Cir. 2010). Plaintiff argued that TransUnion did not do enough to comply with Cortez, but the evidence showed no willful violation of the FCRA or any particular mandate of Cortez. To the contrary, the evidence showed that TransUnion was mindful of Cortez and employed "reasonable procedures for meeting the needs of commerce for consumer credit." See 15 U.S.C. § 1681(b). No substantial evidence showed that TransUnion willfully violated any clear legal guidance, harmed the class or even exposed the class to any material risk of harm.

***Second***, the damages awarded—both statutory and punitive—were grossly excessive and so disproportionate to the lack of actual impact on the class as to shock the conscience. Plaintiff made no attempt to prove that 8,184 of 8,185 class members suffered any injury ***at all***. Moreover, because TransUnion changed its practices years ago, no allegedly violative conduct remains to be deterred. The jury's $8.1 million statutory damages award vastly exceeds any appropriate measure of punishment and deterrence for conduct that was not proved to cause any actual harm.

Yet the jury did not stop with its outsized statutory damages award; it then piled on more than *$50 million* in punitive damages—again, for practices that Plaintiff never even tried to prove caused any class member any concrete injury. The total award of more than $60 million is grossly disproportionate not only to the (complete lack of) evidence of harm, but also to TransUnion's economic activity during the class period, hugely exceeding TransUnion's gross revenue from Name Screen sales for all of 2011, the relevant year, by a factor of nearly thirty to one, and greatly

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

exceeding TransUnion's profits for ***all*** of its economic activity in 2011.

Both the statutory and the punitive damages awards are unduly punishing and cannot be justified on either compensatory or deterrence grounds, but the punitive damages award is particularly egregious and unconstitutionally excessive, constituting impermissibly duplicative punishment. Statutory damages are intended, at least in part, to serve the same punishment and deterrence ends as punitive damages. Thus, when statutory damages are awarded to every member of the class of individuals potentially injured by the relevant conduct, no punishment or deterrence is left to achieve. That is particularly true here, where the plaintiff made no attempt to prove that the class suffered any concrete injury, thus leaving the statutory damages award explained only in terms of punishment and deterrence, rather than compensation. Imposing ***any*** punitive damages on top of class-wide statutory damages thus created a grave risk of impermissible overlap, and the punitive damages verdict ***six-and-a-half times*** larger than the statutory damages award shows that this "risk" became a certainty. Such a massive award cannot be understood as anything other than the product of a jury inflamed by passion, prejudice, and rampant improper arguments by Plaintiff's counsel. At a minimum, TransUnion is entitled to a remittitur or a new trial on damages.

***Third***, the evidence did not support the class certification theory here, and thus the judgment does not comply with Rule 23. The evidence shows that Plaintiff's claim was highly atypical of the class. Moreover, no evidence was presented to show that class members sustained any concrete injury. Many class members also were never given notice of these proceedings.

The evidence and the law do not support the judgment as entered, and it should be set aside.

## II. FACTS

### A. TransUnion's Name Screen Product

TransUnion launched the initial version of its Name Screen product in 2002, which was intended to help lenders conduct preliminary data screens of the U.S. Treasury's Office of Foreign Assets Control ("OFAC") Specially Designated Nationals ("SDN") list to ease their USA PATRIOT Act compliance burden. (Trial Tr. (O'Connell) 459:24-460:10.)

Critically, the evidence at trial, including the testimony of both parties' experts, established that "interdiction software" products like Name Screen are simply not used to make credit

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

decisions or to determine conclusively that an individual is on the SDN list. (Trial Tr. (Sadie) 622:5-623:6, (Ferrari) 430:9-25.) Rather, as even Plaintiff's expert, Erich Ferrari, confirmed, because of the length and complexity of the SDN list, lenders understand that such products are to be used only as a "first line of defense" in identifying "possible" matches to list data, which then must be confirmed with further human analysis. (Trial Tr. (Ferrari) 430:9-25.) Because it was intended to be only the first step in a compliance review process, using a name-only screening technology was appropriate and did not risk material harm to consumers. (Trial Tr. (Sadie) 625:23, 626:18, 636:6-637:11; see also id. at 620:1-624:12.)

TransUnion did not develop the Name Screen product itself, but instead contracted with a third-party vendor, Accuity. (Trial Tr. (Gill) 306:15-17.) As explained by TransUnion Vice President of Product Development Michael O'Connell, TransUnion chose Accuity because "Accuity was the most widely-used software by financial institutions at the time" and it was "the best that was out there." (Trial Tr. (O'Connell) 500:1-20.) Colleen Gill, TransUnion's former Director of Product Development and Management, also noted Accuity's "very high level clearance and endorsement by the American Bankers Association" and that "they ha[d] been doing all types of financial services compliance for a very long time." (Trial Tr. (Gill) 341:24-342:10.)

The Accuity software used name-only matching technology. (Trial Tr. (O'Connell) 463:1-8.) Long before the class period, TransUnion renamed the product "Name Screen" to indicate that it screened only by name. (Trial Tr. (Gill) 341:6-10.) The evidence showed, without contradiction, that the limited nature of interdiction software, and its appropriate use, was communicated repeatedly to end-users. (Trial Tr. (Gill) 353:5-11, (Sadie) 627:16-628:16, 640:19-641:19.) Indeed, TransUnion's expert, Jaco Sadie, testified that during the January to July 2011 class period, financial institutions regularly used interdiction software only in the limited manner expressly directed by TransUnion. (Trial Tr. (Sadie) 623:7-624:12.) And the documentary evidence confirmed this expert testimony. With respect to Dublin Nissan in particular, the dealer's contract for OFAC screening expressly stated that an OFAC name "match" was "merely a message that the consumer may be listed" and did not indicate that the consumer was actually on the OFAC list:

- 3 -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

> Client acknowledges that such an indicator is merely a message that the consumer may be listed on one or more U.S. government-maintained lists of persons subject to economic sanctions, and Client further certifies that in the event that a consumer's ***name*** matches a ***name*** contained in the information, it will contact the appropriate government agency for confirmation and instructions. Client understands that a "match" ***may or may not apply*** to the consumer whose eligibility is being considered by Client, and that in the event of a match, Client should not take any immediate adverse action in whole or in part until Client has made such further investigations as may be necessary (i.e., required by law) or appropriate (including consulting with its legal or other advisors regarding Client's legal obligations).

(Trial Tr. (Coito) 279:20-282:8 & Ex. 42 § G.1 at 042-007 (emphasis added).)

**B. TransUnion's Response to the Cortez Decision**

In October 2005, Sandra Cortez sued TransUnion for alleged violations of the FCRA arising from TransUnion's reporting to a third party that Cortez's name was a "match" to a similar name ("Sandra Cortes") on the OFAC list, and for not disclosing this to her when she requested a copy of her credit file. In April 2007, a jury found in favor of Cortez, and the decision was affirmed by the Third Circuit in 2010. See Cortez v. Trans Union, LLC, No. CIV.A.05-CV-05684JF, 2007 WL 2702945, at *2 (E.D. Pa. Sept. 13, 2007), aff'd, 617 F.3d 688 (3d Cir. 2010).[1]

After the Cortez jury verdict, and while the appeal was pending, TransUnion used a "rules feature" within Accuity's product to reduce the hit rate from the approximately 5% delivered in its "off-the-rack" state, to a rate of 1%, which was lower than what others delivered. (Trial Tr. (O'Connell) 493:15-494:1, 494:18-21.) It was significantly lower than the 20% hit rate described by Plaintiff's witness, Ferrari, as concerning. (Trial Tr. (Ferrari) 429:14-25.)

In 2010, before the class period here began, TransUnion changed OFAC header language on reports that it sold from "input name matches" to "input name is potential match." (Trial Tr. (Gill) 350:25-352:23; ECF No. 303-1 at 3-6 (Acharya), Ex. 62.)[2] The change was announced widely to Name Screen resellers and users. (Trial Tr. (Gill) 352:20-353:10, Ex. 70.) TransUnion

---

[1] The Third Circuit affirmed jury findings that TransUnion negligently failed to maintain reasonable procedures to assure maximum possible accuracy in reporting the "match" and willfully failed to disclose information about the reported "match" to Cortez. See Cortez, 617 F.3d at 705.

[2] Ruling on post-trial motions, the Cortez trial court noted, "It may well be that the defendant could have escaped liability if it merely reported that the plaintiff's name was (arguably) similar to a name on the OFAC list" rather than reporting plaintiff's name as a "match." Cortez, 2007 WL 2702945, at *1. The Third Circuit similarly observed, "The alert on Cortez's credit report does not state that the names are 'similar' to someone on the SDN List or that a match is 'possible.' It reported a 'match' with someone on the SDN List." Cortez, 617 F.3d at 708-09.

- 4 -

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

also developed a disclosure letter for consumers whose names were considered to be a potential match to an OFAC-listed name. (Trial Tr. (Katz) 585:19-585:25, Ex. 3.) In addition, TransUnion expanded upon and refined its procedure whereby consumers could dispute the delivery of an OFAC result and block future results. (Trial Tr. (O'Connell) 501:1-5, (Briddell) 771:14-772:20.)

Steven Katz, TransUnion's Vice President of Consumer Affairs and Operations at the time, contributed to drafting the OFAC letter and testified that TransUnion "wanted to inform the consumer as much as possible about why they were receiving the letter and we felt that this explained as much as possible about how the information might be used by a potential lender in the process that they might be asked to go through once the lender or creditor had received that information." (Trial Tr. (Katz) 590:17- 590:22.) In response to the OFAC letter, more consumers contacted TransUnion and were able to successfully block OFAC results from appearing on their TransUnion reports. (Trial Tr. (Briddell) 785:5-10, 810:4-8.) No evidence showed that ***any*** class members failed to understand the information provided.

TransUnion also improved its accuracy rate by demanding that Accuity cease use of a "Synonyms" file, which returned "matches" between names with different spellings (such as the Cortez/Cortes match in Cortez). (Trial Tr. (O'Connell) 474:7-9; ECF No. 303-1 at 15-17 (Newman).) Ceasing use of the "Synonyms" file reduced the hit rate to one-half of one percent. (Trial Tr. (O'Connell) 494:18-21.) Mr. O'Connell testified that, to the best of his knowledge, the post-Cortez Name Screen product had the lowest false positive rate of any OFAC software on the market. (Trial Tr. (O'Connell) 505:4-6.) It also produced a lower hit rate than is achieved today with OFAC's website search tool, which recommends "fuzzy logic" match techniques. (Trial Tr. (Sadie) 649:4-650:15, Ex. 79.) No evidence showed that any other interdiction software achieved a lower hit rate on a statistical basis or would not have delivered data as to this class. To the contrary, although Plaintiff ***argued*** that TransUnion could have used date-of-birth filtering technology during the class period (Trial Tr. (O'Connell) 487:18-23, 839:6-840:2), argument is not evidence, and no evidence showed that this was reasonable or even feasible in 2011, let alone that it would have led to different reporting as to every member of the class. Rather, TransUnion's expert witness testified that in 2011 it was not standard financial industry practice to use date-of-

birth filtering to reduce the amount of data receiving human review. (See Trial Tr. (Sadie) 621:8-13.) Nor does OFAC's website search tool permit date-of-birth filtering. (See Ex. 79.)

**C. The Dublin Nissan Credit Report**

In February 2011, Plaintiff and his wife visited Dublin Nissan to purchase a car. (Trial Tr. (Ramirez) 141:2-4.) Plaintiff's wife was intended to be the primary driver of the vehicle. (Trial Tr. (Ramirez) 160:7-8.) Plaintiff's wife filled in Plaintiff's name on a joint credit application, which both she and Plaintiff signed, providing Plaintiff's name as simply "Sergio Ramirez," leaving a blank space on the part of the form requesting a middle name. (Trial Tr. (Ramirez) 162:6-13, Ex. 43.) The dealer used Plaintiff's information to obtain data about him through a third-party data aggregator. (Trial Tr. (Ramirez) 142:21-143:6.) A report provided to the dealer by the aggregator via a reseller of TransUnion data included a "SPECIAL MESSAGES" section that included several lines reading: "***OFAC ADVISOR ALERT – INPUT NAME MATCHES NAME ON THE OFAC DATABASE," followed by two names and the information from the OFAC list to allow the user to complete its PATRIOT Act compliance process and clear the applicant. (Ex. 1.) Each of the OFAC names delivered contained "Sergio" as one of the subject's two given names and "Ramirez" as one of the subject's two surnames. (Trial Tr. (Ramirez) 146:9-14, Ex. 1, (O'Connell) 469:1-18.) When the salesperson informed Plaintiff of the results, Plaintiff "asked him to double check and he just wouldn't." (Trial Tr. (Ramirez) 147:16-18.) This was contrary to the dealership's policy, to training the salesperson had received, to contractual limitations on the use of Name Screen data and to instructions set forth on OFAC's website. (Trial Tr. (Coito) 251:22-252:2, 263:9-25, 276:9-18, 281:21-282:8, (O'Connell) 518:20-519:15, 520:25-521:16, Exs. 42, 74.) Instead, rather than follow a formal process of clearing Plaintiff, the salesperson took the informal shortcut of resubmitting the transaction with Plaintiff's wife as the sole purchaser. (Trial Tr. (Ramirez) 147:24-148:8.) Plaintiff believed that the salesperson "just wanted to sell the car" and "obviously knew" that he was not on the list. (Trial Tr. (Ramirez) 147:18-23.)

Although the Dublin Nissan credit report was often referred to at trial by Plaintiff's counsel as a "TransUnion credit report," the Dublin Nissan report was not prepared by TransUnion. TransUnion Senior Vice President Peter Turek explained that Dublin Nissan obtained Plaintiff's

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

credit report via a reseller, Open Dealer Exchange ("ODE"). (Trial Tr. (Turek) 747:23-748:20.) The Dublin Nissan report differed significantly from the authorized TransUnion report format in use at the time, including (among several other variations) the lack of the new "potential match" language. (ECF No. 303-1 at 55-56 (Lytle), Ex. 93.) Mr. Turek also confirmed that, beginning in 2010, resellers like ODE were required to describe Name Screen results as "potential matches" rather than "matches," and that he was unaware of any other resellers that failed to include the mandatory "potential match" language added in 2010. (Trial Tr. (Turek) 747:13-747:22.) No evidence was presented at trial establishing that anyone other than Dublin Nissan received a report that lacked the post-Cortez "potential match" language, or that any report other than Plaintiff's report failed to include this change.[3]

At trial, the parties stipulated to the following facts:

> The class certified by the Court contains 8,185 consumers. Out of 8,185 consumers in the class, Name Screen data was delivered to a potential credit grantor with respect to 1,853 consumers during the class period of January 1, 2011 through July 26, 2011.
>
> Out of the 1,853 consumers for whom Name Screen data was delivered to a potential credit grantor, 40—that's four zero—were delivered via the reseller ODE or one of its affiliates during the class period of January 1, 2011 through July 26, 2011.

(ECF No. 289; see Trial Tr. 402:3-8.)

**D. Disclosure of OFAC Information to Plaintiff**

After his experience at Dublin Nissan, Plaintiff telephoned TransUnion. (Trial Tr. (Ramirez) 150:20-24.) In response to that telephone call, TransUnion mailed to Plaintiff his traditional credit information in the format of a personal credit report, and a separate letter disclosing to him that his name was considered to be a potential match to the OFAC list. (Trial Tr.

[3] The witness from the company that provided Dublin Nissan's dealer management systems, DealerTrack, corroborated that to retrieve credit data, its system merely passes along the "credit bureau codes" provided to it by the dealer. (Trial Tr. (Vale) 213:17-214:5.) This witness had no knowledge of the actual codes that were input, and no documentary evidence was presented to show what codes were input. (Trial Tr. (Vale) 235:10-12.) No evidence contradicted TransUnion's evidence that the Dublin Nissan report (although based on data obtained from TransUnion by ODE) was prepared and delivered by ODE, not TransUnion. TransUnion objected to the document repeatedly on foundational grounds and under Federal Rule of Evidence 403.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

(Ramirez) 150:20-151:8.)[4] After receiving both items, Plaintiff sent a handwritten note to TransUnion to dispute that he was a potential match, and TransUnion responded by blocking future results from being delivered on all future TransUnion reports. (Trial Tr. (Ramirez) 156:23-157:9.) Plaintiff knew that he had the right to dispute information on his credit file because he had done so in the past. (See Trial Tr. (Ramirez) 164:21-165:2.) Plaintiff's dispute was resolved in his favor within the timeframes set forth in 15 U.S.C. § 1681i. (See Trial Tr. (Ramirez) 156:23-158:9.) There was no evidence that, due to the manner of disclosure, or due to any particular language in the disclosure (such as its use of the term "courtesy"), any class member did not understand his rights. Nor was there any evidence that any class member had any difficulty disputing OFAC data.

**E. Damages**

With respect to damages, the ***only*** evidence introduced related to Plaintiff's own unique experience. It was not disputed that Plaintiff's vehicle purchase was completed on the same financial terms and with the same time of vehicle delivery as otherwise would have occurred. (See Trial Tr. (Ramirez) 148:6-8, 155:5-9.) The only difference in the transaction was that Plaintiff's wife was on the title alone. (Trial Tr. (Ramirez) 147:24-148:1.) Plaintiff also testified that due to concern about the Name Screen result, he canceled a trip to Mexico, in spite of his knowledge of the correction of his TransUnion file. (Trial Tr. (Ramirez) 155:5-9.)

No evidence was presented that any other class member was denied credit, had a transaction delayed or canceled travel as a result of TransUnion's sales of Name Screen to third parties or as a result of how it was disclosed to consumers. Nor was any evidence presented to suggest that class members were confused or were discouraged from exercising their FCRA rights. To the contrary, data presented by Denise Briddell suggested that the format encouraged contact with TransUnion. (Trial Tr. (Briddell) 785:5-10, 810:4-8, Ex. 69.) Plaintiff presented the class case on the theory that no evidence of class-wide damages need be proffered. (See Trial Tr. 110:17-112:5.) No evidence

---

[4] Although Plaintiff's counsel argued that it was wrongful for TransUnion's telephone operators not to disclose OFAC information to Plaintiff immediately when he called (Trial Tr. (Ramirez) 150:20-151:3, 859:23-860:7), this is not a requirement of the FCRA. The FCRA does not mandate disclosure on-demand over the telephone. 15 U.S.C. §§ 1681h(a)(2), 1681h(b)(2)(B) (telephonic disclosure must be preceded by written request for telephonic disclosure).

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

quantified the "potential risk" allegedly resulting from TransUnion's practices.

**F. The Verdict and Its Relationship to TransUnion's Economic Activity**

The jury here awarded of $984.22 in statutory damages per class member and $6,353.08 in punitive damages per class member. (ECF No. 309.) Based on a class size of 8,185, this calculates to $8,055,840.70 in statutory damages and $51,999,959.80 in punitive damages, or a total of $60,055,800.50. The total reflects approximately four percent of TransUnion's 2016 net worth. It also exceeds TransUnion's ***entire*** economic activity during the class period, and it dwarfs TransUnion's revenue from the Name Screen product by a factor of nearly thirty. As shown in the concurrently filed Declaration of David Gilbert, TransUnion's gross revenue (i.e., not taking costs into account) from sales of Name Screen in 2011 was approximately $2,100,000. (See Declaration of David Gilbert ("Gilbert Decl.") ¶ 2.) TransUnion's net income (profit) in 2011 from ***all*** business operations, i.e., not limited to Name Screen sales, was approximately $41,000,000. (See id. ¶ 3).[5]

**III. ARGUMENT**

**A. Legal Standards**

**1. Standard on a Motion for Judgment as a Matter of Law**

A party is entitled to judgment as a matter of law if no reasonable jury would have had a legally sufficient evidentiary basis to find against the party. Fed. R. Civ. P. 50(a)(1). "A jury's verdict must be upheld if it is supported by 'substantial evidence.'" S.E.C. v. Todd, 642 F.3d 1207, 1215 (9th Cir. 2011) (citing Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994)). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." Id. (citing Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007) (citation and internal quotation marks omitted)). TransUnion filed a written motion under Rule 50(a) and argued it orally at trial, and accordingly

---

[5] Rule 59(c) permits submission of affidavits with a new trial motion. Unlike a Rule 60 motion for relief from judgment, Rule 59(c) does not require a showing that the moving party could not have obtained material earlier through the exercise of reasonable diligence. See Benton v. United States, 188 F.2d 625 (D.C. Cir. 1951) (allowing affidavit that contradicted trial testimony). Moreover, because 15 U.S.C. § 1681n(a)(2) states that punitive damages are to be "as the court may allow," the Court should consider this information even though it was not presented to the jury.

- 9 -

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

TransUnion may renew that motion now "and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).

**2. Standard on a Motion for New Trial or to Alter or Amend a Judgment**

Under Rule 59(a), "[t]he trial court may grant a new trial, even though the verdict is supported by substantial evidence, if 'the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice.'" Roy v. Volkswagen of Am., Inc., 896 F.2d 1174, 1176 (9th Cir. 1990) (quoting Hanson v. Shell Oil Co., 541 F.2d 1352, 1359 (9th Cir. 1976)); see also Byrd v. Blue Ridge Rural Elec. Co-op., Inc., 356 U.S. 525, 540 (1958) (federal judge has "discretion to grant a new trial if the verdict appears to him to be against the weight of the evidence.").

Rule 59(a) also permits the granting of a new trial to address a "grossly excessive" award of damages, or to order damages remitted. Del Monte Dunes v. City of Monterey, 95 F.3d 1422, 1435 (9th Cir. 1996). A new trial also may be granted to address instructional error. Masson v. New Yorker Magazine, Inc., 85 F.3d 1394, 1397 (9th Cir. 1996). "[T]he existence of substantial evidence does not prevent the court from granting a new trial if the verdict is against the clear weight of the evidence. 'The judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party.' Therefore, the standard for evaluating the sufficiency of the evidence is less stringent than that governing the Rule 50(b) motions for judgment as a matter of law after the verdict." O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 420 F. Supp. 2d 1070, 1075-76 (N.D. Cal. 2006) (quoting Landes Constr. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987)).

Rule 59(e) permits amendment of a judgment "if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." O2 Micro, 420 F. Supp. 2d at 1075 (quoting Zimmerman v. City of Oakland, 255 F.3d 734, 740 (9th Cir. 2001)).

**B. Plaintiff Failed to Present Sufficient Evidence That TransUnion Willfully Violated the Requirement of § 1681e(b) to Employ Reasonable Procedures to Assure Maximum Possible Accuracy of the Information in Class Members' Credit Reports.**

TransUnion is entitled to judgment as a matter of law, or to a new trial, because the

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

evidence did not support a finding that TransUnion willfully violated 15 U.S.C. § 1681e(b).

The FCRA requires consumer reporting agencies, in creating credit reports, to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). A "willful" violation of the FCRA occurs only if the defendant either knew that it was violating clearly established law or that it took such an "obvious" risk of violating the law that its culpability was substantially greater than ordinary negligence. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 68-69 (2007); see also Smith v. LexisNexis Screening Sols., Inc., 837 F.3d 604, 611 (6th Cir. 2016) (holding that plaintiff must prove that the defendant disregarded "a high risk of harm of which it should have known").

Here, Plaintiff failed to present substantial evidence either: (1) that TransUnion failed to follow reasonable procedures to assure maximum possible accuracy of the information it reported; or (2) that any violation of § 1681e(b) in this regard was willful.

***First***, the evidence showed that TransUnion's Name Screen product met the "maximum possible accuracy" standard because it accurately conveyed precisely the information that it was designed to convey: whether an individual's ***name*** was a possible match to the OFAC list, such that the user of the information could perform its own due diligence in reaching a final determination of whether the ***individual*** was on the list. (Trial Tr. (Sadie) 621:8-622:4, (Ferrari) 430:13-25.) The testimony of both parties' experts established that "interdiction software" products like TransUnion's Name Screen are simply not used, without further human review, to determine that an ***individual*** is on the OFAC list; rather, they are understood to provide only first-level checks to be buttressed by human review. (Trial Tr. (Ferrari) 430:9-25, (Sadie) 625:23-626:18, 636:6-637:11; see also id. at 620:1-624:12.) The evidence also showed that the proper—and limited—use of interdiction software results was communicated to the end-users. (Trial Tr. (Gill) 353:5-11, (Sadie) 627:16-628:16, 640:19-641:19.) For instance, Dublin Nissan's contract for OFAC screening corroborated that an OFAC name "match" was "merely a message that the consumer may be listed" and that "a 'match' may or may not apply to the consumer whose eligibility is being considered." (Trial Tr. (Coito) 279:20-282:8, Ex. 42 § G.1 at 042-007 (emphasis added).) No evidence showed that, except with respect to Plaintiff, any end-user misused any OFAC Name

Screen sold with respect to any member of the class.

In short, the evidence at trial showed that TransUnion was asked by its customers during the class period to report only whether the ***name*** of an individual matched a name on the OFAC list. (Trial Tr. (Gill) 340:3-341:10, (O'Connell) 491:2-5.) TransUnion was not asked to cross-check the individual's name with other information such as date of birth, address, nationality or any other information that might be included within the OFAC database. (Id.) Nor did TransUnion ever lead end-users to believe that TransUnion might cross-check these factors. These were things that the end-users themselves would check, and in fact were in a better position to check because of their direct access to the consumer and the consumer's identity verification documents (such as a driver's license). (Trial Tr. (Sadie) 620:10-621:7.) Because TransUnion accurately reported only what it was asked to report, and accurately described the limited nature of what it was reporting, it did not violate § 1681e(b) by including name-only matches in the credit reports it provided to its customers. In other words, because users understood the limited purpose for which a Name Screen would be employed, and because TransUnion expressly and repeatedly explained to users that limited purpose and because TransUnion (post-Cortez) changed the result delivery format to describe results as merely ***potentially*** matching the input name provided by the user, no substantial evidence shows that TransUnion willfully provided information that was either "patently incorrect" or "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876, 890 (9th Cir. 2010); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1163 (9th Cir. 2009); see also FTC, Report to Congress Under Sections 318 and 319 Under the Fair and Accurate Credit Transactions Act of 2003 at 46 (Dec. 2004) (refusing to recommend a rule that would mandate perfect data matching: "The CRAs often identify matches that are close, but not perfect. Accepting an imperfect match risks inaccuracy. . . . On the other hand, rejecting the match risks incompleteness. The CRAs attempt to minimize both inaccuracy and incompleteness, but the limitations of the identifying information mean that they cannot eliminate both. If the CRA adopts a 'stricter' matching algorithm that reduces inaccuracy, the necessary result is that incompleteness will increase."). Here, when used as intended, Name Screen results would not be expected to adversely affect credit

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

decisions. (Trial Tr. (Sadie) 622:5-623:6, (Ferrari) 430:9-25.)

Toliver v. Experian Info. Solutions, Inc., 973 F. Supp. 2d 707 (S.D. Tex. 2013), is instructive. The Toliver plaintiff alleged that certain codes used by a consumer reporting agency were inaccurate or misleading because they might be read by third parties as implying something other than what the agency intended. See id. at 714 (alleging that it was misleading to label an account as "open" as opposed to being "charged off"). However, because the plaintiff provided no evidence that the agency ever characterized the codes as meaning anything other than their defined meanings, the court determined that the reporting was "undeniably accurate," in spite of plaintiff's claim that the codes were misused; the agency had a right to expect that its reporting would be used as intended. See id. at 717-19; see also Dickens v. Trans Union Corp., 18 F. App'x 315, 318 (6th Cir. 2001) (credit report was not inaccurate because user understood how the information was supposed to be used). Further, in Shaw v. Experian Info. Sols., Inc., No. 13-CV-1295 JLS (BLM), 2016 WL 5464543, at *10 (S.D. Cal. Sept. 28, 2016), appeal docketed, No. 16-56587 (9th Cir. Oct. 25, 2016), summary judgment was entered against a class on the grounds that a consumer reporting agency is not responsible for a user's misreading of data that was transmitted. Here, as in Tolliver and Shaw, the uncontroverted evidence showed that TransUnion made substantial efforts to ensure that users read and applied Name Screen data properly. (Trial Tr. (Gill) 344:9:19, 345:11-348:15, (Turek) 747:13-747:22.) TransUnion's expert also confirmed that, as a common practice, lenders understand how to properly use results received from interdiction software like Name Screen. (Trial Tr. (Sadie) 615:3-616:23.)

Plaintiff offered no substantial evidence to the contrary. Indeed, Plaintiff failed to present evidence of the existence of any ***possible*** technology that in 2011 could have achieved a greater accuracy rate, or at least any such technology that TransUnion actually knew of then. Likewise, the only evidence of an end-user failing to properly verify a possible OFAC match was Plaintiff's own transaction at Dublin Nissan. (Trial Tr. (Ramirez) (146:2-14.) Although Plaintiff's expert, Mr. Ferrari, testified (over TransUnion's objection) that he had seen creditors decline to do business with individuals based solely on interdiction software results, he did not state when this occurred (i.e., during or after the class period), whether it had happened to any class members, how many

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

times he had seen this, or whether the unnamed creditors he referred to relied upon name-only matching technology or instead, had reached a conclusion to decline business based on interdiction software that also used other criteria. (Trial Tr. (Ferrari) 425:2-426:12, 432:15-17.) Moreover, Dublin Nissan's General Manager testified that, in the only other instance in her experience where interdiction software delivered a "hit," the dealer completed the transaction promptly after confirming that the customer was not on the OFAC list. (Trial Tr. (Coito) 268:25-270:16.) A single aberrant anecdote describing a report not even prepared by TransUnion is simply not sufficient evidence of a class-wide violation of § 1681e(b).

***Second***, even if Plaintiff introduced sufficient evidence that TransUnion violated § 1681e(b), any violation in this regard was not willful. As a result of the Cortez appellate ruling, TransUnion changed the OFAC header language from "input name matches" to "input name is potential match," to make it more certain that users would not misuse the information. (Trial Tr. (Gill) 304:24-305:5, 350:25-352:23, Ex. 62.)[6] That TransUnion changed this language prior to commencement of the class period here demonstrates that it was attempting to comply with Cortez and thus did not ***willfully*** violate § 1681e(b). Again, Plaintiff offered no substantial evidence to the contrary. In particular, the fact that the revised "potential match" language did not appear in Plaintiff's own credit report does not support a finding of willfulness. As discussed above on pages 6 and 7, the evidence at trial confirmed that the Dublin Nissan report was not prepared by TransUnion, and that resellers were required to include the "potential match" language and to forbid end-users from denying credit solely because of a Name Screen result.

Additional evidence, including the testimony of TransUnion employee Michael O'Connell, also demonstrates that TransUnion sought to comply with Cortez and that TransUnion's response to Cortez was reasonable. TransUnion made nationwide changes to its Name Screen product, including by refusing Accuity's Synonyms file to reduce the number of "false positives" and to avoid the exact issue (Cortez/Cortes) that gave rise to the Cortez litigation itself. (Trial Tr. (O'Connell) 501:15-502:1; ECF No. 303-1 at 15-17 (Newman).) Mr. O'Connell testified that if

---

[6] As addressed above in footnote 2, both the trial and appellate courts in Cortez recognized that addition of language like this might have led to a defense outcome in the Cortez case itself.

- 14 -

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

TransUnion had used the Accuity product without making any modifications via the rules feature, the hit rate would have been about five percent. (Trial Tr. (O'Connell) 493:15-19.) By employing the rules feature (after the Cortez verdict but before the appeal was decided) and refusing the Synonyms file (in response to the Cortez appellate ruling), TransUnion lowered the hit rate to less than 0.5 percent, substantially lower than the "high" hit rate of twenty percent described by Plaintiff's expert witness, Mr. Ferrari. (Trial Tr. (Ferrari) 429:14-25, (O'Connell) 494:18-21, 506:6-10.) Mr. O'Connell testified at trial that, to the best of his knowledge, the Name Screen product had the lowest false positive rate of any OFAC software on the market. (Trial Tr. (O'Connell) 505:4-6.) No evidence suggested that any other interdiction software provider had a lower hit rate, on a statistical basis. By contrast, uncontradicted evidence showed that others, including Accuity and OFAC itself, offer interdiction tools that, by permitting "fuzzy logic" matching, deliver higher hit rates. (Trial Tr. (O'Connell) 494:18-21, (Sadie) 649:4-20.)

At trial, Plaintiff focused on TransUnion's alleged failure to use a date-of-birth filter during the class period. (Trial Tr. (O'Connell) 487:18-23, 839:6-840:2.) The evidence does not support a finding that this constituted a ***willful*** failure to employ a reasonable procedure to assure maximum possible accuracy. As discussed above, Name Screen (at the time) was intended by TransUnion (and understood by users) to be used only to match potential names, and thus users understood that the results indicated only a potential name match. (Trial Tr. (Sadie) 622:5-623:6, (Ferrari) 430:9-25.) The product achieved the "maximum possible accuracy" for the information it actually conveyed, with respect to the class here. Moreover, as explained by Mr. O'Connell, there was, in fact, no date-of-birth filtering technology available to TransUnion during the class period, and Plaintiff presented no contrary evidence in this regard. (Trial Tr. (O'Connell) 487:18-489:3.) The legal standard involves consideration of the maximum ***possible*** accuracy, but Plaintiff's witnesses at trial, including Mr. Ferrari, failed to present evidence of the existence of any ***possible*** technology that in 2011 could have achieved a greater accuracy rate, or at least any such technology that TransUnion both actually knew of, at the time, and ***willfully*** refused to implement. See Halo Elecs., Inc. v. Pulse Elecs., 136 S. Ct. 1923, 1933 (2016) ("Nothing in Safeco suggests that we should look to facts that the defendant neither knew nor had reason to know at the time he acted.").

- 15 -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

Accordingly, TransUnion was and is entitled to judgment as a matter of law or, in the alternative, a new trial on Plaintiff's claim for a willful violation of § 1681e(b).

**C. Plaintiff Failed to Present Sufficient Evidence That TransUnion Willfully Violated the Requirement of § 1681g(a) and (c)(2) to Provide All Information in Class Members' Credit Files and a Statement of Their FCRA Rights.**

TransUnion is entitled to judgment as a matter of law, or to a new trial, because the evidence did not support a finding that TransUnion willfully violated the disclosure requirements of 15 U.S.C. §§ 1681g(a) or 1681g(c)(2). See Murray v. New Cingular Wireless Servs., Inc., 523 F.3d 719, 727 (7th Cir. 2008) (no FCRA statutory damages liability for violation of § 1681m disclosure rules because no specific guidance had issued at the time of the violation); Henderson v. Trans Union, LLC, No. 3:14-CV-00679-JAG, 2017 WL 1734036, at *3 (E.D. Va. May 2, 2017) (summary judgment granted against class on FCRA statutory damages claim challenging timing of § 1681k disclosure, because of the lack of "clear guidance" as to the "mechanics" of disclosure).

Section 1681g(a) requires that a consumer reporting agency "clearly and accurately disclose to the consumer … [a]ll information in the consumer's file at the time of the request," and § 1681g(c)(2) states that the agency shall "provide to [the] consumer" a summary of the consumer's rights under the FCRA "with each written disclosure by the agency to the consumer under this section." In 2011, no authoritative legal guidance put TransUnion on specific notice that disclosing OFAC information in a separate letter would violate these provisions.

It is beyond dispute that TransUnion adopted this manner of disclosure out of a desire to comply with the appellate ruling in Cortez, which was the first precedential statement that Name Screen was subject to the FCRA. The evidence here showed that TransUnion made a good-faith attempt to comply with its disclosure obligation by sending the consumers' personal credit reports with a letter identifying the OFAC records that were considered a potential match to the name on the consumers' files. (ECF No. 303-1 at 45 (Lytle).) This material was sent via an automated process, such that the OFAC letter was always sent contemporaneously with the other material, including the statement of rights. (See Trial Tr. (Walker) 677:9-16.) It is undisputed that the information in the credit report, together with the information in the letter, constituted "[a]ll information in the consumer's file at the time of the request." 15 U.S.C. § 1681g(a). Undisputed

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

testimony also established that TransUnion provided the summary of rights to all class members in the envelope containing each class member's personal credit report. (Trial Tr. (Walker) 687:9-14.)

Nothing in § 1681g(a) or (c)(2) requires file information to be delivered in a single document or envelope. Section 1681g(a) states only that all information in the file at the time of the request must be disclosed. Likewise, Section 1681g(c)(2) states only that the summary of rights must be provided "with each written disclosure … under this section." Neither the Cortez trial nor the appellate decision addressed the details of compliance, because the case focused on whether OFAC data was subject to the FCRA at all. TransUnion was under no clear mandate to include a separate summary of rights in ***each*** envelope when information was disclosed in multiple mailings in response to a single disclosure request. Neither the FTC nor the CFPB has ever stated how the summary of rights must be conveyed, only that all information must be "clearly and prominently displayed." See CFPB Examination Procedures: Consumer Reporting Larger Participants, Sept. 2012, http://files.consumerfinance.gov/f/201209_cfpb_Consumer_Reporting_Examination_Procedures.pdf.

No regulatory or judicial guidance required delivery of this summary of rights more than once per disclosure ***request***. Neither the FCRA itself nor the FTC's commentary on the FCRA requires that an individual's information all be sent in a single document or in a single mailpiece. Instead, the FCRA and the FTC Staff Interpretations state only that disclosures must be made "in writing"; the statute and regulatory guidance nowhere require that all disclosures be made in a ***single*** writing. See 15 U.S.C. § 1681h(a)(2) ("Conditions and form of disclosure to consumers"); 40 Years of Experience with the Fair Credit Reporting Act, FTC Staff Summary of Interpretations of the Fair Credit Reporting Act 70-72 (July 2011). When Congress intends to impose a single-document requirement, it does so clearly, but nothing in the FCRA suggests that such a requirement exists under § 1681g(a) or (c)(2). Cf. FTC Issues Final Rule Amendments Related to the E-Warranty Act, https://www.ftc.gov/news-events/press-releases/2016/09/ftc-issues-final-rule-amendments-related-e-warranty-act (clearly defining the parameters of what constitutes a warranty disclosure, under the "Disclosure Rule": "Any warrantor warranting to a consumer by means of a written warranty a consumer product actually costing the consumer more than $15.00 shall clearly

- 17 -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

and conspicuously disclose ***in a single document*** in simple and readily understood language . . .") (emphasis added); FTC Franchise Rule Compliance Guide, https://www.ftc.gov/system/files/documents/plain-language/bus70-franchise-rule-compliance-guide.pdf (defining a "single document" as "be[ing] printable as a single document—***it cannot be presented in multiple, discrete parts***") (emphasis added); see also Henderson, 2017 WL 1734036, at *2-*3 (no willful violation of § 1681k requirement to make a disclosure to an applicant for employment "at the time" a report is provided, even though the applicant was not sent the disclosure ***simultaneously*** with the employer's receipt of the report; mailing the disclosure to the applicant within one business day of sending it to the employer did not willfully violate the FCRA).

Cortez also provided no guidance as to the mechanics of disclosure or the language that should be used in the disclosure. In Cortez, the Third Circuit concluded that OFAC information must be disclosed under § 1681g(a), but it did not state what form the disclosure must take. At trial, both Steven Katz and Denise Briddell testified that TransUnion's goal was consistent with Cortez—to present information about OFAC results to consumers in a manner that was complete and easy to understand. (Trial Tr. (Katz) 585:19-25, 589:5-10, (Briddell) 780:3-781:5, 807:9-17.) Ms. Briddell also explained that the consumer relations contact data demonstrated the effectiveness of this manner of communication. (Trial Tr. (Briddell) 785:5-10, 810:4-8, Ex. 69.) Plaintiff presented no evidence that the information was ***not*** easy to understand, that anyone failed to understand it or that use of the term "courtesy" distracted from anyone's understanding of the information. Plaintiff understood it well enough to successfully contact TransUnion and block future deliveries of OFAC data with TransUnion reports. (Trial Tr. (Ramirez) 156:11-157:9, 157:23-158:10, 166:3-5.) Thus, TransUnion is entitled to judgment as a matter of law, or to a new trial, because no substantial evidence showed that TransUnion's disclosure procedures "ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Safeco, 551 U.S. at 50; Fuges v. Sw. Fin. Servs., Ltd., 707 F.3d 241, 248 (3d Cir. 2012).

Finally, mailing the personal credit report and letter separately did not evidence any intent to violate the requirements of the FCRA as set forth by the court in Cortez. As noted above, Cortez did not address this detail. Sean Walker, a senior manager in consumer relations, testified that, at

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

the time of the Cortez decision and during the class period, TransUnion did not have the technology to provide the information in the OFAC letter and the credit report in a single mailing. (Trial Tr. (Walker) 686:6-687:14.) Mr. Walker also explained that the summary of rights was not included a second time in the OFAC letter "[b]ecause it was provided as part of the credit file disclosure ... that we had sent to the consumer that same day, or within hours of each other." (Trial Tr. (Walker) 687:12-14.) No one ever told him that it violated the FCRA to send OFAC information in a separate letter or without an additional summary of rights, and he confirmed that TransUnion's desire was to comply with the law. (Trial Tr. (Walker) 687:23-688:8.)

Accordingly, TransUnion was and is entitled to judgment as a matter of law or, in the alternative, a new trial on Plaintiff's claims for willful violations of §§ 1681g(a) and (c)(2).

**D. A New Trial Should Be Ordered Because of Counsel's Improper Arguments.**

TransUnion also is entitled to a new trial because Plaintiff's counsel both repeatedly misstated the evidence and stipulated facts, and improperly attempted to put excluded material before the jury in violation of pretrial rulings. As a result of Plaintiff's counsel's improper arguments, the jury was left with the false impression that TransUnion was attempting to conceal information from them, thus leading to the enormously punishing verdict here.

"[N]o verdict can be permitted to stand which is found to be in any degree the result of appeals to passion and prejudice." Minneapolis, St. P. & S. S. M. Ry. Co. v. Moquin, 283 U.S. 520, 521 (1931). Accordingly, counsel's improper reference in closing argument to excluded material is grounds for new trial. See Anheuser-Busch, Inc. v. Nat'l Beverage Distribs., 69 F.3d 337, 346-47 (9th Cir. 1995) (reference to excluded material merits new trial); see also Leathers v. Gen. Motors Corp., 546 F.2d 1083, 1086 (4th Cir. 1976) ("Counsel for defendant was placed in an unnecessarily difficult and embarrassing position. To interrupt argument by plaintiffs' counsel might antagonize the jury, and would certainly emphasize the point."); Globefill, Inc. v. Elements Spirits, Inc., 640 F. App'x 682, 684 (9th Cir. 2016) (district court should have granted new trial based on counsel's mischaracterization of evidence during summation). The huge aggregate amount of statutory and punitive damages here, in a case with no proof of actual impact on the class, see Kehr v. Smith Barney, Harris Upham & Co., 736 F.2d 1283, 1286 (9th Cir. 1984), shows

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

convincingly that counsel's improper argument led the jury to be "influenced by passion and prejudice in reaching its verdict," Standard Oil Co. v. Perkins, 347 F.2d 379, 388 (9th Cir. 1965).

For example, Plaintiff's counsel improperly referred to unnamed "executives in tall buildings in Chicago just waiting to hear what you're going to say about this." (Trial Tr. 948:25-949:2.) He also claimed that the persons with bad intent were not any of the witnesses who testified at trial, but rather the never-identified "people they answer to," "bosses" and "business managers—made decisions that are in willful non-compliance." (Trial Tr. 901:20-902:6.) None of these people were named, and no evidence about them was presented. The only person identified in counsel's closing argument was Lynn Prindes: "You remember Ms. Prindes? [Mr. Newman] said she was going to come here and explain the technology. Where was she?" (Trial Tr. 906:23-24.) However, Ms. Prindes was mentioned nowhere in TransUnion's opening, and Plaintiff ***stipulated*** that she need not be produced at trial because her testimony about the class data was agreed to be presented by stipulation. (See ECF No. 289.) Nor did the pretrial order indicate that Ms. Prindes would be offered to "explain the technology." (ECF No. 250 at 18 ["Expected to testify regarding data and the authenticity or lack of authenticity of particular documents."].)

Plaintiff's counsel similarly argued, with no evidentiary basis, and contrary to stipulation, that TransUnion concealed evidence of impact to class members after the class period:

> And Mr. Newman, very careful with his language, he tells you: Well, only about a quarter of these people, 1,800, even applied for credit to have their reputations harmed. Not so, all right? The evidence of the records through our stipulation is during a six-month period, from June—sorry, January 2011 to July 2011 about 25 percent of the class population applied for credit. That's because people don't apply for credit every day. Not everybody needs a car loan or a credit card all the time.
>
> We don't know the data for the next six months and the six months after that and the year after that. But we know the name only procedure was the same. We know that it attacked every single one of these people.

(Trial Tr. 903:18-904:5.)

What was read to the jury about the data was a stipulation of facts, agreed to by both sides. (ECF No. 289.) No evidence was presented that any of the vast majority of class members about whom no OFAC data was sold were "attacked" or injured in any way.

Collectively, these arguments, calling to mind a shadowy network of unseen executives

- 20 -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

secretly attacking members of the public, improperly inflamed the jury to passion and prejudice, inviting them to ignore the actual evidence presented at trial. This was prejudicial. "[I]rreparable prejudice was caused because the statement[s] before the jury encouraged speculation upon what was purposely being kept from them." Maricopa Cty. v. Maberry, 555 F.2d 207, 217 (9th Cir. 1977) (reversing denial of motion for new trial); Hern v. Intermedics, Inc., 210 F.3d 383, 2000 WL 127123, at *4 (9th Cir. 2000) (reversing denial of motion for new trial, based on counsel's improper reference in closing argument to material outside the record, which "left the jury with a final impression that serious information had been kept from it at trial").

Regarding use of the Cortez appellate opinion, the Court ruled before trial to exclude the opinion pursuant to Federal Rule of Evidence 403. (Further Pre-Trial Conf. Tr. 5:16-21 ["So the Cortez Third Circuit opinion I'm not inclined to let in. That's just going to really confuse the jury. There's a lot of stuff in there. I mean, the fact that the Third Circuit ruled and affirmed, of course, is a fact that needs to come in, but that will come in, but not with the opinion."].) Throughout the course of the trial, and over TransUnion's repeated objections and requests for curative instructions, Plaintiff's counsel aggressively worked to put this excluded material before the jury, reading exact quotations from it and at one point even displaying it on the exhibit screen visible to the entire jury. (See Trial Tr. (O'Connell) 531: 8-533:19, 763:6-22.) This was a clear violation of Federal Rule of Evidence 103(d), which states, "To the extent practicable, the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means." Similarly, Plaintiff's counsel's closing argument differed substantially from the parties' stipulation as to how Cortez would be put into evidence, as the Court already noted in response to TransUnion's objection. (See Trial Tr. 918:17-25, 919:3-7 ["In your closing argument you said the Cortez jury found a willful violation on the disclosure. And while that's, in fact, true, it is not in evidence. The stipulation does not include that distinction as to the negligence or the willful finding."].) This too was highly prejudicial. In Cortez, TransUnion was found to have willfully violated the FCRA for not disclosing OFAC data at all, and for refusing to respond to the Cortez plaintiff's request to dispute the data. This case, by contrast, involves a claim that TransUnion's efforts to comply were insufficient, not that TransUnion never attempted to comply.

- 21 -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Plaintiff's improper arguments in violation of prior stipulations and the Court's Cortez order should be corrected by ordering a new trial.

**E. The Jury's Awards of Statutory and Punitive Damages Are Excessive and Should Be Reduced Significantly, or a New Trial Should Be Ordered.**

Despite the lack of substantial evidence that TransUnion violated the FCRA—let alone did so willfully, or in a way that actually caused the class any harm—the jury here awarded $984.22 in statutory damages per class member and $6,353.08 in punitive damages per class member. Based on a class size of 8,185, this calculates to $8,055,840.70 in statutory damages and $51,999,959.80 in punitive damages, for a total of $60,055,800.50. These are staggering awards, particularly since so much of the case focused on highly technical disclosure provisions. The damages are all the more shocking given that no effort was made to prove that the class suffered ***any*** actual damages as a result of any of the challenged practices. Nor did Plaintiff even attempt to quantify any potential harm. In light of the reality that the challenged practices had no measurable impact on the class, both the statutory and punitive damages awards are so excessive as to shock the conscience. They should be substantially reduced, or a new trial should be ordered.

**1. Statutory Damages Are Excessive in Light of the Lack of Evidence of Harm to the Class and the Lack of Evidence That the Legal Requirements for Post-Cortez Compliance Were Abundantly Clear.**

A statutory damages award should be reduced if it "would be unconstitutionally excessive." Murray v. GMAC Mortg. Corp., 434 F.3d 948, 954 (7th Cir. 2006); accord In re Toys R Us-Del., Inc.—Fair & Accurate Credit Transactions Act (FACTA) Litig., 295 F.R.D. 438, 453-54 (C.D. Cal. 2014); see also Parker v. Time Warner Entm't Co., L.P., 331 F.3d 13, 22 (2d Cir. 2003) (Due Process Clause can justify reducing an aggregate statutory damages award); United States v. Citrin, 972 F.2d 1044, 1051 (9th Cir. 1992) (statutory penalty violates due process if it "is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable") (quoting St. Louis, Iron Mt. & S. Ry. Co. v. Williams, 251 U.S. 63, 66-67 (1919)); Pinner v. Schmidt, 805 F.2d 1258, 1265-66 (5th Cir. 1986) (court may remit award of compensatory damages where there is no proof of financial damages); Six Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1309-10 (9th Cir. 1990) ("When the class size is large, the individual award will be reduced so that

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

the total award is not disproportionate."); In re Hulu Privacy Litig., No. C 11-03764 LB, 2014 WL 2758598, at *23 (N.D. Cal. June 17, 2014) (a court may reduce statutory damages post-verdict because "aggregation of statutory damages claims potentially distorts the purpose of both statutory damages and class actions"); In re Farmers Ins. Co., Inc., FCRA Litig., 738 F. Supp. 2d 1180, 1224-26 (W.D. Okla. 2010) (discussing post-verdict reduction of statutory damages); Ashby v. Farmers Ins. Co., 592 F. Supp. 2d 1307, 1316 (D. Or. 2008) (stating that review of statutory damages award for excessiveness will occur post-verdict). The award of statutory damages here is grossly excessive and unduly punitive. It should not be upheld.

Because the jury did not differentiate among the three claims when awarding damages, the statutory damages award can be sustained in its current form only if the evidence is sufficient to support a finding not only that each purported violation was willful, but that each purported violation caused the class concrete harm. As already explained, however, Plaintiff did not prove that any of the alleged statutory violations was willful, let alone that all three were. Nor did Plaintiff prove that each violation caused the class concrete harm. The proof was particularly weak as to the two disclosure claims, with no evidence showing that ***even Plaintiff*** suffered harm specific to the alleged disclosure violations. Nor did Plaintiff even try to prove that any other class member was harmed by receiving the OFAC letter separately from the personal credit report and its enclosed statement of rights. That alone requires a new trial on damages or a remittitur.

But even setting aside that problem, the statutory damages verdict of nearly $8.1 million—for the seven-month class period of January through July 2011—is nearly four times TransUnion's gross revenue of $2.1 million from Name Screen sales for all of 2011. (See Gilbert Decl. ¶ 2.) The statutory damages award is excessively punitive because it bears no reasonable relationship either to the actual impact on the class (for which there was no evidence) or to TransUnion's financial gain. It is also excessive because the conduct complained of was corrected. TransUnion no longer discloses OFAC information in a separate letter, and TransUnion now uses date-of-birth information to screen results. (Trial Tr. (O'Connell) 512:20-513:4.) There is no past harm to remedy and no future harm to deter. With respect to a remittitur, TransUnion submits that statutory damages should be reduced to an amount no greater than TransUnion's OFAC-related revenue for

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

the year 2011, of $2.1 million, or $256.56 per class member (based on 8,185 class members). Because this is a revenue figure, not a profits figure, and because it is for the full calendar year, and not just for the class period, an award of this size deprives TransUnion of substantially ***more*** than any financial gain associated with its OFAC sales during the period of alleged non-compliance. This figure also is well within the $100 to $1,000 range established by Congress, and therefore would amply compensate class members for what the evidence showed was at most only a ***potential*** risk of harm. It would also deprive TransUnion of more than what it obtained from selling Name Screen during the seven-month class period.

As entered, the statutory damages award is excessive and a violation of due process principles. See Six Mexican Workers, 904 F.2d at 1310 (reducing class statutory damage award averaging $1,369 per class member to between $150 and $600 per class member, in part because "the district court's damage assessment did not involve fact specific calculations of actual injury" and to balance "the need for deterrence with the inequity of disproportionate punishment"). A new trial should be ordered, or the total statutory damages should be remitted to not more than the $2.1 million revenue figure described above.

**2. The Jury's Award of Punitive Damages Is Excessive and Should Be Eliminated or Reduced Significantly, or a New Trial Should Be Ordered.**

**a. Any Award of Punitive Damages Here Would Be Excessive.**

Trial courts have a duty to prevent excessive awards of punitive damages and should order a new trial or remit damages when a jury renders an excessive award. See, e.g., Exxon Shipping Co. v. Baker, 554 U.S. 471, 513 (2008). Similarly, when substantial compensatory damages are awarded, punitive damages that exceed the compensatory award should only rarely be awarded. See id.; State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) ("When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."); see also, e.g., Bach v. First Union Nat'l Bank, 486 F.3d 150, 156 (6th Cir. 2007) (reducing punitive damage award in FCRA case to equal the compensatory damages in light of "general principle that a plaintiff who receives a considerable compensatory damages award ought not also receive a sizeable punitive damages

- 24 -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

award absent special circumstances … [A] ratio of 1:1 or something near to it is an appropriate result"); Morgan v. New York Life Ins. Co., 559 F.3d 425, 443 (6th Cir. 2009) (vacating punitive damages in a discrimination case where the compensatory award was $6 million and instructing lower court not to exceed 1:1 punitive damages ratio); Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594, 603 (8th Cir. 2005) (reducing punitive damages to a 1:1 ratio where compensatory award was over $4 million).

Excessive punitive damages awards are even more problematic where, as here, substantial statutory damages have been awarded. See Parker, 331 F.3d at 26 (noting the "pseudo-punitive intention" of statutory damages) (Newman, J., concurring). Indeed, the large statutory damages award here should preclude the imposition of ***any*** punitive damages. The purpose of punitive damages is to punish and deter egregious conduct. See BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 580 (1996). While punishment and deterrence are not the only aim of statutory damages, statutory damages undoubtedly serve similar (if not the same) punishment and deterrence ends, especially in a case like this where there is no evidence of actual harm for statutory damages to compensate. See, e.g., Bateman v. Am. MultiCinema, Inc., 623 F.3d 708, 718 (9th Cir. 2010) (FCRA's "statutory damages provision[] … effectuate[s] the Act's deterrent purpose"); Vanderbilt Mortg. & Fin., Inc. v. Flores, 692 F.3d 358, 373 (5th Cir. 2012) (purpose of statutory damages is to "deter[] the public harm associated with the activity proscribed, rather than seeking to compensate each private injury caused by a violation" (quoting DirecTV, Inc. v. Cantu, No. SA-04-CV-136-RF, 2004 WL 2623932, at *4 (W.D. Tex. Sept. 29, 2004))); cf. Educ. Testing Servs. v. Katzman, 670 F. Supp. 1237, 1243 (D.N.J. 1987) ("[S]tatutory damages have all the trappings of punitive damages and, indeed, the tests are virtually the same, *i.e.*, the more willful the infringement—the more outrageous the conduct—the higher the award.").[7]

Given that potential overlap, courts in cases under the Copyright Act—which, like the

---

[7] See also Phillips v. Netblue, Inc., No. C05-4401 SC, 2006 WL 3647116 (N.D. Cal. Dec. 12, 2006) ("Statutory damages may either take the form of penalties, which impose damages in an arbitrary sum, regardless of actual damages suffered, or, ... may provide for the doubling or trebling of actual damages as determined by the jury." (quoting Beeman v. Burling, 216 Cal. App. 3d 1586, 1589 (Cal. App. Ct. 1990))).

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

FCRA, authorizes victims of "willful" conduct to receive statutory damages and punitive damages—have often rejected attempts to impose punitive damages on top of statutory damages, out of concern that doing so could impose double punishment in violation of the Due Process Clause. See, e.g., TVT Records & TVT Music, Inc. v. The Island Def Jam Music Grp., 262 F. Supp. 2d 185, 186 (S.D.N.Y. 2003) (rejecting attempt to impose punitive damages because statutory damages already punished); see also On Davis v. The Gap, Inc., 246 F.3d 152, 172 (2d Cir. 2001) ("The purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17 U.S.C. § 504(c)(2), which allow increases to an award of statutory damages in cases of willful infringement."); Silberman v. Innovation Luggage, Inc., No. 01 CIV. 7109 (GEL), 2003 WL 1787123, at *10 (S.D.N.Y. Apr. 3, 2003) ("the purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved by statutory damages").

The potential for impermissible overlap between statutory and punitive damages is particularly acute in the class action context. When a defendant engages in conduct that injures many individuals, but suit is brought on behalf of only one of them, the statutory damages award alone might not be considered sufficient to deter egregious conduct if the limit on statutory damages is relatively low. An additional punitive damages award in an individual case thus could at least theoretically be designed to punish and deter the defendant from injuring other individuals in the same way that it injured the plaintiff. But when a class action suit has already brought the relevant universe of potentially affected individuals before the court, and when every class member has been awarded statutory damages, then imposing a punitive damages award on top of the class-wide statutory damages award is all but certain to result in excessively punishing damages.

Here, that risk of excessive and unconstitutional double punishment was ever further exacerbated by the problem that Plaintiff submitted literally ***no*** additional evidence to support his plea for punitive damages, except for TransUnion's wealth. See, e.g., Ashby, 592 F. Supp. 2d at 1315 (noting that it would be impermissible to permit punitive damages "for the same conduct that gives rise to statutory damages" under FCRA). There simply is no evidence—let alone sufficient evidence—to support the imposition of any punitive damages on top of an award of substantial

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

statutory damages to each and every class member.

**b. A New Trial on Punitive Damages Should Be Ordered Because the Jury Was Not Properly Instructed on the Proper Legal Standard.**

In an effort to guard against precisely that risk of impermissible duplicative punishment, TransUnion repeatedly requested jury instructions that would have required the jury to find a higher level of culpable conduct for punitive damages than for statutory damages. The Court repeatedly refused these instructions, on the grounds that under the statute and Safeco, the same standard applied. Over TransUnion's objection, the Court expressly permitted the jury to award punitive damages "if the defendant acts in the face of a perceived risk that its actions will violate the plaintiff's rights under federal law." (Trial Tr. 939:18-20.) Based on this instruction, Plaintiff's counsel argued, to TransUnion's prejudice, that the legal standard for statutory damages and punitive damages was exactly the same:

> You've already made the liability determination in your verdict. There is no further liability determination. The standard is the same. It is showing reckless disregard of consumer rights. You have already found that. The only issue is one of damages. What punitive damages, and in what amount would you award. The perceived risk of harm that you just heard Judge Corley speak about is the same as we talked about yesterday. So liability is done. So therefore, you're completely within your rights to award punitive damages if you see fit, and in whatever amount you see fit.

(Trial Tr. 943:3-11.)

This was error, further justifying setting aside the punitive damages award, as that instruction invited the jury to impose impermissible double punishment for the same conduct. See Masson, 85 F.3d at 1397 (new trial may be granted to address claim of instructional error).

Safeco addressed the standard of recklessness that must be proven for statutory damages, but it did not address punitive damages specifically. Pre-Safeco authority consistently recognized that punitive damages may only be awarded upon proof of a high level of culpability: "knowing and intentional commission of an act the defendant knows to violate the law." Gohman v. Equifax Info. Servs., LLC, 395 F. Supp. 2d 822, 828 (D. Minn. 2005) (quoting Phillips v. Grendahl, 312 F.3d 357, 370 (8th Cir. 2002)); see also Pinner, 805 F.2d at 1263 (plaintiff must prove that the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others"); Riley v. Equifax Credit Info. Servs., 194 F. Supp. 2d 1239, 1245 (S.D. Ala. 2002) (same).

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

A defendant's belief it is in compliance with the law, even if erroneous, bars a punitive damages claim under the FCRA. See Grendahl, 312 F.3d at 370; see also Acton v. Bank One Corp., 293 F. Supp. 2d 1092, 1102 (D. Ariz. 2003) (no FCRA punitive damages without proof that the defendant "knowingly or intentionally acted in conscious disregard of the Plaintiff's rights").

Post-Safeco cases also state that to obtain punitive damages, the plaintiff must prove a higher degree of culpable conduct than recklessness. See Davenport v. Sallie Mae, Inc., 124 F. Supp. 3d 574, 584 (D. Md. 2015) ("knowing and intelligent commission of acts in conscious disregard for the rights of its customers"); Edeh v. Equifax Info. Servs., LLC, 974 F. Supp. 2d 1220 (D. Minn. 2013) ("knowingly and intentionally committed an act in conscious disregard for the rights of others") (quoting Bakker v. McKinnon, 152 F.3d 1007, 1013 (8th Cir. 1998)), aff'd, 564 F. App'x 878 (8th Cir. 2014). That requirement is essential to ensure that imposing punitive damages on top of statutory damages does not violate due process. See supra Section E.2.a. Because the Court's instruction was not just improper, but also invited a constitutional violation, TransUnion is entitled to a new trial with respect to punitive damages.

**c. The Punitive Damages Should At Least Be Reduced Substantially, Or a New Trial on Punitive Damages Should Be Ordered.**

At a minimum, the considerable risk of impermissible overlap between the awards weighs heavily in favor of a remittitur or a new trial on damages. It is hard to see how the evidence demonstrated ***any*** need for deterrence or punishment here given TransUnion's undisputed evidence that the particular practices challenged were corrected years ago: OFAC information is now disclosed in a single document, and TransUnion now employs date-of-birth screening technology to reduce the hit rate well below the already-low level it achieved during the seven-month class period. (Trial Tr. (O'Connell) 512:15-513:20.) But even assuming some minimal level of punishment and deterrence were still permissible, surely it was fully achieved (and then some) by the jury's $8.1 million statutory damages award. As noted, that award alone is nearly ***four times*** higher than TransUnion's entire gross revenue from the sales of OFAC Name Screen during ***calendar year*** 2011 (approximately $2.1 million). (Gilbert Decl. ¶ 2.) The $50 million punitive damages award is a shocking ***25 times*** greater than those revenues. Indeed, the punitive damages

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

award is excessive even in relation to the company's entire economic activity in 2011. TransUnion's net income for all of calendar year 2011 was $41 million. (Gilbert Decl. ¶ 3.) The $50 million punitive damages award, which is based on only seven months of activity and only one of TransUnion's products, would more than wipe out its entire profitability for that entire year, for all of its economic conduct, even though the case involves only a small portion of the company's activity, and only for a little more than half of the year.

Such an astounding award is not only excessive, but unconstitutionally so. Under State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003), courts consider three factors when determining whether a punitive damages award exceeds the bounds of constitutional due process: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of punitive damages to harm or potential harm to the plaintiff; and (3) the disparities between the punitive damages award and the civil penalties authorized or imposed in comparable cases. Every one of those factors confirms that the jury's punitive damages award is unconstitutionally excessive.

***First***, there is no evidence of reprehensibility here. Reprehensibility is measured by "considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." Id. at 419. Even taken as a given the jury's unsupported willfulness finding, none of the factors is present here. There is no claim of physical harm—indeed, there is not even any evidence of economic harm. Nor did the technical FCRA violations pose any risk to the health or safety of anyone or target the vulnerable. See Jones v. United Parcel Serv., Inc., 674 F.3d 1187, 1207 (10th Cir. 2012) (punitive damages of $2 million reduced to equal the compensatory damages of approximately $630,000, because the impact of the defendant's conduct was economic and did not threaten health or safety). Plaintiff introduced no evidence that TransUnion made any deliberate false statements or engaged in any form of deceit. To the contrary, the evidence demonstrated that TransUnion was actively attempting to address the issues in Cortez after the Third Circuit ruled in that case. (Trial Tr. (O'Connell) 500:21-502:1.) Moreover, the omission of the "potential match"

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

language from the Dublin Nissan report was not intentional and was outside of TransUnion's control (see ECF No. 303-1 at 56), and there was no evidence that any other class member was similarly affected. This is not a case where a defendant was flouting the law; indeed, Plaintiff's theory of the case was that TransUnion did not act rapidly enough in attaining compliance. Thus, even accepting Plaintiff's theory of liability, this factor supports reduction of the punitive damages award to something that does not exceed the statutory damages award.

As to the second factor, the ratio of punitive damages to actual or potential harm is, by definition, excessive because Plaintiff did not even ***try*** to prove any actual or even potential harm as to 8,184 members of the 8,185-member class. Instead, he attempted to prove harm only as to himself—and even there he came up woefully short. He identified ***zero*** harm as a result of the disclosure violations, which plainly did not impede his ability to contact TransUnion and exercise his FCRA rights. And as TransUnion's evidence showed, Plaintiff was not unique in that respect: Consumers have repeatedly demonstrated that they had no problem understanding or exercising their rights under the FCRA when they received notice in the manner that Plaintiff did. (Trial Tr. (Briddell) 785:5-10, 810:4-8, Ex. 69.) As for the reasonable procedures claim, Plaintiff offered no evidence that positive Name Screen results had any adverse credit impact on any class members. Users, when employing properly-trained reviewers, rapidly clear positive Name Screen results with no denial of credit or inconvenience to consumers. (Trial Tr. (Sadie) 637:12-638:6.) TransUnion presented unrebutted evidence that, in the wake of the Cortez decision, it specifically instructed Name Screen users that they may not deny credit solely on the basis of a Name Screen result, and that the Treasury Department provides similar guidance as well. (Trial Tr. (O'Connell) 523:5-18, (Sadie) 645:9-23, Exs. 74, 82.) The jury's staggering $50 million punitive damages award thus does not correspond to any actual or potential harm to Plaintiff or the class ***at all***.

When compared to the statutory damages award, which is not an appropriate measure of either actual or potential harm, the ratio is a grossly excessive 6½ to 1. Ratios above 2:1 are typically reserved for extreme misconduct resulting in bodily harm or severe emotional distress, yet no such evidence was presented here. The jury's verdict here is grossly excessive because it is at a ratio that greatly exceeds those imposed on defendants who imposed massive abuse on their

victims. Cf. Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 146 (2d Cir. 2014) (ratio of 2:1 in case involving "racial insults, intimidation, and degradation over a period of more than three years"); Lee ex rel. Lee v. Borders, 764 F.3d 966, 976 (8th Cir. 2014) (ratio of 3:1 approved in case involving rape of a patient at a facility for the developmentally disabled); Ondrisek v. Hoffman, 698 F.3d 1020, 1029 (8th Cir. 2012) (punitive damages reduced to 4:1 ratio in case involving a cult leader's repeated instances of child abuse); Leavey v. Unum Provident Corp., 295 F. App'x 255, 258-59 (9th Cir. Oct. 6, 2008) (insurance bad faith claim where jury found defendant acted with an "evil mind"; $15,000,000 punitive damages award reduced to $3 million; original ratio was 7½:1, and the reduced ratio was 1½:1). This factor supports reduction of the punitive damages award to no more than the amount of the statutory damages award, a 1:1 ratio as in Exxon.

Finally, as to the third factor, comparison to a comparable civil penalty, the jury's award of more than $50 million in punitive damages, or $6353.08 per class member, far outpaces the maximum civil penalty of $2500 the FTC could obtain only upon a ***greater*** showing of culpability than the jury was instructed on here: proof of "a knowing violation, which constitutes a pattern or practice of violations." 15 U.S.C. § 1681s(a)(2)(A). The award also greatly exceeds the maximum statutory damages of $1,000 authorized under § 1681n(a)(1)(A)—the same maximum that applies when a person violates consumer privacy by obtaining credit data "under false pretenses or knowingly without a permissible purpose," § 1681n(b), a more serious violation than at issue here. Under any measure, there is simply no justification for the massive over-deterrence reflected in the jury's award of punitive damages. The award should be remitted or a new trial ordered.

**F. The Judgment Should Be Altered or Amended to Conform to Rule 23.**

TransUnion also requests, in the alternative, that the judgment be altered or amended pursuant to Fed. R. Civ. P. 59(e).

**a. The Evidence Does Not Support Entry of Any Class Judgment.**

TransUnion renews its prior challenges to class certification, and submits that because the evidence at trial did not establish the elements of Rule 23, it is improper for any class-wide judgment to be entered. Critically, with respect to the element of typicality under Rule 23(a)(3), the evidence showed that Plaintiff's experience was so far removed from the experiences of other

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

class members that it deprived TransUnion of a fundamentally fair trial. See Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 598 (3d Cir. 2012) (purpose of the typicality requirement is "to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class") (internal quotation marks and citation omitted); Soutter v. Equifax Info. Servs., LLC, 498 F. App'x 260, 265 (4th Cir. 2012) (reversing certification order because the representative's claims were "typical" only on an "unacceptably general level"); Cox v. TeleTech@Home, Inc., No. 1:14-CV-00993, 2015 WL 500593, at *7 (N.D. Ohio Feb. 5, 2015) (denying certification on typicality grounds because of "the unique factual circumstances" of plaintiff's case); Davis v. Chase Bank U.S.A., N.A., No. CV 06-04804 DDP PJWX, 2013 WL 169868, at *6 (C.D. Cal. Jan. 16, 2013) (denying motion for class certification because "[t]he factual circumstances surrounding Plaintiff's purchases are so atypical as to fall below the normally permissive standard of Rule 23(a)'s typicality requirement"). There was no evidence that the post-Cortez "potential match" language was dropped from any Name Screen sold as to any other class member. There was no evidence that any other class member was denied credit because a lender failed to follow TransUnion's and OFAC's instructions with respect to the handling of interdiction results. There was no evidence that any class member was confused or misled by any communications with TransUnion, either in writing or over the telephone. Most importantly, with respect to more than three-quarters of the class, no Name Screen data was sold at all. Plaintiff unfairly leveraged his unique experience into a massive statutory and punitive damages award in favor of a group of highly atypical and dissimilar people.

A class judgment also is improper because no evidence of actual harm to any class members, or to the class as a whole, was proffered. Plaintiff maintains that such evidence is not necessary. (See Trial Tr. 842:20-23, 851:10-12, 863:20-22, 864:15.) With respect to the Court's prior rulings on this issue, TransUnion notes recent Supreme Court authority calling into doubt whether a class case may proceed without proof of concrete injury to class members other than the representative plaintiff. On June 5, 2017, in Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645 (2017), the Supreme Court examined what a proposed intervenor-of-right under Rule 24(a)(2) must show to comply with the standing requirements of the Constitution's Article III. The

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Supreme Court confirmed that "standing is not dispensed in gross," that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought" and that the "same principle applies when there are multiple plaintiffs." Id. at 1650-51 (internal citations and quotation marks omitted). "[A]n intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." Id. at 1651.

This same principle should also apply in class cases under Rule 23(b)(3), as class litigation is merely a species of intervention. Because here Plaintiff asks the Court to award each class member his or her own separate money damages, the standing limitations of Article III must be considered in light of each class member, and not simply the class representative. See 137 S. Ct. at 1651 ("In sum, an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing. That includes cases in which both the plaintiff and the intervenor seek separate money judgments in their own names."). There was no evidence of concrete harm to the class as a whole here, or even to any particular individual. See Nicklaw v. Citimortgage, Inc., 839 F.3d 998, 1002-03 (11th Cir. 2016) (intangible harm caused by delay in recording a mortgage satisfaction did not cause injury in fact, barring claim for statutory damages), pet. for reh'g en banc denied, 855 F.3d 1265 (2017). To the contrary, the evidence showed that more than three-quarters of the class had no OFAC data sold about them at all (Trial Tr. 577:1-13), and further, that even when data was sold, financial institutions' general practice was to rapidly clear consumers without incident or inconvenience. (Trial Tr. (Sadie) 637:12-638:6.)

With respect to the disclosure claims under 15 U.S.C. § 1681g, and as argued previously in regard to Dreher v. Experian Information Solutions, Inc., 856 F.3d 337 (4th Cir. 2017), pet. for reh'g en banc denied (June 26, 2017), "informational injury" alone does not satisfy Article III's standing requirements. See also Medellin v. IKEA U.S.A. West, Inc., 672 F. App'x 782, 783 (9th Cir. 2017) (vacating lower-court judgment where plaintiff "alleged only a bare procedural violation of the statute"); Smith v. Bank of Am., N.A., No. 15-55674, 2017 WL 631696, at *1 (9th Cir. Feb. 16, 2017) ("[m]ere receipt" of a document that does not adhere to the standards of a federal statute, "without more, is insufficient to establish injury-in-fact"); Holmes v. Contract Callers, Inc., No. 3:17CV148-HWH, 2017 WL 2703685 (E.D. Va. June 22, 2017) (dismissing claim under Fair Debt

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Collection Practices Act for lack of standing where plaintiff failed to show how he was injured by the lender's alleged failure to report to credit bureaus that plaintiff disputed the debt); Gathers v. CAB Collection Agency, Inc., No. 3:17CV261-HEH, 2017 WL 2703686 (E.D. Va. June 22, 2017) (same). Accordingly, the class should be decertified for lack of proof that each class member—or even a specifically ascertainable subset of class members—sustained concrete, individualized injury in fact as a result of each FCRA violation alleged. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1551 (2016) ("special, individualized damage" must be shown to recover under the FCRA for violation of a public right) (Thomas, J., concurring).

**b. Persons Known With Certainty Never to Have Received Notice Should Be Omitted From the Class, and the Judgment Should be Corrected to Reflect the Proper Number of Class Members.**

As raised before trial, the number of class members needs to be corrected to reflect only those persons whom the notice might have reached. (See ECF No. 280.) The evidence was undisputed that neither actual nor constructive notice was given to approximately 15 percent of the class, and that ***at maximum*** only 6,894 persons (taking the seven opt-outs into account) could have even seen the class notice. (See Declaration of Jason S. Yoo Ex. A.)[8]

It is fundamental that each class member is entitled to the best notice practicable under the circumstances. Fed. R. Civ. P. 23(c)(2); see, e.g., Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 157 (1974) ("The express language and intent of Rule 23(c)(2) leave no doubt that individual notice must be sent to all class members who can be identified through reasonable effort … [I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case but an unambiguous requirement of Rule 23"). It is also fundamental that a court has the discretion to "adjust the class, informed by the proceedings as they unfold." See, e.g., Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997) (citing Fed. R. Civ. P. 23(c), (d)). As these class members were never even given an opportunity to request exclusion, they cannot be included in the final judgment. See, e.g., Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985).

[8] Further, publication notice was never provided to class members who could not be reached by mail, so there is not even any constructive notice basis to keep in the class the 1,291 persons for whom mailed notice is known to have failed.

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

Any defect in notice is the class representative's and counsel's responsibility. See Lambert v. Nutraceutical Corp., No. ED CV 13-05942-AB (SPx), 2015 WL 12655392, at *8 (C.D. Cal. June 24, 2015). Their failure to address this issue requires amendment of the judgment. TransUnion faces risk of severe prejudice if the wholly unnoticed class members are included in the judgment, as TransUnion cannot be certain that the judgment will even bind them to preclude subsequent litigation. See, e.g., In re Del-Val Fin. Corp. Sec. Litig., 154 F.R.D. 95 (S.D.N.Y. 1994) (permitting extension of time to opt out where class member did not receive notice until after opt-out deadline); In re Prudential-Bache Energy Income P'ships Sec. Litig., No. MDL 888, 1995 WL 263879, at *6 (E.D. La. May 4, 1995) (permitting extension of time to opt out where notice sent to wrong address). Persons for whom the notice program failed should be removed from the class.

#### c. The Judgment Does Not Comply With Rule 23(c)(3)(B).

The judgment also does not comply with the formalities of Rule 23(c)(3)(B), which mandates that the judgment expressly "include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members." As entered, the judgment does not set forth what the rule requires, and at a minimum should be amended to comply with the rule.

The judgment should be amended to decertify the class, or at a minimum to limit its scope to eliminate persons known with certainty never to have received any notice of these proceedings, and further to comply with the requirements of Rule 23.

## IV. CONCLUSION

For the foregoing reasons, TransUnion respectfully requests that this Court enter an order granting judgment to TransUnion as a matter of law or, in the alternative, granting a new trial or, in the alternative, ordering a remittitur or, in the alternative, altering or amending the judgment, as requested herein, and for such other and further relief as may be just and proper.

- 35 -
DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063

Dated: July 19, 2017

STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND
STEPHEN J. NEWMAN
DAVID W. MOON
BRIAN C. FRONTINO
JASON S. YOO

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
BRUCE S. LUCKMAN (Admitted Pro Hac Vice)

By: */s/ Stephen J. Newman*
Stephen J. Newman

Attorneys for Defendant
TRANS UNION LLC

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

- 36 -

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC

LA 52092063

STROOCK & STROOCK & LAVAN LLP
2029 Century Park East
Los Angeles, California 90067-3086

**CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2017, a copy of the foregoing **DEFENDANT TRANS UNION LLC'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, MOTION FOR REMITTITUR OR, IN THE ALTERNATIVE, MOTION TO ALTER OR AMEND THE JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's EM/ECF System.

*/s/ Stephen J. Newman*
Stephen J. Newman

DEF.'S NOT. OF MOT. & RENEWED MOT. FOR JDGMT. AS A MATTER OF LAW, FOR A NEW TRIAL, FOR REMITTITUR OR, TO ALTER OR AMEND THE JDGMT. / CASE NO. 3:12-CV-00632-JSC
LA 52092063