ANDREW J. OGILVIE (SBN 57932)
CAROL M. BREWER (SBN 214035)
OGILVIE & BREWER LLP
4200 California Street, Suite 100
San Francisco, California 94118
Telephone: (415) 651-1950
Facsimile: (415) 651-1952

JAMES A. FRANCIS (*pro hac vice*)
JOHN SOUMILAS (*pro hac vice*)
LAUREN KW BRENNAN (*pro hac vice*)
FRANCIS MAILMAN SOUMILAS
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Telephone: (215) 735-8600
Facsimile: (215) 940-8000

ELIZABETH J. CABRASER
MICHAEL W. SOBOL
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery St.
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiff*
*Sergio L. Ramirez and the Class*

STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND (SBN 83013)
STEPHEN J. NEWMAN (SBN 181570)
2029 Century Park East, 18th Floor
Los Angeles, CA 90067-3086
Telephone: (310) 556-5800
Facsimile: (310) 556-5959

SHERMAN SILVERSTEIN KOHL ROSE
AND PODOLSKY
BRUCE LUCKMAN (*pro hac vice*)
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: (856) 662-0700
Facsimile: (856) 448-4744

O'MELVENY & MYERS LLP
DAMALI A. TAYLOR (SBN 262489)
Two Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 984 8700
Facsimile: (415) 984 8701

O'MELVENY & MYERS LLP
ELIZABETH L. MCKEEN (SBN 216690)
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823 6900
Facsimile: (949) 823 6994

*Attorneys for Defendant,*
*Trans Union LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO L. RAMIREZ, on behalf of himself and all others similarly situated, | Case No. 3:12-cv-00632-JSC |
| Plaintiff, | **JOINT REPORT RE: POST-APPEAL PROCEEDINGS** |
| v. | |
| TRANS UNION, LLC, | |
| Defendant. | |

Pursuant to this Court's Order of October 25, 2021 (ECF 389), the parties submit this joint report containing their respective proposals as to further proceedings in this action following the Ninth Circuit's August 23, 2021 Order directing this Court to conduct further proceedings consistent with the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. ___, 141 S. Ct. 2190 (2021).  The parties were unable to reach agreement as to next steps in this litigation.  Plaintiff's proposed next steps and supporting reasons are immediately below; TransUnion's begin on page 10 of this document.

## I.      **Plaintiffs' Proposal**

Plaintiffs propose further proceedings in three stages: First, a factual determination of which class members can satisfy the Supreme Court's Article III standing rule announced in *TransUnion LLC v. Ramirez*.   Second, a reassessment of class certification under Rule 23(c)(1)(C). Third, a process for arriving at an amended or new judgment through a combination of briefing and/or a limited new trial.

### A.  Stage One – Class Member Standing Determination

This first stage is essential and fully within this Court's discretion to authorize, and necessary in this case to prevent a miscarriage of justice, as discussed below.  Two factors, one legal and the other factual, drive the need for a fresh determination of class member standing.

#### 1.  Changed Legal Standard

The U.S. Supreme Court in *TransUnion LLC v. Ramirez* announced for the first time that every class member in an FCRA section 1681e(b) case must show third-party *publication* in order to have Article III standing to recover money damages. *TransUnion LLC*, 141 S. Ct. at 2208. Consistent with this ruling, the Court confirmed that the 1,853 class members for whom there was confirmed publication had Article III standing.   However, in announcing that "[e]very class member must have Article III standing in order to recover individual damages" the Court cited to no previous decisions on point, and only to a concurring opinion in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring).   *Id.*  At the time of this class action trial in June 2017, the legal standard for standing did not require a showing of publication for all class members.

Indeed, the parties briefed Article III standing in detail before this Court prior to the trial in this matter. This Court issued a pre-trial order specific to standing on October 17, 2016, in which it found that Plaintiffs had satisfied the Supreme Court's Article III standard announced only earlier that year in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ("*Spokeo*") (ECF 209). *Spokeo* was an FCRA section 1681e(b) class action seeking statutory and punitive damages, just like the case at bar. The Supreme Court held that a "material risk of harm" (or as the Court otherwise stated, "the risk of real harm") was the standard for concreteness under Article III standing principles, and did not so much as mention the need for "publication" in that FCRA section 1681e(b) case, much less the need for every class member to show publication of the inaccurate report to a third party about him or her in order to recover money damages by the time of trial. *See generally Spokeo*, 578 U.S. 330, 341-342; *see also* ECF 209 at pp. 4-9 (applying *Spokeo* pre-trial in this matter).

There can be no question that at the 2017 trial Plaintiffs satisfied the existing legal standard as set forth in *Spokeo* because they showed a material risk of harm to every class member. (*See* ECF 344) (this Court's post trial order denying Defendant's motion for a new trial)). But material risk alone is now not enough according to *TransUnion LLC v. Ramirez* in a case seeking money damages at trial. Of course, *Spokeo* was an FCRA section 1681e(b) case seeking money damages also, but the publication element was never announced or even mentioned there, even for the lead plaintiff. It would be patently unfair and a deprivation of due process for class members in this case to be denied a recovery because at their 2017 trial they did not all satisfy a publication standard for Article III standing that was not announced until 2021.

The Ninth Circuit has found that upon remand discovery may need to be reopened pursuant to Rule 16, and that such determination is "reviewed for an abuse of discretion." *King v. GEICO Indem. Co.,* 712 Fed. App'x. 649, 651 (9th Cir. 2017) ("A district court's determination regarding whether to ... reopen discovery is reviewed for abuse of discretion."); *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1066-67 (9th Cir. 2017) (refusal to reopen discovery to reflect post-appeal developments was an abused of discretion).

Courts within the Ninth Circuit have recognized that a change in the law as a result of an appellate determination provides good cause to reopen discovery.  Courts within the Ninth Circuit

have also recognized that a change in the law as a result of an appellate determination provides good cause to reopen discovery. *Thomas v. Cassia Cnty, Idaho*, 2019 WL 5270200, at *11 (D. Idaho Oct. 17, 2019); *Ave. 6e Invs., LLC v. City of Yuma*, 2017 WL 4922019, at *6 (D. Ariz. Oct. 27, 2017). Reopening discovery here is an appropriate use of this Court's discretion in light of the change in the law on standing which shaped this case, and would allow the parties to establish conclusively, one way or the other, which class members can satisfy the publication standard.

### 2.  Factual Concealments or Misrepresentations by Trans Union

From a factual point of view, the issue of publication (which Trans Union made the crown jewel of its appeal) was predicated upon a set of evidentiary concealments or misrepresentations by Defendant that were not known, and could not reasonably have been known, by Plaintiffs at the time of the June 2017 trial.  Indeed, the Supreme Court was led to believe by Trans Union's appellate counsel that for the vast majority of class members the OFAC inaccuracy was present only in an "internal credit file, that is not disclosed to a third party" just like someone who "wrote a defamatory letter and then stored it in her desk drawer." *TransUnion LLC v*, 141 S. Ct. at 2210.  But this is fiction predicated upon Defendant's concealments or misrepresentations.

First, Defendant repeatedly misrepresented that its "name-only" OFAC product was in use for a limited period of time, and the scope of the class here was limited based upon Defendant's representations that its name-only matching procedure at the heart of this case had materially changed.  Plaintiff filed his class action complaint on February 9, 2012.  (ECF 1).  He sought damages for a class "during a period beginning two (2) years prior to the filing of this Complaint and continuing through the date of the resolution of this case . . . ." (ECF 1 at ¶ 81). This is nothing unusual given that the FCRA has a 2-year statute of limitations and violations can be continuous, or at least injuries could continue into the future, as in any cases sounding in tort.  *See* 15 U.S.C. § 1681p.  Plaintiff also sought injunctive relief, to stop the false reporting caused by the name-only matching procedure. (*See, e.g.*, ECF 1 at ¶ 110).

But Defendant contended in documents (largely filed under seal) that the name-only matching practice had ended by late 2013 and into 2014 when Defendant "implemented a DOB filer." (*See* ECF 218-4 at pp. 16, 32) (filed under seal). Trans Union witness Michael O'Connell

swore in his February 18, 2017 Declaration that as of 2014 Trans Union allegedly developed its own technology and began "to use DOB data to filter OFAC results." (ECF 218-22) (filed under seal). Defendant argued vigorously and in detail that Plaintiff's request for injunctive relief was "moot" (ECF 218-4 at p. 32) (filed under seal) allegedly because the name-only procedure that formed the basis of his claim was materially changed by 2014 due to "new technology." (ECF 227-3 at pp. 9-10) (filed under seal).  Trans Union repeated these same inaccurate statements and arguments at trial to the jury, again through witness O'Connell.  (T.T., Vol 3, pp. 487:489:22; 512:13-513:4).  Indeed, at trial O'Connell, when questioned by his own counsel, testified that the new DOB-based filter was working "very good."  (*Id.* at p. 513:3-4).

Trans Union's statements were false, but Plaintiff did not know it until after the trial.  Ample evidence has now come to light that Trans Union continued with its name-only matching procedure for OFAC into 2014, 2017, 2018 and 2020, and perhaps other time periods as well. This evidence also shows that Trans Union published the credit reports of class members who were associated with false OFAC alerts for a much longer period than originally believed possible given the contentions of Trans Union at summary judgment and at trial, which obviously took place after the close of discovery.

This newly discovered post-trial evidence (summarized below) is vitally important given the fact that the Supreme Court considered its new "publication" standard only in light of limited publication data about potential creditor inquiries (and not also employment, tenant, account review or other forms of publication inquiries) and only for a limited 7-month window in 2011 based on a trial stipulation (intended by Plaintiff to establish "material risk" of harm and, obviously, not actual publication for every class member).  *See TransUnion LLC*, 141 S. Ct. at 2208-2212.

Importantly, the Supreme Court noted that evidence beyond the stipulation *and beyond the 7-month period* may be relevant.  *Id.* 141 S. Ct. at 2212.  The Supreme Court was not persuaded by Trans Union's argument that injury could occur only in the 7-month period in 2011 used to identify the class objectively (as employed within the class definition) and found that examining the "entire 46-month period permitted by the statute of limitations" was a "serious argument."  *Id.*  Now, we know that the permissible period is much longer than 46 months (likely double that period, or longer)

because Trans Union continued to prepare and sell credit reports for victims of the name-only matching procedure *for many years after it represented to this Court that it fixed the problem and began using a date of birth filter to weed out false positives*.

Like the Supreme Court, this Court was never persuaded by Trans Union's attempt to limit the possible injury period to a 7-month period in 2011, expressly rejecting defense counsel's attempt to do that during the closing argument. T.T. Vol. 5 at 733:21-734:23 (charging conference).  At the end of the day, however, the Supreme Court stated that the Plaintiffs' trial evidence was "too weak" and "insufficient" to demonstrate third party publication for approximately 75% of class members. *Id.* 141 S. Ct. at 2212.   But there are good reasons why this evidence was weak.

As noted above, under *Spokeo*, and at the time of trial, evidence of publication was not needed to establish Article III standing or any element of any claim prosecuted by Plaintiffs in this action. Plaintiffs had satisfied the Supreme Court's 2016 standing standard from *Spokeo* eight months before trial (ECF 209), and did not try the case to jury seeking to establish constitutional principles, but the merits of their FCRA claims.

And although Plaintiffs sought publication evidence in discovery in order to establish the fact that credit reports are sold routinely to creditors and others, and also used this evidence to establish *material risk* of harm under *Spokeo*, Trans Union flatly misrepresented the availability of such evidence and the time period in which it may exist.  For example, Plaintiff sought publication evidence in written discovery, but Trans Union responded that a response was not possible because Trans Union (one of the largest data sellers in the world) allegedly could not conduct electronic searches of its own database, and also that the results of any search "cannot be guaranteed because of changes in the database and potential differences in inquiry input between the report and disclosure." (*See* ECF 66-2, Trans Union's responses to Plaintiff's Interrogatories 5-11).  Even after this Court compelled Trans Union to respond to some of Plaintiff's Interrogatories (ECF 75), Trans Union continued to insist that data on publication of OFAC hits to third parties was not "reasonably accessible" for any consumers other than those to whom it sent the OFAC disclosure letter.  (*See* ECF 110-20 Trans Union's 7/18/13 Suppl. Resps. To Interrogatories 1, 3, 5, 7-11).

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

1    Trans Union furthermore limited its review of "billing table" data to publications that took

2   place between January 1, 2011 and July 26, 2011.  (ECF 289 ¶ 1(b)).).  Therefore, a class member

3   who had an OFAC hit delivered to a potential creditor in December 2010, for example, and thus

4   unquestionably experienced the publication harm contemplated by the Supreme Court within the

5   statute of limitations, but did not receive the OFAC letter until January 2011, is *excluded* from the

6   group of 1,853 found to have Article III standing. Trans Union billing data could have been used to

7   identify additional publications within the statute of limitations.

8    After the trial it has further come to light that Trans Union maintains at least one type of

9   record called an "Input/Output" log that identifies exactly which of its clients has purchased an

10  OFAC alert and the exact date and content of the third-party report.  (*See* Appendix I, Ex. 2, *Al-*

11  *Shaikli v. Trans Union, LLC*, No. 5:20-cv-4155 (E.D. Pa.), 8/25/2021 Trans Union Suppl. Resp. to

12  Pl. Rog. 3).   This and other evidence, such as the billing records evidence discussed above can

13  conclusively establish who within the class had their credit report published while the name-only

14  OFAC procedure was still in effect, and who did not have such a third party publication.

15    At any rate, now that the Supreme Court has spoken and we know that third-party publication

16  is required for every class member and further know that the entire statute of limitation period may

17  be considered for publication purposes, this Court should allow discovery that would definitely

18  establish publication or lack thereof for every class member during the relevant period.   Such

19  discovery is permitted under Ninth Circuit law and Rule 16 on remand, *see supra* at pp. 2-3, and

20  consistent with the Supreme Court's decision in *Trans Union LLC v Ramirez*.

21       a.   **Evidence of Trans Union's Use of the Name-Only Procedure, with no DOB Filter, And Publication For Years After 2014**

22    Following the Supreme Court's decision announcing the new publication standard, class

23  counsel gathered information from class members about further publication.  Some of their

24  experiences demonstrate why further discovery on standing is warranted.

25    For example, class member **Miguel E. Rodriguez** had multiple false OFAC alert on his

26  Trans Union credit report in 2011 associating him with multiple versions of the name Miguel

27  Rodriguez Olivera and date of births which were not even close to his own.  **Rodriguez** had multiple

28  false OFAC alerts on his Trans Union credit report in 2011 associating him with multiple versions

-6-

of the name Miguel Rodriguez Olivera and date of births which were not even close to his own.  *See*

App. I Ex. 2 at ¶¶ 1-15.  But this was not the end of the story. Trans Union continued to place the

same false OFAC alert on Mr. Rodriguez's credit report in 2018. *Id.* at ¶¶ 16-31 and Exhibit C

thereto. That OFAC alert continued to show the Miguel Rodriguez Olivera name and a date of birth

some 33 years different than Mr. Rodriguez's. *Id.* at ¶¶ 15, 19 and Exhibit C thereto. The 2018 Trans

Union credit report shows that it was sold to several third parties, including a car dealership in Miami

in 2017 and to some of Mr. Rodriguez's existing creditors in 2018.  *Id.* at ¶¶ 19, 30-31 and Exhibit

C thereto. Mr. Rodriguez disputed this false OFAC alert directly with Trans Union in 2018 but Trans

Union did not remove it from his credit file despite telling him in a letter that it took his dispute

"seriously."  *Id.* at ¶¶ 21- 26 and Exhibits D and E thereto. It is unclear whether Trans Union is still

selling false OFAC alerts about class member Rodriguez – but what is clear is that Trans Union was

not "implementing" a "DOB filter" to eliminate false positives after 2014, and that it was selling

third party reports about Mr. Rodriguez in 2017 and 2018 while it had an OFAC alert on his file

based on nothing more than a partial name match.

The experience of class member **Jose Guadalupe Leal** is also instructive. Two of Mr. Leal's

2014 Trans Union credit reports associated him with an OFAC list Columbian named Jose Guillermo

Leal Rodriguez.  App. I Ex. 3 at ¶¶ 1-14 and Exhibits A and B thereto.  The dates of birth for the

OFAC suspect are 40 years different than Mr. Leal's actual date of birth at it appears in his Trans

Union credit file, showing that no date of birth filter was being used by Trans Union at those times

to eliminate false positives.  Mr. Leal's credit report was sold by Trans Union to multiple third parties

in this timeframe. *See Id*. ¶¶ 15-18 and Exhibits A and B thereto.

Non-class member **Ahmed Al-Shaikli** also presents an experience which undermines Trans

Union's representations that it filed the OFAC matching problem by implementing a "DOB filter"

in 2014.  *See* App. I Ex. 4 at ¶¶ 1-11 and Exhibits A and B thereto.  Mr. Al-Shaikli received Trans

Union "personal credit reports" on April 11, 2018 and on April 8, 2020 showing OFAC alerts

matched on what appear to be nothing more than a partial name.  *Id.*  Although years of birth on the

OFAC alerts themselves are from 1949, 1951 and 1967, this data was not used by Trans Union to

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

eliminate Mr. Al-Shaikli as a possible OFAC match, despite the fact that his date of birth in Trans Union's own credit files is in 1986. *Id.*

Trans Union has taken the position in separate litigation brought by Mr. Al-Shaikli, *Al-Shaikli v. Trans Union, LLC*, No. 5:20-cv-4155 (E.D. Pa.), that it can determine through its records that although the OFAC alert was on file for Mr. Al-Shaikli in 2018 and 2020, it did not sell it to a third party in a credit report. *See* App. I Ex. 1. Importantly, however, the same records would show a third-party sale of OFAC when it has occurred for a particular consumer. *Id.* There can be no question that Mr. Al-Shaikli's experience shows that no DOB filter was not actually implemented in 2014 and therefore, despite Mr. O'Connell's testimony, and the same basic name-only procedure led to false positives for consumers in the three-plus years since the trial in this matter.

### b. Further Evidence of Third-Party Publication Outside of the 7-Month Window

In addition to the evidence above, the experiences of other class members show that Trans Union sold credit reports about them to third parties outside of the 7-month period in 2011 that was part of the trial stipulation.

For example, the experience of class member **Luis A. Garcia** shows a false OFAC alert based upon a name-only match in 2012 and publications within the statute of limitations period both before and after the 7-month window in 2011. *See* App. I Ex. 5 at ¶¶ 1-14 and Ex. A thereto. The experience of class member **Jose Luis Jimenez** is also instructive. Mr. Jimenez, who was born in 1985, also had 2012 credit report provided to him by Trans Union with false OFAC alerts using the name-only procedure and not using dates of birth in 1945 and 1963 to eliminate false positives. *See* App. I Ex. 5 at ¶¶ 1-15 and Ex. A thereto. This document also lists multiple third-party publications to his potential and existing creditors in 2012, and well outside of the 7-month window, but well within the statute of limitations period for injury. *Id.* at ¶¶ 10-15 and Ex. A thereto.

These class member experiences individually and collectively show that there is a substantial basis to now think that class members, including some or all of the class members who fall within the population of 6,332 who did not specifically show third party publication at trial, can satisfy the publication standard announced in *Trans Union LLC v. Ramirez*. Given the changed legal landscape since *Spokeo* and Trans Union's lack of transparency and disclosure as to which class members had

-8-

1   a third-party publications and over what period of time the name-only procedure was in place while

2   OFAC sales were occurring, this Court should use its discretionary power under Rule 16 to allow

3   limited and targeted discovery on the subject of third party publication as a first stage of further

4   proceeding following remand.

5           **B.  Stage Two – Class Certification Determination**

6           A class remains certified in this case and the Supreme Court did not disturb that certification

7   ruling.  *Trans Union LLC v. Ramirez,* 141 S. Ct. at 2214. Rule 23(c)(1)(C) permits a court to "alter[]

8   or amend[] before final judgment" any order granting or denying class certification. Plaintiffs

9   propose that once it is determined through a period of limited discovery which class members have

10  third party publication, this Court should set a briefing schedule under Rule 23 when the parties can

11  argue whether the named Plaintiff Ramirez is typical of the class, the additional issue that Trans

12  Union sought to challenge on appeal to the Supreme Court. In Plaintiffs' view, however, such

13  briefing and any alteration of this Court's class certification order, if appropriate, should take place

14  only after a first stage of factual discovery regarding the number of class members who meet the

15  publication standard announced in *Trans Union LLC v. Ramirez.*

16          **C.  Stage Three – Amended or New Judgment Determination**

17          As a final stage of post-remand proceedings, this Court should determine whether it can

18  reinstate or modify the previous judgment in this matter based upon the June 2017 trial through

19  dispositive motions and/or a new trial on limited issues. As noted above, the Supreme Court affirmed

20  that at least 1,853 members of the class have Article III standing and the judgment in their favor still

21  stands. In Plaintiffs' view, re-litigating issues of reasonableness of procedures or the willfulness of

22  Defendant's non-compliance with FCRA section 1681e(b) will likely be unnecessary, but it is

23  difficult at this stage to propose a more detailed process before the parties know how this Court will

24  deal with scope of  a class with standing (which includes only class members who can demonstrate

25  publication and over what period of time) and whether this Court will revisit, alter or uphold its

26  previous class certification order. Plaintiff proposes that once stages one and two of post-remand

27  proceedings discussed above are completed, this Court should order the parties to once again confer

28  and propose an efficient process to bring this matter to a close.

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

## II.     Defendant's Proposal

### A. Background and Summary of TransUnion's Position

Plaintiff's proposal seeks sweeping discovery that would effectively restart the entire litigation.  It is based on allegations and accusations so obviously false that the very submission of the proposal impugns Plaintiff's credibility.  Early in the case, Plaintiff sought detailed discovery about which putative class members had OFAC data about them transmitted to third parties (the 1,853 "Publication" class members), and which did not (the 6,332 "No-Publication" class members).  TransUnion explained the methodology behind production of the Publication and No-Publication lists, and this methodology and the lists resulting from it were accepted by Plaintiff's counsel.  Plaintiff never questioned these, and to the contrary stipulated to the relevant figures at trial.  Now, having obtained this information through contested discovery and having stipulated to its accuracy, Plaintiff's counsel artfully repackage what they have had for a decade in an attempt to re-open an issue that has been litigated all the way to the Supreme Court.  They do so by painting a picture for the Court that is a hopeless fallacy, one that is easily disproven.

It is no coincidence that TransUnion only received the specifics of Plaintiff's proposal on Monday, November 8, despite requesting it for two months, and despite Plaintiff's counsels' repeated representations that they would provide it with sufficient time for TransUnion to analyze it and for the parties to meaningfully meet and confer regarding its contents.  Instead, Plaintiff emailed the instant proposal just 48 hours before the briefing deadline, and waited another 6 hours before providing the supporting exhibits in a form that was so heavily redacted as to impair TransUnion's review.  TransUnion can only assume that these tactics were employed to hamper its ability to vet Plaintiff's allegations and effectively respond.  However, even a cursory review reveals that Plaintiff's proposal is riddled with inaccuracies upon which the Court cannot rely.

That the parties have reached this point is unfortunate.  In an attempt to avoid what will surely be further protracted litigation and trial, TransUnion has repeatedly tried to engage Plaintiff's counsel in settlement talks.  TransUnion made a settlement offer soon after the Supreme Court ruled, and expressed a willingness to mediate if Plaintiff provided a meaningful counter.  Plaintiff rejected the offer without any counterproposal.  Just last month, TransUnion again tried to initiate settlement

discussions.  Once again, Plaintiff declined and, instead, has chosen to demand a re-do of the class discovery that was completed more than eight years ago.  Plaintiff's proposal is untenable and should be rejected.  After continual attempts to be reasonable, TransUnion is left with no option but to vigorously pursue its available remedies.

Consistent with the Supreme Court's ruling, TransUnion proposes the following.

First, the Court should enter an order dismissing Counts III and V, which assert claims for violation of disclosure provisions of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681g, since the Supreme Court found that no class member had standing to assert these claims.

Second, the Court should enter an order dismissing the claims of all 6,332 No-Publication class members.   Plaintiff stipulated before trial that these class members did not have OFAC data about them published to third parties during the class period.[1]  As discussed in greater detail below, there is no justification to re-open discovery as to these class members.  At no time has Plaintiff filed a motion to be relieved from the stipulation pertaining to the numbers of Publication and No-Publication class members.  Nor, as explained below, is there any factual or legal basis for such a motion.  The notice administrator previously used to give notice of the pendency of the class action should give notice to the No-Publication class members that their claims are dismissed and the case is complete as to them.  Because TransUnion is the prevailing party as to these class members, Plaintiff or his counsel should bear the cost of such notice.

Third, on Plaintiff Sergio Ramirez's personal claim, TransUnion should pay Mr. Ramirez $4,921.10, reflecting the jury's verdict as reduced by the Ninth Circuit.  Upon receipt of payment, Mr. Ramirez should be dismissed from the case, without prejudice to a subsequent motion for attorneys' fees, costs and a service award, to be filed after completion of all other proceedings in the case.  TransUnion reserves the right to oppose such motion and/or the amounts sought in such motion.

---

[1] These specific individuals can be identified by removing from the class list all persons who do not appear on Exhibit D to TransUnion's July 17, 2013, Supplemental Response to Plaintiff's First Set of Interrogatories.

1    <u>Fourth</u>, as ordered by the Supreme Court, typicality (and TransUnion contends, also other

2    Rule 23 elements) must be re-assessed.  TransUnion maintains that Mr. Ramirez's claim is not

3    typical of the 1,853 remaining class members, and that Mr. Ramirez is not adequate (per Fed. R.

4    Civ. P. 23(a)(4)) to continue pursuit of claims on behalf of the remaining class members.  Plaintiff's

5    submission does not make clear whether Mr. Ramirez still wishes to represent the class, or if

6    alternative class representatives will be proposed.  The Court should order Plaintiff to identify any

7    additional proposed class representatives within 30 days, and thereafter establish a schedule for

8    discovery focused on the qualifications of any additional proposed representative.  Within the same

9    30-day period, Mr. Ramirez should indicate whether he intends to continue to attempt to represent

10   what remains of the class.  Within a reasonable time thereafter (depending on the responses received

11   and whether discovery pertaining to the qualifications of any additional representatives is required)

12   TransUnion would file a motion to decertify the class.

13   <u>Fifth</u>, should the Court deny TransUnion's motion to decertify the class, then the Court

14   should enter an order in that regard and schedule a new trial on Count I, which seeks statutory

15   damages under 15 U.S.C. § 1681e(b).  This is the only count that survives the Supreme Court's

16   ruling, and given how much evidence was put before the jury on counts that were rejected by the

17   Supreme Court as a matter of law, it would be prejudicial error to deny TransUnion a new trial on

18   Count I.  In scheduling the trial, the Court should make provision for the possibility of appellate

19   review pursuant to Fed. R. Civ. P. 23(f) of any ruling on decertification of the class.

20   <u>Sixth</u>, after trial, the Court should address all issues pertaining to attorneys' fees, costs and

21   whether any service award is appropriate for Mr. Ramirez (and/or any substitute class

22   representative(s)).

**B.  There Is No Basis to Re-Open Discovery.**

**1.   Plaintiff's Counsel Have Long Been Aware of the Importance of Determining Which Class Members Had OFAC Information Published About Them During the Class Period, but Never Challenged the Findings to Which They Stipulated at Trial.**

This case was tried in June 2017 on three claims under the FCRA.  Two claims (Counts III and V of the Complaint) challenged the adequacy of defendant TransUnion's disclosures to consumers.  See 15 U.S.C. § 1681g(a), (c).  One claim (Count I) alleged that, in transmitting certain consumer reports with information pertaining to the U.S. Treasury's Office of Foreign Assets Control ("OFAC"), TransUnion failed to employ reasonable procedures designed to assure the maximum possible accuracy of the information transmitted.  See 15 U.S.C. § 1681e(b).[2]  All claims were asserted on behalf of a certified class of 8,185 consumers.  The jury rendered a verdict of $984.22 in statutory damages per class member and $6,353.08 in punitive damages per class member.  The Ninth Circuit reduced the punitive damages verdict to $3,936.88.

As set forth in the jointly-submitted Proposed Final Pretrial Order (Dkt. 250), TransUnion contended "that Plaintiff will be unable to prove injury in fact as a result of any statutory violation, and that proof of injury in fact is a condition of any recovery for the class."  In its June 25, 2021, opinion in this case, the Supreme Court accepted TransUnion's contention in full with respect to the two disclosure claims, and accepted TransUnion's contention in part with respect to the reasonable procedures claim.  The trial record did not show sufficient injury in fact to any class member to support either disclosure claim.  The 6,332 class members who did not have OFAC information about them communicated externally to a third party (the "No-Publication" class members) lacked sufficient injury in fact to pursue any claim at all.  The Supreme Court also ordered that further proceedings occur with respect to whether the element of typicality, per Fed. R. Civ. P. 23(a)(3), was sufficiently established for class certification.

---

[2] Counts II, IV and VI asserted claims under state law, but the Court denied Plaintiff's motion to certify those claims for class treatment, and they were abandoned before trial.

Plaintiff relies on <u>Thomas v. Cassia County</u>, No. 4:17-CV-00256-DCN, 2019 WL 5270200 (D. Idaho Oct. 17, 2019), to argue that a change in law provides good cause to re-open discovery on class membership.[3]  <u>Thomas</u> does not help them.  There, the Supreme Court decision turned on a new, unforeseen <u>factual</u> issue, on which there was <u>no</u> previous discovery – circumstances nothing like the present case.  This Court will recall that it was <u>Plaintiff</u> who argued that discovery of which consumers were Publication class members and which were No-Publication class member mattered greatly to the case, and <u>Plaintiff</u> who successfully pursued a discovery motion seeking both the numbers in each category as well as the consumers' names and addresses.  When this information was provided, Plaintiff accepted it without further discovery efforts, and ultimately entered into a stipulation conclusively resolving the factual issue and definitively establishing the size of each population.  Unlike <u>Thomas</u>, the present case involves no <u>unforeseen</u> factual issue created by the Supreme Court's ruling.  Plaintiff's counsel both foresaw the factual issue and took discovery on it.  The parties have long foreseen the importance of distinguishing between Publication and No-Publication class members, a methodology for identifying them was employed, the outcome was accepted via stipulation and its implications were argued by both sides at trial and on appeal.[4]

---

[3] In <u>Ave. 6e Invs., LLC v. City of Yuma</u>, 2017 WL 4922019 (D. Ariz. Oct. 27, 2017), also cited by plaintiff, the court never addressed the issue of whether a change in law provides good cause to reopen discovery.

[4] Regardless, Plaintiff's claim that the Supreme Court's ruling constitutes "new law" on the subject of whether third-party communication must be shown to pursue a §1681e(b) claim is untrue.  The statute itself defines a "consumer report" as a "communication," 15 U.S.C. § 1681a(d)(1), and for that reason most courts found communication to be an element of a §1681e(b) claim.  <u>See, e.g.</u>, <u>Collins v. Experian Info. Sols., Inc.</u>, 775 F.3d 1330, 1335 ("A 'consumer report' requires communication to a third party…."), <u>pet. for reh'g denied</u>, 781 F.3d 1270 (11th Cir. 2015); <u>Washington v. CSC Credit Servs., Inc.</u>, 199 F.3d 263, 267 (5th Cir. 2000) ("a plaintiff bringing a claim that a reporting agency violated the 'reasonable procedures' requirement of § 1681e must first show that the reporting agency released the report"); <u>Johnson v. Equifax, Inc.</u>, 510 F. Supp. 2d 638, 645 (S.D. Ala. 2007) ("a prerequisite to a cause of action under § 1681e(b) is evidence showing that a consumer report was furnished to a third party," and not simply to the consumer himself).  Ninth Circuit authority holding to the contrary, <u>Guimond v. Trans Union Credit Info. Co.</u>, 45 F.3d 1329 (9th Cir. 1995), was an outlier, and its authority was crumbling by the time of trial here.  Plaintiff's counsel concede that the Supreme Court's 2016 <u>Spokeo</u> ruling discussed standing requirements and the need for plaintiffs to plead injury-in-fact, and was the foundation for the Supreme Court decision here.  Moreover, on <u>Spokeo</u>'s remand to the Ninth Circuit in 2017, the Ninth Circuit effectively repudiated <u>Guimond</u>, saying that third-party communication must be

1    <u>Thomas</u> also confirms that diligence is the most important factor in determining whether

2    good cause justifies re-opening discovery.  <u>Id.</u> at *11.  Plaintiff did not exercise diligence here.

3    Critically, at no time during the pre-trial or trial proceedings did Plaintiff challenge the evidence

4    showing which class members fell into the "Publication" category and which fell into the "No-

5    Publication" category.  Nothing justifies re-doing factual analysis that was completed more than

6    eight years ago.

7         Plaintiff first sought discovery as to the parameters of the class in 2012 by way of his First

8    Set of Interrogatories (the "Interrogatories"), and TransUnion first responded in August 2012.

9    Subsequently, Plaintiff questioned whether TransUnion's response was sufficient, and the Court

10   entered its March 13, 2013 Order re: Joint Discovery Dispute Statement.  In response, on July 17,

11   2013, TransUnion served its Supplemental Responses to the Interrogatories.  These were verified by

12   Lynn Romanowski (also known as Lynn Prindes).

13        Among other things, TransUnion identified, by name and address, all 8,192 individuals

14   originally in the class (seven later opted out of the class), in its response to Interrogatory No. 4 and

15   Exhibit B thereto.  In its verified response to Interrogatory No. 8 and Exhibit D thereto, TransUnion

16   also identified, by name and address, the subset of 1,853 class members who had OFAC data about

17   them sold to a third party.  Interrogatory No. 7 explained the methodology TransUnion followed to

18   determine who was in the subset of class members about whom OFAC data was sold:  "by

19   determining how many individuals listed [in the larger group of 8,192] had an inquiry logged to a

20   billing table, where OFAC data was requested and resulted in delivery of data."

21        TransUnion also explained in its July 2013 Supplemental Interrogatory Responses that "these

22   responses are as complete as TransUnion can provide based upon reasonably accessible data.  The

23   responses also focus on the 2010 and 2011 calendar years, which was critical to allow the responses

24   _____

25   shown in FCRA cases.  "[I]n many instances, a plaintiff will not be able to show a concrete injury
     simply by alleging that a consumer-reporting agency failed to comply with one of FCRA's

26   procedures.  For example, a reporting agency's failure to follow certain FCRA requirements may
     not result in the creation or dissemination of an inaccurate credit report.  In such a case, the statute

27   would have been violated, but that violation alone would not materially affect the consumer's
     protected interests in accurate credit reporting."  <u>Robins v. Spokeo, Inc.</u>, 867 F.3d 1108, 1115-16

28   (9th Cir. 2017).

1    to be delivered in a reasonable amount of time."  (Gen. Obj. 11.)  Notably, although the class period

2    only covered the period January 1-July 26, 2011, the data pre-dates the start of the class period by

3    one full year, and post-dates the end of the class period by more than five months.  In other words,

4    the class list is already over-inclusive by a period of 17 months.  None of this was controversial, and

5    for the subsequent eight years of litigation all parties treated it as definitive data for purposes of

6    litigating the case.  TransUnion made no effort to refine the data to exclude persons who fell outside

7    the class definition written by Plaintiff's counsel.

8           Plaintiff never challenged the July 2013 Supplemental Interrogatory Responses as

9    insufficient, and took no discovery seeking to challenge the methodology employed or questioning

10   the results.  This is because, as noted above, those results were over-inclusive and gave Plaintiff a

11   larger class than was pleaded.  Plaintiff never requested Ms. Romanowski's deposition.  Later, on

12   April 22, 2014, Ms. Romanowski submitted a declaration providing additional detail about the

13   composition of the proposed class, in connection with TransUnion's opposition to Plaintiff's motion

14   to certify the class.  Again, Plaintiff did not challenge her analysis or seek to depose her.

15          On July 15, 2016, more than two years later, at any time during which Plaintiff could have

16   pursued additional discovery on the issue, the Court entered its Amended Pretrial Order, which

17   established an October 14, 2016, Fact Discovery Cut-Off.  Plaintiff never sought relief from this

18   Order to take further discovery pertaining to the composition of the class (having already had four

19   years since the initial discovery on the issue), nor did Plaintiff seek to depose Ms. Romanowski prior

20   to the cut-off.  To the contrary, Ms. Romanowski's work formed the basis of the June 13, 2017,

21   Stipulation Regarding Class Data, which was read to the jury and never questioned at any time during

22   the appellate proceedings.

23          Further, Plaintiff's counsel had unfettered access to the class for nearly a decade.  To the

24   extent information was needed to question whether a class member did or did not belong on the

25   Publication list, nothing stopped Plaintiff's counsel from obtaining that information directly from

26   class members.  Plaintiff's counsel do not describe any efforts made during the course of the

27   litigation to test the accuracy of the class list or of the identification of which class members were

28

-16-

Publication class members.  They describe no outreach to the class members as to this issue.  Their

lack of diligence is alone sufficient to deny their request to re-open discovery.

## 2.   Plaintiff's Claim That Four Class Members Were Erroneously Left Off the "Publication" List Lacks Factual Support.

Plaintiff's main argument to re-open discovery as to class composition is a brand-new

argument that four class members should have appeared on the Publication list but do not:  Luis A.

Garcia, Jose Luis Jimenez, Jose Guadalupe Leal and Miguel E. Rodriguez.  Of course, Plaintiff's

counsel waited until Monday, November 8, to even identify these individuals to TransUnion's

counsel despite TransUnion's requests for this information for two months.[5]

The supporting exhibits were not provided until the afternoon of November 8, and even then

they were so heavily redacted as to make it exceptionally challenging for TransUnion and its counsel

---

[5] Plaintiff's counsel John Soumilas and Lauren Brennan first suggested that they would like additional discovery in a September 10, 2021, phone call with TransUnion's counsel Stephen Newman and Damali Taylor.  During this call, TransUnion's counsel requested details as to what discovery would be requested and the reasons why, but no concrete details were provided.  Nor were Plaintiff's counsel prepared at that time to suggest any going-forward case management plan.  The call was adjourned with TransUnion's counsel requesting to receive Plaintiff's proposal before speaking again.  In a follow-up call on September 23, 2021, Plaintiff's counsel stated that they wished discovery to test whether the Publication list was accurate, but provided no details as to why they believed that to be so.  TransUnion requested specific documentation in support of their contentions (and the proposed case management plan, which had not been received).  Plaintiff's counsel promised their portion of the joint report and supporting materials – including materials supporting any request to re-open discovery – by October 8 or thereabouts.  Again, nothing was provided on October 8.  The explanation given was that Mr. Soumilas was on honeymoon, so TransUnion's counsel did not immediately press the issue.  In an October 12 email from Lauren Brennan, Plaintiff's counsel stated, "We certainly want to give TransUnion time to prepare its section," and for that reason the conference before this Court was continued.  However, Plaintiff's section of the joint report still was not forthcoming.  In an email dated October 19, Ms. Brennan stated, "We expect to get you a draft of the report by the end of this week [October 22]," but again that date was missed.  In a conversation between Mr. Soumilas and Mr. Newman on October 29, Mr. Newman again requested specific information in support of the claim that the Publication list was not accurate, as well as for Plaintiff's portion of the joint report.  Mr. Newman reminded Mr. Soumilas again in a phone call on November 3, and Mr. Soumilas said Plaintiff's portion of the joint report would be provided within "a day or two" (i.e., by November 5 at the latest).  Ultimately, nothing was received until November 8, nearly two months after the issues were first discussed, and only two days before the deadline for filing the present joint report.  Plaintiff's counsel refused TransUnion's request to stipulate to move the conference date again in light of the late delivery of their portion of the joint report and the supporting material.

to properly evaluate Plaintiff's new arguments.  In an apparent effort to prevent TransUnion from meaningful review until after the joint report was submitted, Plaintiff's counsel expressly refused to provide Social Security Numbers for these individuals.

Notwithstanding the limited information provided, and despite the obstacles Plaintiff's counsel attempted to interpose, TransUnion can confirm that the supposedly "new" information does not contradict the accuracy of the Publication list or otherwise prove that any No-Publication class member has a potentially valid claim.

TransUnion's Supplemental Responses to Interrogatory No. 8 and Exhibit D thereto, served on July 17, 2013, set forth the subset of 1,853 unique class members who had OFAC data sold about them to a third party during the 2010 and 2011 calendar years.  Of the four class members identified, two accurately appear on Exhibit D, the list of Publication class members.  Based on the documents submitted, Luis A. Garcia appears on line 332 of this list, and Jose Guadalupe Leal appears on line 813 of this list.  Their accurate appearance on the Publication list dooms Plaintiff's request for new discovery.

With respect to the other two, Miguel E. Rodriguez and Jose Luis Jimenez, who appear on the class list but not the Publication list, none provides any evidence of any publication of OFAC information about them during the 2010-2011 period which Plaintiff's counsel accepted long ago as the appropriate period to review.  Mr. Rodriguez's documents show no hard inquiries (regular credit inquiries) in 2010-2011, and just one in 2009, before the class period alleged in the complaint.[6]  Mr. Jimenez also provides no documents showing any publication of OFAC information during the accepted 2010-2011 period.  There were no regular credit inquiries during this period and only three inquiries in 2012, after the class period.  Moreover, even if information about the 2010-2011 period had been provided, that would not be definitive.  As was explained at trial (and undisputed), OFAC

---

[6] Plaintiff concedes in his section, supra, that claims based on activity in 2009 would be time-barred, which is why the class was defined to exclude such activity.  Information provided about activity in 2018, post-trial, is far outside the class period and completely irrelevant.  Regardless, TransUnion's preliminary review of Mr. Rodriguez's file shows no possibility that any adverse OFAC data was published about him to any third party, and Mr. Rodriguez proffers no evidence of any publication.

is not always sold with every credit report because many large lenders conduct their own review of OFAC data, so proof of a credit inquiry does not establish delivery of OFAC data by TransUnion. Regardless, neither Mr. Rodriguez nor Mr. Jimenez claims to have been denied or delayed credit by reason of any delivery of any OFAC data or any OFAC review by anyone.

In short, there is no evidence that any of these four class members were improperly categorized at all, much less that fraud or poor recordkeeping caused any improper categorization. Hyperbole aside, Plaintiff's counsel give the Court no credible support for their unorthodox request.

Plaintiff also challenges – eight years after discovery responses were served – the methodology by which the class list and Publication list were developed.  Their basis for doing so is information supposedly obtained about "input/output logs" in another case, Al-Shaikli v.TransUnion, in which erroneous OFAC information supposedly was transmitted in violation of 15 U.S.C. § 1681e(b).  But Plaintiff's counsel fail to disclose to the Court that they were counsel to Mr. Al-Shaikli in the other case, that they voluntarily dismissed his §1681e(b) count on September 24, 2021, and that TransUnion paid no consideration for the dismissal.  These are major omissions that further call into doubt the credibility of Plaintiff's proposal and the arguments made in support of it.

Regarding the input/output logs, when they were provided to Plaintiff's counsel in connection with the Al-Shaikli case, Plaintiff's counsel were informed that neither these logs or anything like them are available for activity prior to October 2016, long after the Ramirez class period closed.  Their suggestion now to the Court that additional information is available to challenge the No-Publication list is disturbing, and particularly so in light of their decision to dismiss the §1681e(b) count in Al-Shaikli itself.  Discovery of input-output logs is irrelevant to the Ramirez class and class period, as Plaintiff's counsel well know.

The Al-Shaikli material is the same material Plaintiff's counsel also uses to suggest – again falsely – that TransUnion's prior statement about filtering OFAC data against date-of-birth data was incorrect.  Plaintiff's allegations are false and Plaintiff's counsel should know that.  As an initial matter, Al-Shaikli involved only disclosures to consumers, not reports published to third parties. Michael O'Connell's May 27, 2015, Declaration (Dkt. 181) stated, "As of September 29, 2014, TransUnion ceased using name-only matching logic.  Since September 29, 2014, TransUnion has

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

incorporated date of birth information, where such information is readily available, as a filter to exclude certain potential matches from OFAC product deliveries."  Nothing Plaintiff's counsel submits now contradicts this statement in any respect.

In Mr. Al-Shaikli's case, during an error that inadvertently occurred during a hardware upgrade, unfiltered OFAC data was for a short period of time accidentally observable by certain consumers on their own reports, but never by third parties.  After Mr. Al-Shaikli sued, TransUnion provided his counsel (the same counsel here) evidence that no erroneous third-party publication occurred, that there was no risk of erroneous publication and that erroneous OFAC data could not have been transmitted to anyone but the consumer himself or herself.  Plaintiff's counsel accepted this evidence as credible and therefore dismissed his claim under §1681e(b).  TransUnion hopes that Plaintiff's counsel's failure to disclose this critical information regarding the true circumstances of the Al-Shaikli case is somehow inadvertent and not a blatant attempt to mislead the Court.

Similarly, Mr. Rodriguez observed unfiltered OFAC information on his own credit report, but nothing in his documents suggests erroneous OFAC information about him was either published to any third party or that a risk of such erroneous publication existed.  And the Supreme Court expressly found that communication of erroneous information to the consumer himself or herself is not actionable under §1681e(b).  Hence Mr. Al-Shaikli's dismissal of his §1681e(b) claim.  Just as Mr. Al-Shaikli conceded, Mr. Rodriguez has no valid claim under §1681e(b) based on this post-class-period, post-trial event.

Nor do Mr. Leal's documents contradict Mr. O'Connell's testimony.  As noted above, Mr. Leal accurately appears on the Publication list.  With respect to documents purporting to show no date-of-birth filtering in 2014, Mr. Leal's documents are from June 2014 and earlier.  Mr. O'Connell testified that the filtering was implemented on September 29, 2014.  Plaintiff's contention that Mr. O'Connell lied is untrue and no evidence supports Plaintiff's contention.

Plaintiff has filed no motion for relief from the discovery cut-off or his prior stipulation as to the class list and Publication list, and any such motion would lack a factual basis.  Nothing they have placed before the Court shows any inaccuracy or any defect in methodology.

There is literally no evidence that TransUnion made any false statement to the Court.

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

### 3.    The Supposedly "New" Facts Provide No Grounds to Reopen Discovery.

Plaintiff's submission does not establish that the Publication list is inaccurate.   To the contrary, the additional documents confirm its accuracy.   Regardless, Plaintiff has waited far too long to raise the issue:   nine years after the information was first provided in discovery, six years past the fact discovery cut-off, and four years past the stipulation as to how many class members had OFAC information about them published to third parties.

Federal Rule of Civil Procedure 16(b)(4) provides that "a schedule may be modified only for good cause and with the judge's consent."   "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment."   <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.2d 604, 609 (9th Cir. 1992).   "If that party was not diligent, the inquiry should end."   Id.   Plaintiff's lack of diligence with regards to class composition and the categorization of class members traces back almost a decade.   The scope of the class was litigated from the beginning of the case, and that litigation resulted in the class list itself and the Publication list.   "Where, as here, the party knows or is in possession of the information that forms the basis of the later [Rule 16(b) motion] at the outset of the litigation, the party is presumptively not diligent."   <u>Price v. Trans Union, LLC</u>, 737 F. Supp. 2d 276, 280 (E.D. Pa. 2010) (emphasis added); <u>see also</u> <u>Miller v. O'Brien Constr., Inc.</u>, No. 4:19-CV-01611, 2021 WL 510072, at *3 (M.D. Pa. Feb. 11, 2021) ("This presumption 'may be rebutted by a cogent explanation as to why the proposed amendment was not included in the original pleading.'   But in the absence of diligence, there is no 'good cause.'") (internal citations omitted). Plaintiff's proposal lacks any discussion whatsoever of counsel's own diligence in seeking information to challenge the list.

In essence, having lost in the Supreme Court, Plaintiff wishes to re-start class discovery from the very beginning, but this is completely improper.   Rule 16(b)(4) "good cause" is not met when a party seeks relief from a "calculated decision" regarding litigation strategy.   <u>Kernal Recs. Oy v. Mosley</u>, 794 F. Supp. 2d 1355, 1370 (S.D. Fla. 2011), <u>aff'd</u>, 694 F.3d 1294 (11th Cir. 2012).   If Plaintiff's failure to take discovery was inadvertent, "carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."   <u>Johnson</u>, 975 F.2d at 609; <u>see also</u> <u>Petrone v. Werner Enters., Inc.</u>, 940 F.3d 425, 434 (8th Cir. 2019) (good cause to extend discovery deadline

1  to allow revised expert report not shown when expert could have recognized flaws in his report, but

2  "simply failed to do so").

3      Where, as here, a party had "ample opportunity to conduct discovery, . . . yet they simply

4  failed to diligently pursue evidence," such failure "dooms" their "belated request" to reopen

5  discovery. Hamidi v. Serv. Emps. Int'l Union Loc. 1000, 386 F. Supp. 3d 1289, 1299 (E.D. Cal.

6  2019); accord Panatronic USA v. AT&T Corp., 287 F.3d 840, 846 (9th Cir. 2002) (no abuse of

7  discretion for refusal to reopen discovery where the movant had "ample opportunity to conduct

8  discovery" prior to its request to reopen); see also Anderson Living Tr. v. WPX Energy Prod., LLC,

9  308 F.R.D. 410, 414 (D.N.M. 2015) ("the Court will not reopen class certification discovery, because

10  the Plaintiffs had a full and fair opportunity to develop evidence supporting their class certification

11  evidence in the first round of discovery, and because reopening discovery at this stage would

12  prejudice the Defendants and needlessly delay the case's progress") (citing Newberg on Class

13  Actions).

14      The present situation, moreover, goes beyond a mere lack of diligence.  Plaintiff stipulated

15  at trial to the sizes of the Publication and No-Publication populations within the class.  This

16  stipulation is binding on Plaintiff and on all class members (since it was made after class certification

17  and after appointment of class counsel).  Plaintiff fails to proffer sufficient evidence – indeed, any

18  evidence – suggesting that the stipulation was entered into without full awareness of the parameters

19  of the case, or that TransUnion acted in bad faith in making the stipulation.  As noted above, Ms.

20  Romanowski's analysis potentially overstated both class size and the subpopulations within the

21  class.  The rule is simple: Stipulations of fact are binding against the party that makes them. Geremia

22  v. First Nat. Bank of Boston, 653 F.2d 1, 5 (1st Cir. 1981); see also Gaztambide Barbosa v. Torres

23  Gaztambide, 776 F. Supp. 52, 57-58 (D.P.R. 1991) (refusing to relieve a party of an "admission"

24  that was "embraced for at least five years").

25      Even if this matter had not already proceeded through a full jury trial and two levels of

26  appellate review, Plaintiff would not be justified in re-opening discovery.  There is no "good cause,"

27  within the meaning of Federal Rule of Civil Procedure 16(b)(4), to reopen discovery on this subject

28  six years after expiration of the deadline set forth in the Amended Pretrial Order.

Further, that this case went up on appeal and was decided by the Supreme Court independently forbids Plaintiff's counsel's attempt to take new discovery in an effort to re-make the class.  Plaintiffs cannot seek to undo their prior stipulation by seeking new evidence outside the class period, and they are bound by the Supreme Court's determination that all claims of all 6,332 No-Publication class members are barred.  The Supreme Court ruled – expressly rejecting Plaintiff's arguments to the contrary – that <u>only</u> publications within the January-July 2011 class period matter at all, and that the class data stipulated to at trial was definitive and binding:

> Finally, the plaintiffs advance one last argument for why the 6,332 class members are similarly situated to the other 1,853 class members and thus should have standing. The 6,332 plaintiffs note that they sought damages for the entire 46-month period permitted by the statute of limitations, whereas the stipulation regarding dissemination covered only 7 of those months. They argue that the credit reports of many of those 6,332 class members were likely also sent to third parties outside of the period covered by the stipulation because all of the class members requested copies of their reports, and consumers usually do not request copies unless they are contemplating a transaction that would trigger a credit check.
>
> That is a serious argument, but in the end, we conclude that it fails to support standing for the 6,332 class members. The plaintiffs had the burden to prove at trial that their reports were actually sent to third-party businesses. The inferences on which the argument rests are too weak to demonstrate that the reports of any particular number of the 6,332 class members were sent to third-party businesses. The plaintiffs' attorneys could have attempted to show that some or all of the 6,332 class members were injured in that way. They presumably could have sought the names and addresses of those individuals, and they could have contacted them. In the face of the stipulation, which pointedly failed to demonstrate dissemination for those class members, the inferences on which the plaintiffs rely are insufficient to support standing.

<u>TransUnion</u>, 141 S. Ct. at 2212.

To allow Plaintiff to attempt to redefine the class period, to change the composition of the class or to redefine No-Publication class members as Publication class members would directly contradict the Supreme Court's mandate and thus be immediately correctable by mandamus.  "A district court, upon receiving the mandate of an appellate court cannot vary it or examine it for any other purpose than execution."  <u>United States v. Cote</u>, 51 F.3d 178, 181 (9th Cir. 1995) (internal quotation marks omitted).  The request to re-open discovery should be denied.

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

**C.   There Is No Dispute that the Disclosure Counts Should Be Dismissed or that No-Publication Class Members Should Be Dismissed.**

Although Plaintiff's Proposal improperly suggests that some No-Publication class members might be Publication class members, Plaintiff does not appear to question that the Supreme Court's ruling bars the disclosure claims (Counts III and V) as to all class members and bars all claims as to No-Publication class members.  As shown above, there is no justification to revisit the composition of the Publication list, and to implement the Supreme Court's mandate an order of dismissal should be entered as to these items, leaving only Count I and only (potentially) as to Publication class members.

The No-Publication class members should be informed of the dismissal.  These individuals previously received notice of pendency of the class action after their claims were certified, and they should be informed now that their claims have been resolved against them, because dismissal is an important "step in the action."  See Fed. R. Civ. P. 23(d)(1)(B)(i).  Because TransUnion prevailed as to these class members, Plaintiff (or class counsel) should bear any associated notice costs.

**D.   Mr. Ramirez's Claim Has Been Fully Adjudicated, and TransUnion Should Pay Mr. Ramirez the Amount Awarded by the Jury (as Reduced by the Ninth Circuit).**

With respect to Mr. Ramirez's personal claim, TransUnion should pay the total jury award (as modified by the Ninth Circuit) of $4,921.10.  As the Ninth Circuit found, "This litigation has already spanned a number of years, and we do not think a new trial would bring to light any new evidence that might permit a [punitive damages] ratio higher than 4 to 1."  Ramirez v. TransUnion LLC, 951 F.3d 1008, 1037 (9th Cir. 2020).  Mr. Ramirez did not contest this finding in the Supreme Court and nothing in Plaintiff's Proposal suggests any further proceedings on Mr. Ramirez's personal claim.  Upon payment, he should be dismissed from the case.  Proceedings pertaining to any attorneys' fees or cost awards can be addressed later, and do not depend on his continued participation in the litigation.

**E.  The Supreme Court Expressly Directed Further Proceedings as to the Propriety of Class Certification, and Accordingly TransUnion Has the Right to Move for Decertification.**

With the elimination of the disclosure counts as well as all No-Publication class members, the case for maintaining certification is extremely weak.  Accordingly, TransUnion would move to decertify what remains of the class.

This Court initially noted, in the original class certification order, that certification of Count I was a much closer call than certification of the disclosure counts.  The evidence at trial confirmed the weakness of the certification theory for Count I.  Mr. Ramirez's personal claim under Count I was significantly different than that of a generic class member, in terms of the nature of the impact on him and even as to the specific words used to communicate OFAC information.  The undisputed evidence at trial showed that almost no class members had credit reports with the pre-Cortez "match" language rather than the post-Cortez "potential match" language.[7]

Regardless of whether that distinction matters for purposes of liability, it certainly matters for damages.  TransUnion would be prejudiced based if a damages award is based on evidence that simply did not apply to over 97% of the portion of the class that remains.  See Marcus v. BMW of N. Am., LLC, 687 F.3d 583, 598 (3d Cir. 2012) (purpose of the typicality requirement is "to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class") (internal quotation marks and citation omitted); Soutter v. Equifax Info. Servs., LLC, 498 F. App'x 260, 265 (4th Cir. 2012) (reversing certification order in FCRA case because the representative's claims were "typical" only on an "unacceptably general level").

Accordingly, it would be reversible error to allow Mr. Ramirez to remain as the class representative, in light of the present record.  There can be no reasonable dispute that the disclosure claim – based on all class members receiving the same form of letter from TransUnion – was the

---

[7] The evidence was undisputed that the reseller ODE delivered TransUnion data on a non-standard form that omitted the post-Cortez "potential match" language, and that only 40 class members had OFAC data sold via ODE.  There was no evidence that any other transmission occurred without the post-Cortez language.

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

glue that held the whole class together.  With that claim out of the case, the differential experiences of all class members become much more salient, and the atypicality of Mr. Ramirez's own claim becomes glaringly obvious.  To date, there has been no evidence that any class member other than Mr. Ramirez was denied credit or had a transaction delayed by reason of publication of erroneous OFAC information.  Not even the new declarations from the four class members presented now make such a claim.  None alleges any denial or delay of credit whatsoever.  None alleges any personal embarrassment or emotional distress at all, much less of the degree of seriousness to which Mr. Ramirez testified.  At a minimum, this lack of evidence suggests lack of typicality and commonality with respect to the assessment of damages.[8]

Nevertheless, TransUnion acknowledges that an alternative class representative potentially may be willing to pursue the litigation on behalf of the remaining portion of the class.  Any such representative should be identified promptly, and TransUnion should be allowed a full and fair opportunity to contest such person's qualifications, including through targeted discovery focused on such qualifications, and to bring a motion for decertification.

If TransUnion's motion for decertification is granted, there will remain no substantive matters to litigate, and the case should be dismissed in its entirety.  Subsequently (and most likely, after Plaintiff files a petition for leave to appeal under Rule 23(f)), the parties can file motions pertaining to fees and costs.

If instead TransUnion's motion for decertification is denied, TransUnion anticipates seeking leave to appeal under Rule 23(f), and if the class remains certified, a new trial can be scheduled.

**F.  If the Class Remains Certified, TransUnion Is Entitled to a New Trial**

Most of the trial evidence focused on the disclosure counts, which the Supreme Court held were defective as a matter of law.  They never should have been presented to the jury, and

---

[8] Mr. Ramirez also faces a potential adequacy challenge.  See In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1124 (7th Cir. 1979) (court has a "continuing duty to undertake a stringent examination of the adequacy of representation by the named class representatives and their counsel at all stages of the litigation").  Failure to seize opportunities to settle the matter on behalf of all class members resulted in TransUnion pursuing its remedies in the Supreme Court, leading to an outcome where approximately 80% of the class will recover nothing.  Even today Plaintiff's counsel refuses any meaningful engagement on the subject of settlement.

1   TransUnion objected repeatedly to them and to the evidence proffered in support of those legally

2   invalid claims.

3            The submission of the disclosure evidence necessarily had a prejudicial impact on

4   TransUnion in both the liability and damages phases of the trial.  Among other things, Plaintiff's

5   counsel improperly displayed to the jury a portion of the <u>Cortez</u> opinion, pertaining to the disclosure

6   claim, that had been excluded pursuant to a prior motion in limine.  Plaintiff also introduced

7   correspondence between a TransUnion in-house attorney and OFAC and focused intensely on the

8   disclosure-related issues presented by that correspondence, arguing that TransUnion had lied to

9   OFAC about what it was disclosing to consumers:  "And then I'd like you to consider what

10  TransUnion, at the very highest level, its general counsel's office is telling the U.S. government

11  about this and what they actually tell consumers in this letter."  In his closing argument,  Plaintiff's

12  counsel also mocked TransUnion's "Stone Age" disclosure technology and again emphasized, that

13  TransUnion was "not honest" with consumers about what was in their file or how to fix it:  "And no

14  good could come from that."  Much of Plaintiff's argument on punitive damages also focused on

15  matters pertaining to the disclosure claims, and this Court's refusal to remit punitive damages was

16  based principally on the evidence submitted in support of the disclosure claims.  Plaintiff's counsel

17  also argued for a large punitive damages award based on the unsupported claim that persons outside

18  the class were harmed – an argument that under the Supreme Court's ruling was plainly improper.

19  With the disclosure claims completely out of the case per the Supreme Court's decision, none of this

20  evidence and argument should have been before the jury at all, and its inflammatory and prejudicial

21  impact cannot be unwound.

22           Fairness dictates that TransUnion be allowed a new trial if class proceedings are permitted

23  to continue.  See <u>Maryland v. Baldwin</u>, 112 U.S. 490, 493 (1884) (retrial ordered after reversal on

24  one count based on risk that jury was influenced by evidence on reversed count); <u>Freitag v. Ayers</u>,

25  468 F.3d 528, 547 (9th Cir. 2006) (general compensatory damages verdict entered on claims under

26  two different statutes; new trial on damages strongly suggested when liability was upheld as to only

27  one claim); <u>Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.</u>, 173 F.3d 725, 732-33 (9th Cir.

28  1999) (claims for defamation and false advertising based on multiple statements resulted in general

damages verdict; when appellate court found that two statements were not actionable, retrial on damages was ordered because "we cannot discern how much may have been attributable to the two statements that were not actionable"); Maynard v. City of San Jose, 37 F.3d 1396, 1406 (9th Cir. 1994) ("The special verdict form did not apportion the damages between the verdicts we have reversed and the ones we have affirmed.  We vacate the damages award and remand."); Counts v. Burlington N. Ry., 952 F.2d 1136, 1140 (9th Cir. 1991) (retrial ordered despite no request for verdict form allocating damages to particular counts).

**G.   Attorneys' Fees and Costs Cannot Be Determined until All Other Issues Are Resolved.**

Plaintiffs' proposal does not address how claims for attorneys' fees and costs might be resolved.  Presumably they do not object to deferring all such matters until all prior issues are finally determined.

Respectfully submitted,

/s/ John Soumilas

**FRANCIS MAILMAN SOUMILAS, P.C.**
JAMES A. FRANCIS
JOHN SOUMILAS
1600 Market Street, Suite 2510
Philadelphia, PA 19103
Telephone: (215) 735-8600


**OGILVIE & BREWER, LLP**
**ANDREW J. OGILVIE**

ANDREW J. OGILVIE
CAROL MCLEAN BREWER
4200 California Street, Suite 100
San Francisco, California 94118
Telephone: (415) 651-1950
Facsimile: (415) 651-1952

*Attorneys for Plaintiff*
*Sergio L. Ramirez and the Class*

/s/ Stephen J. Newman

**STROOCK & STROOCK & LAVAN LLP**
JULIA B. STRICKLAND
STEPHEN J. NEWMAN
CHRISTINE ELLICE
2029 Century Park East, 18th Floor
Los Angeles, CA 90067-3086
Telephone: (310) 556-5800


**SHERMAN SILVERSTEIN KOHL
ROSE AND PODOLSKY**

BRUCE LUCKMAN
308 Harper Drive, Suite 200
Moorestown, NJ 08057
Telephone: (856) 662-0700
Facsimile: (856) 448-4744



**O'MELVENY & MYERS LLP**

DAMALI A. TAYLOR
Two Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 984 8700
Facsimile: (415) 984 8701

**O'MELVENY & MYERS LLP**

ELIZABETH L. MCKEEN
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823 6900
Facsimile: (949) 823 6994

*Attorneys for Defendant*
*Trans Union, LLC*

1    I, Stephen J. Newman, attest that all other signatories listed, on whose behalf the filing is

2  submitted, concur in the filing's content and have authorized the filing.

3

4                                                     /s/ Stephen J. Newman
                                                      Stephen J. Newman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT REPORT RE: POST-APPEAL PROCEEDINGS
Case No. 12-cv-00632-JSC

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2021, a copy of the foregoing **JOINT REPORT RE: POST-APPEAL PROCEEDINGS** was filed electronically and served by U.S. Mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


*/s/ Stephen J. Newman*
Stephen J. Newman