UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO L. RAMIREZ,<br><br>    Plaintiff,<br><br>    v.<br><br>TRANS UNION, LLC,<br><br>    Defendant. | Case No. 12-cv-00632-JSC<br><br>**ORDER RE: MOTION FOR FINAL APPROVAL; MOTION FOR ATTORNEY'S FEES, COSTS, AND INDIVIDUAL SERVICE AND SETTLEMENT AWARD**<br><br>Re: Dkt. Nos. 420, 426 |

Sergio Ramirez filed this class action alleging that Trans Union violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq., through its OFAC Name Screen Alert. The OFAC Name Screen Alert or OFAC Alert is a service Trans Union provides to its customers which identifies persons whose names match individuals (known as Specially Designated Nationals or SDNs) on the United States government's list of terrorists, drug traffickers, and others with whom Americans are prohibited from doing business.

After a jury returned a verdict in Mr. Ramirez's favor, Trans Union appealed and the Ninth Circuit Court of Appeals affirmed the verdict except for the amount of punitive damages. The Supreme Court subsequently reversed the Ninth Circuit's finding that all class members had Article III standing and remanded the action to this Court. Following remand, the parties participated in a mediation and reached a class-wide settlement. The Court previously granted preliminary approval of the class action settlement. (Dkt. No. 416.) Mr. Rameriz's unopposed motion for final approval of the class action settlement, and motion for attorney's fees and costs, and an individual service award and settlement award for Mr. Ramirez are now pending before the

1  Court. (Dkt. Nos. 420, 426.)  Having considered the motions, and having had the benefit of oral

2  argument on December 15, 2022, the Court GRANTS the motion for final approval and the

3  motion for attorney's fees and costs, and an individual service award and individual settlement

4  award for Mr. Ramirez.

## BACKGROUND

The factual and procedural background of this action is discussed in detail in the Court's preliminary approval order and is incorporated by reference here. (Dkt. No. 416 at 2.)

## THE SETTLEMENT AGREEMENT

### A. The Class

The Settlement Class is composed the two categories of individuals: (1) the 1,853 class members Trans Union identified in its pre-trial stipulation as individuals for whom Trans Union had delivered a credit report containing OFAC data to a third-party, and (2) class members from the remaining group of 6,332 individuals not identified in the stipulation who submit a claim demonstrating publication of OFAC data to a third-party during the class period.  (Dkt. No. 404-1, The Settlement Agreement at §§ 1(jj)-(mm)).  From the non-stipulation subgroup, 305 individuals filed a claim form.  (Dkt. No. 426-1 at ¶ 7.)  The Settlement Administrator determined that 147 of these claims complied with the Settlement Agreement and represent valid claims.  (*Id.*)  The total number of Settlement Class Member is thus 1,939.[1]  (*Id.* at ¶ 8.)

### B. The Payment Terms

The Settlement Agreement requires Trans Union to establish a Settlement Fund of $9,000,000 which will be allocated on a pro rata basis to Settlement Class Members minus any Court-approved deductions and expenses (including attorneys' fees, litigation costs, and an individual settlement and service award for Mr. Ramirez).  (Dkt. No. 404-1, The Settlement Agreement at § 3(a).)  Given the number of approved claim forms, the estimated pro rata payment to class members is estimated to be in excess of $2,200 each.  (Dkt. No. 426-1 at ¶ 9.)

---

[1] This amount includes 21 members of the Stipulation Subgroup who received email notice, but for whom there is no mailing address.  Upon final approval, the Settlement Administrator will make multiple attempts to obtain a valid mailing address. (Dkt. No. 426 at 12, n.3.)

**C. Scope of Release**

The motion in support of final approval represents that class members release only claims that arise out of or are related to the facts alleged in the litigation relating to the Class Claims. (Dkt. No. 426 at 14.) The actual release in the Agreement, however, does not appear to limit the release to claims arising under to the facts alleged in the litigation. Instead, it provides:

> Each Settlement Class Member who receives a payment under the Settlement Agreement will release any and all claims for actual, statutory, and punitive damages under the FCRA as set forth in 15 U.S.C. §§ 1681e(b), 1681g(a)(1), and 1681g(a)(3), and for actual, statutory, and punitive damages and injunctive relief under the CCRAA as set forth in Cal. Civ. Code §§ 1785.10, 1785.14(b), and 1785.31.

(Dkt. No. 404-1 at § 10(a).) At the final approval hearing, however, the parties stipulated on the record to amend Section 10(a) to limit the release to claims that arise out of or are related to the facts alleged in the litigation relating to the Class Claims. The Release is accordingly so limited.

Mr. Ramirez, in contrast to class members, generally releases any and all claims known and unknown that could have been asserted. (*Id*. at § 10(b).) In addition, Mr. Ramirez and Settlement Class Members waive "any and all rights" under California Civil Code § 1542 which excludes from release those claims which are unknown at the time of the release. (*Id*. § 10(c).)

**D. Residual Funds/*Cy Pres***

The Settlement Agreement provides that there will be no reversion of any funds to Trans Union. (*Id*., § 3(c).) To the extent money remains in the Settlement Fund following the last pro rata payment to a Settlement Class Member, the parties have agreed that the funds shall be redistributed to Settlement Class Members who cashed their initial payment check if the amount remaining is sufficient to deliver $15.00 to each such Settlement Class Member. (*Id* § 9(c).) If such redistribution is not possible, any remaining amounts shall be distributed to the *cy pres* recipients proposed by the parties: Inclusiv (https://www.inclusiv.org/) and the Consumer Federation of California (https://consumercal.org/).). (*Id*., § 3(d).)

**E. Notice**

Following preliminary approval, the Settlement Administrator, Continental DataLogix,

1    LLC coordinated the printing and mailing of the Notice (plus a Proof of Claim Form to all
2    members of the Non-Stipulation Subgroup[2]) to all Class Members on August 19, 2022. (Dkt. No.
3    418 at ¶¶ 6-7; Dkt. No. 426-1 at ¶ 2.)  The Settlement Administrator also located email addresses
4    for 5,241 individuals and provided notice by email on the same date.  (Dkt. No. 418 at ¶ 8.)  As of
5    September 14, 2022, the Settlement Administrator received 609 returned mail notices and
6    following a change of address search, remailed notice to 462 individuals.  (*Id*. at ¶ 9.)  Of the
7    email notices, 756 were undeliverable. (*Id*. at ¶ 11.)  Based on these numbers, the Settlement
8    Administrator estimates that notice was successfully delivered to all but 65 of the non-stipulation
9    sub-group class members.  (*Id*. at ¶ 13.)  For the stipulation subgroup, 21 individuals did not
10   receive notice.  (*Id*. at ¶ 12)

The Settlement Administrator also created an informational website (https://www.RamirezTUSettlement.com), which was published on July 22, 2022. (*Id*. at ¶ 14.) Class members can send emails through the website and access court filings and orders, the Settlement Agreement, all forms of notice, and class counsel's motion for final approval and motion for attorneys fees, costs, and an individual settlement and service award for Mr. Ramirez. (*Id*.)  The Settlement Administrator also established and maintained a toll-free hotline for questions regarding the settlement.  (*Id*. at ¶ 15.)

Following notice, 305 individuals from the non-stipulation subgroup submitted claim forms.  (Dkt. No. 426-1 at ¶ 7.)  158 of these were determined not to comply with the requirements of the Settlement Agreement and were sent a notice of disallowance.  (*Id*.)  The Settlement Administrator also received 420 claim forms from individuals who were not on any class list and who are not eligible to participate in the Settlement Agreement.  (*Id*. at ¶ 7.)

**F. Objections**

The deadline for class members to object to the settlement was November 18, 2022. (Dkt. No. 416 at 14.)  No class member objected to the Settlement Agreement, the request for attorney's

---

[2] Class Members who are part of the stipulation subgroup did not have to submit a claim form.

4

fees and costs, or the request for individual service award for Mr. Ramirez.[3] (Dkt. No. 420-1, Soumilas Decl. at ¶ 13.)

**DISCUSSION**

The approval of a settlement is a multi-step process. At the preliminary approval stage, the court should grant such approval only if it is justified by the parties' showing that the court will likely be able to (1) "certify the class for purposes of judgment on the proposal" and (2) "approve the proposal under Rule 23(e)(2)." Fed. R. Civ P. 23(e)(B). If the court preliminarily certifies the class and finds the settlement appropriate after "a preliminary fairness evaluation," then the class will be notified, and a final fairness hearing scheduled to determine if the settlement is fair, adequate, and reasonable pursuant to Rule 23. *Villegas v. J.P. Morgan Chase & Co.*, No. CV 09-00261 SBA (EMC), 2012 WL 5878390, at *5 (N.D. Cal. Nov. 21, 2012).

At the second stage, "after notice is given to putative class members, the Court entertains any of their objections to (1) the treatment of the litigation as a class action and/or (2) the terms of the settlement." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. Oct. 8, 2014) (citing *Diaz v. Tr. Territory of Pac. Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989)). Following the final fairness hearing, the Court must finally determine whether the parties should be allowed to settle the class action pursuant to their agreed upon terms. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).

**I.    Class Certification**

The Court previously certified a class under Rule 23(b)(3). (Dkt. No. 140.) Thus, "the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." Fed. R. Civ. P. 23 Advisory Committee's Note to 2018 Amendment. Nothing in the current submission gives the Court reason to reconsider its prior certification order.

---

[3] One individual sent an email to Class Counsel which included the case number for this action and stated "THINK LAWYERS FOR THE CLASS ARE TOO EXPENSIVE. THEY ARE ASKING HALF ONE HALF OF SETTLEMENT FUND." (Dkt. No. 420-1 at ¶ 14.) However, this individual did not file an objection with the Court or pursuant to the provisions of the Settlement Agreement. (Dkt. No. 404-1 at § 6(a)(ii).)

Further, the Court is satisfied that the content of the Notice was sufficient under Rule Fed. R. Civ. P. 23(c)(2)(B). (Dkt. No. 418.) *See Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.") (internal quotation marks and citation omitted).

## II. Final Approval of the Settlement Agreement

To grant final approval, the Court must find that the terms of the parties' settlement are fair, adequate, and reasonable under Rule 23(e). In making this determination, courts generally must consider the following factors: "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement." *Churchill*, 361 F.3d at 575. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). Under the revised Rule 23(e), the Court must also consider whether the settlement resulted from collusion among the parties. *See Briseno v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (holding that courts must apply the collusion factors set forth in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011), to post-class action settlements as well as those settled before certification.)

As discussed below, a review of the fairness and *Bluetooth* factors indicates that the settlement is fair, adequate, and reasonable.

### A. The Fairness Factors

#### 1) The Strength of Plaintiff's Case and Risk, Expense, Complexity, and Likely Duration of Further Litigation

The first and second factors require the Court to consider "the strength of the [P]laintiffs' case on the merits balanced against the amount offered in the settlement" and the risks of further litigation. *See Nat'l Rural Telecomm.*, 221 F.R.D. at 526 (cleaned up). There is no "particular

6

formula by which th[e] outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Rather, the Court's assessment of the likelihood of success is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Id.* (internal quotation marks and citation omitted). "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to a present value." *Id.* "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Knapp v. Art.com, Inc.*, 283 F.Supp.3d 823, 832 (N.D. Cal. 2017) (internal citation omitted).

While Plaintiff previously prevailed on his claims at trial and achieved a substantial class-wide award of statutory and punitive damages, he acknowledges that there are a number of obstacles that stand in the way of future litigation. If the litigation continued, Trans Union has argued that it would seek decertification of the entire class and that Mr. Ramirez should be replaced as the class representative. (Dkt. No. 390 at 12-13.) In addition, there would be a new trial and the potential of the imposition of substantial additional appellate costs—Trans Union previously submitted a bill of costs for over $1 million which Plaintiff contends "could be imposed on members of any remaining class if litigation continues." (Dkt. No. 404 at 32 (citing Dkt. No. 382).) Given the risks posed by continuing to litigate Plaintiff's claims through another trial and an almost certain appeal, the certainty of Class Members' recovery under the settlement weighs in favor of granting approval.

### 2) Risk of Maintaining Class Action Status Throughout Trial

In considering the third factor, the Court looks to the risk of maintaining class certification if the litigation were to proceed. Although the Court previously certified the class here, Trans Union had indicated that it intends to seek decertification if the litigation proceeds. Plaintiff does not believe Trans Union would be successful, but given that the Supreme Court's decision the risk of decertification is significant. This factor thus weighs in favor of granting approval.

### 3) Settlement Amount

The fourth fairness factor, the amount of recovery offered, favors final approval of the

7

settlement. When considering the fairness and adequacy of the amount offered in settlement, "it is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *DIRECTV, Inc.*, 221 F.R.D. at 527. "[I]t is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Id.* (collecting cases).

The Settlement Agreement will result in a payment of over $2,200 to each Settlement Class Member for whom there is evidence of publication of an OFAC record to a third party. This represents a recovery of the full $984.22 in statutory damages that were awarded at trial, as well as substantial amount of punitive damages. This is an excellent result when compared to damages awards in other FCRA class action settlements. *See, e.g., Singletary v. G6 Hosp., LLC*, No. 20-CV-00270 LAB AHG, 2022 WL 2193111, at *4 (S.D. Cal. June 17, 2022) (granting final approval of a settlement awarding $63.29 per class member); *Patel v. Trans Union, LLC*, No. 14-CV-00522-LB, 2018 WL 1258194, at *5 (N.D. Cal. Mar. 11, 2018) (providing class members $400 in damages); *Pietras v. Sentry Ins. Co.*, 513 F. Supp. 2d 983, 985 (N.D. Ill. 2007) (surveying FCRA class actions and finding average settlement of $34.59 per class member).

In granting preliminary approval, the Court concluded that the estimated payout to Settlement Class Members was fair in relation to the risks of continued litigation, and there is nothing in the final approval materials that changes the Court's analysis on this score. The Court therefore concludes that the amount offered in settlement also weighs in favor of final approval.

**4) Extent of Discovery Completed and Stage of Proceedings**

Class settlements are presumed fair when they are reached "following sufficient discovery and genuine arms-length negotiation." *DIRECTV, Inc.*, 221 F.R.D. at 528. "The extent of discovery [also] may be relevant in determining the adequacy of the parties' knowledge of the case." *Id.* at 527 (quoting MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42 (1995)). "A court is more likely to approve a settlement if most of the discovery is completed because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." *Id.* (quoting 5 Moore's Federal Practice, § 23.85[2][e] (Matthew Bender 3d ed.)).

Here, the parties engaged in substantial discovery and motion practice, tried the case to a jury, and fully exhausted any appeal of the jury's verdict. Further, while Plaintiff and the class members' Article III standing was the subject of continual motion practice, in light of the Supreme Court's ruling the law is clear as to which class members have standing to pursue a claim here. All of this indicates that Plaintiff was "armed with sufficient information about the case" to broker a fair settlement. *See Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007).

This factor thus weighs in favor of final approval as well.

### 5) Experience and Views of Counsel

"The Ninth Circuit recognizes that parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Knapp*, 283 F. Supp. 3d at 833 (citation omitted). Thus, Courts grant "great weight ... to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017) (quoting *Nat'l Rural Telecomm.*, 221 F.R.D. at 528).

The class has been represented by Francis Mailman Soumilas, P.C. for the past ten years.[4] Courts have consistently recognized Francis Mailman Soumilas "for its expertise in FCRA litigation and the high caliber of its work for the classes it represents." (Dkt. No. 420-1 at ¶ 4 (collecting cases).) Further, Class Counsel represents that "the Settlement is fair, reasonable, and adequate." (Dkt. No. 426 at 22.) Accordingly, "the abilities and views of counsel support settlement." *Kudatsky v. Tyler Techs., Inc.*, No. C 19-07647 WHA, 2021 WL 5356724, at *3 (N.D. Cal. Nov. 17, 2021).

### 6) Presence of a Government Participant

In accordance with the Settlement Agreement, the Settlement Administrator provided the notice required under the Class Action Fairness Act, 28 U.S.C. § 1715, to the attorney generals of

---

[4] Until 2020, Andrew J. Ogilvie and Carol M. Brewer were co-counsel in this matter. (Dkt. No. 420-1 at ¶¶ 49-59.) Further, Lieff, Cabraser, Heimann & Bernstein, LLP, and Samuel Issacharoff and Robert Klonoff, associated into the case to assist with the Supreme Court appeal. (*Id*. at ¶¶ 62, 69.)

50 states, as well as the U.S. territories and the District of Columbia's Corporate Counsel. (Dkt. No. 407.) No government entity has objected to the settlement or sought to intervene. "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 08 1365 CW EMC, 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) (citation omitted).

### 7) Reaction of Class Members

No objections to the settlement have been received. "Courts have repeatedly recognized that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members." *Garner*, 2010 WL 1687832, at *14 (cleaned up). Thus, the Court "may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it." *Id.* (internal quotation marks and citation omitted).

***

In sum, the fairness factors weigh in favor of granting Plaintiff's motion for final approval of the class action settlement.

### B. The *Bluetooth* Factors

Finally, the Court must determine whether the settlement was the result of good faith, arms-length negotiations or fraud and collusion. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). In determining whether the settlement is the result of collusion, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest and that of certain class members to infect the negotiations." *Id.* The Ninth Circuit has identified three such signs:

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
>
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class

>     counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
>
>     (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund.

*Id.* (internal quotation marks and citations omitted).

For the first *Bluetooth* factor, the Court compares the payout to the class (actual and expected) to class counsel's unopposed claim for fees. *See Harris v. Vector Mktg. Corp.*, No. C–08–5198 EMC, 2011 WL 4831157, at *6 (N.D. Cal. Oct. 12, 2011). The gross settlement amount is $9 million and Class Counsel seeks $4.2 million in attorney's fees—44 percent of the Settlement Amount. This ratio taken alone may be a sign of collusion. *See Bluetooth*, 654 F.3d at 947. However, given that the fees requested are two-thirds of Class Counsel's lodestar the Court finds that while the high percentage is a red flag, it does not raise a concern regarding collusion.

The second warning sign—a "clear sailing" provision—is not present here. While the Settlement Agreement states that the Settlement Administrator shall pay Class Counsel $4.5 million in attorney's fees and costs if approved by the Court, the agreement does not state that Trans Union cannot object to requested fee award. (Dkt. No. 404-1, § 3(b)(iii).) Even if Trans Union waived its right to object (and, indeed, has not objected), the Settlement Agreement does not appear to be an example of Trans Union agreeing to pay Class Counsel excessive fees and costs in exchange for accepting an unfair settlement for the Class given that amount of fees sought is much less than counsel's lodestar.

The third warning sign—whether the parties have arranged for fees not awarded to the class to revert to defendant rather than be added to the settlement fund, *see Bluetooth*, 654 F.3d at 948—is not present here. The Settlement Agreement is non-reversionary—all of the funds will be distributed to the class members.

Notwithstanding the existence of one of the three *Bluetooth* factors, the Court concludes the Settlement Agreement did not result from, nor was it influenced by, collusion. Instead, the Settlement Agreement adequately satisfies the Settlement Class Members' claims. As explained below, the amount of fees sought is reasonable as well.

\* \* \*

11

1   In sum, the *Churchill* fairness factors support approval, and the *Bluetooth* factors do not indicate collusion. The Court is therefore satisfied that the Settlement Agreement was not the result of collusion between the parties and instead is the product of arms-length negotiations between experienced and professional counsel. There are no objections to address. For each of these reasons, the Settlement Agreement passes muster under Rule 23(e) and final approval is appropriate.

### III.   Motion for Attorney's Fees, Costs, and Individual Service Award

#### A. Attorney's Fees

Rule 23 permits a court to award "reasonable attorneys' fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the determination of whether the settlement is 'fundamentally fair, adequate, and reasonable.'" *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (quoting Fed. R. Civ. P. 23(e)). In addition, the FCRA provides for reasonable attorney's fees and costs as determined by the Court. *See* 15 U.S.C. §§ 1681n(a)(3), 1681o(a)(2).

When a negotiated class action settlement includes an award of attorney's fees, the fee award must be evaluated in the overall context of the settlement. *Knisley v. Network Assocs.*, 312 F.3d 1123, 1126 (9th Cir. 2002). At the same time, the court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941. The Ninth Circuit has approved two methods of determining attorney's fees in cases where the amount of the attorney's fee award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The district court retains discretion in common fund cases to choose either method. *Id*. Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Given the unique procedural posture of this case—the certified class action proceeded to

12

trial, Plaintiff prevailed and the jury returned a compensatory damages verdict of $984.22 and a punitive damages verdict of $6,353.08 for each of class member, and Class Counsel defended the verdict through multiple stages of appeal—the Court finds that the lodestar method is the appropriate analysis to apply to the attorney's fees request in this matter.  Further, the lodestar figure "has become the guiding light of our fee-shifting jurisprudence. We have established a 'strong presumption' that the lodestar represents the 'reasonable' fee." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

### 1) Lodestar Method

The lodestar method "requires multiplying a reasonable hourly rate by the number of hours reasonably expended on the case." *Shirrod v. Dir., Office of Workers' Comp. Programs*, 809 F.3d 1082, 1086 (9th Cir. 2015).  "In determining reasonable hours, counsel bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Chalmers City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986), amended on denial of reh'g, 808 F.2d 1373 (9th Cir. 1987).

Class Counsel's total lodestar is $6,468,006.75.  (Dkt. No. 420-1, Soumilas Decl. at ¶ 79.) After deducting Class Counsel's litigation expenses of $299,276.10, Class Counsel seeks a total of $4,200,723.90 in fees. The requested fee award represents 65% of the lodestar.

### a) Reasonable Rate

"In determining a reasonable hourly rate, the district court should be guided by the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers*, 796 F.2d at 1210-11 (citation omitted). The relevant community for the purposes of determining the prevailing market rate is generally the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008) (citation omitted). In addition to affidavits from the fee applicant, other evidence of prevailing market rates may include affidavits from other area attorneys or examples of rates awarded to counsel in previous cases. *See Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (citation omitted). Civil Local Rule 54-5(b)(3) requires the party seeking fees to submit "[a] brief description of relevant qualifications and experience and a statement of the customary hourly

1  charges of each such person or of comparable prevailing hourly rates or other indication of value
2  of the services."

3      In support of the motion for attorney's fees, Class Counsel submitted declarations from
4  each of the four firms who worked on this action detailing their qualifications and hourly rates.
5  (Dkt. No. 420-1, Soumilas Decl. Ex. A; Dkt. No. 420-11, Sobol Decl. at ¶¶ 12-18; Dkt. No. 420-
6  12, Issacharoff Decl. at ¶ 4; Dkt. No. 353-7, Ogilvie Decl. at ¶¶ 4-14; Dkt. No. 353-8, Brewer
7  Decl. at ¶¶ 9-15.)

8      First, Class Counsel Francis Mailman Soumilas submitted a declaration from John
9  Soumilas, which attached among other things, an October 18, 2022 expert report from Abraham
10 C. Reich of Fox Rothschild, LLP recommending the hourly rates to be charged by Francis
11 Mailman Soumilas in each of the legal markets in which the firm has an office, including San
12 Francisco. (Dkt. No. 420-1, Soumilas Decl. at ¶¶ 29-30, Ex. E.) This analysis accounts for the
13 experience and specialization of Francis Mailman Soumilas attorneys in fair credit reporting
14 litigation, and adjusts the rates for the appropriate legal markets. *Id*. The hourly rates charged by
15 Francis Mailman Soumilas attorneys in this matter are as follows: James A. Francis: $905/hour;
16 Mark D. Mailman: $905/hour; David A. Searles: $935/hour; John Soumilas: $805/hour; Lauren
17 KW Brennan: $465/hour; Jordan Sartell: $465/hour; Erika Heath: $530/hour; experienced
18 paralegals: $305/hourr; inexperienced paralegals: $265/hourr. Francis Mailman Soumilas' hourly
19 rates have been approved by other courts in this District. *See, e.g.*, *Der-Hacopian v. DarkTrace,*
20 *Inc.*, No. 18-cv-06726-HSG, 2020 WL 7260054, at * 7-8 (N.D. Cal. Dec. 10, 2020) (approving
21 firm's hourly rates); *Patel v. Trans Union, LLC*, No. 14-cv-00522-LB, 2018 WL 1258194, at *7
22 (N.D. Cal. Mar. 11, 2018) (stating that the firm's "billing rates are within normal and customary
23 ranges for timekeepers with similar qualifications and experience in the San Francisco market").

24     Second, prior Co-Class Counsel, Andrew J. Ogilvie and Carol M. Brewer, who have since
25 taken inactive status, seek an hourly rate of $840/hour. (Dkt. No. 420-1, Soumilas Decl. at ¶¶ 55-
26 56.) These hourly rates are supported by the declaration of Richard Pearl. (Dkt No. 353-9, Pearl
27 Decl. at ¶¶ 9-13.)

28     Third, the hourly rates of the attorneys of Lieff, Cabraser, Heimann & Bernstein, LLP

14

1 ("LCHB"), who associated into the case when the Supreme Court granted certiorari, range from
2 $1,325 to $560 for partners and associates, and $485-$455 for "litigation support" and paralegals
3 (Dkt. No. 420-11, Sobol Decl. at ¶ 8.)  These hourly rates "are set based on periodic analysis of
4 rates charged by firms performing comparable work and that have been approved by courts in
5 other class actions within this Circuit and nationwide."  (*Id*. at ¶¶ 2, 9.)

6     Finally, Class Counsel also associated with two experienced Supreme Court
7 advocates in connection with the Supreme Court appeal in this matter, Samuel Issacharoff and
8 Robert Klonoff.  (Dkt. No. 420-1, Soumilis Decl. at ¶ 69.)  Mr. Issacharoff's hourly rate is
9 $1,200/hour and Mr. Klonoff's hourly rate is $985/hour.  (*Id*. at ¶ ¶ 70, 72.)

10     These hourly rates are generally in line with rates prevailing in this community for similar
11 services by lawyers of reasonably comparable skill, experience and reputation.  *See, e.g*., *Hefler v.*
12 *Wells Fargo & Co*., No. 16-CV-05479-JST, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018)
13 (rates from $650 to $1,250 for partners or senior counsel, $400 to $650 for associates); *In re*
14 *Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig*., No. 2672 CRB (JSC),
15 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (billing rates ranging from $275 to $1600 for
16 partners, $150 to $790 for associates, and $80 to $490 for paralegals reasonable "given the
17 complexities of this case and the extraordinary result achieved for the Class.").

18     The Court thus concludes that the hourly rates charged by Class Counsel, and the firms
19 who associated with Class Counsel for appeal, are reasonable.

20 <center>**b) Reasonable Hours Expended**</center>

21     As to the number of hours billed, they must equal the number of hours that can reasonably
22 be billed to a private client. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).
23 Thus, the court should only award fees based on "the number of hours reasonably expended on the
24 litigation" and should exclude "hours that are excessive, redundant, or otherwise unnecessary."
25 *Hensley v. Eckerhart*, 461 U.S. 424, 433-34 (1983). "There is no precise rule or formula for
26 making these determinations," and the court "necessarily has discretion in making this equitable
27 judgment." *Id*. at 436-37.

28     Class Counsel submitted detailed records of the time expended in connection with this

1  matter, derived from contemporaneous billing records. (Dkt. No. 420-1, Soumilas Decl. at ¶¶ 19-
2  25, 50, 53, 55, 63, 70, 72 and exhibits thereto.) These billing records reflect 9,076.5 hours of
3  attorney and paralegal time. (*Id*. at ¶ 78.)   While this number is quite high, as discussed above,
4  Class Counsel litigated this case through trial, multiple appeals including before the Supreme
5  Court, and while the Supreme Court found that many class members lacked Article III standing, as
6  a result of Class Counsel's efforts, the Settlement Class Members will still receive a significant
7  financial recovery.  In light of all this, the number of hours expended was reasonable. This work
8  could reasonably be billed to a private, hourly-fee client and is therefore compensable. *Gonzalez*,
9  729 F.3d at 1202.

\* \* \*

11  Calculation of the lodestar, which measures the lawyers' investment of time in the
12  litigation, provides a check on the reasonableness of the percentage award." *Vizcaino v. Microsoft*
13  *Corp*., 290 F. 3d 1043, 1050 (9th Cir. 2002). Here, Class Counsel do not seek a multiplier; rather,
14  their request for $4,200,723.90 is 65 percent of their lodestar of $6,468,006.75. The lodestar
15  method establishes the reasonableness of this request.

### 2) Percentage of the Fund

17  "Under the percentage-of-recovery method, the attorney's fees equal some percentage of
18  the common settlement fund." *In re Online DVD-Rental Antitrust Litig*., 779 F.3d 934, 949 (9th
19  Cir. 2015). In the Ninth Circuit, "courts typically calculate 25% of the fund as the 'benchmark' for
20  a reasonable fee award, providing adequate explanation in the record of any 'special
21  circumstances' justifying a departure." *In re Bluetooth*, 654 F.3d at 942. "The benchmark
22  percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances
23  indicate that the percentage recovery would be either too small or too large in light of the hours
24  devoted to the case or other relevant factors." *Six Mexican Workers v. Ariz. Citrus Growers*, 904
25  F.2d 1301, 1311 (9th Cir. 1990).

26  Plaintiff's request for $4,200,723.90 or 46 percent of the Settlement Fund is higher than
27  the benchmark for a reasonable award. The Court nevertheless finds it appropriate under the
28  circumstances. First, the overall result and benefit to the class from the litigation is the most

16

important factor in granting a fee award, *see In re Bluetooth*, 654 F.3d at 942, and as discussed above, the result achieved for the class is significant. Class Counsel secured a settlement of $9,000,000 which affords a substantial financial recovery for Settlement Class Members who meet the Supreme Court's new standard for Article III standing. Settlement Class Members will likely receive more than $2,200, which therefore includes a recovery of punitive damages on top of the maximum available statutory damages.

Second, the skill required and quality of work performed likewise supports the fee award sought here. This result would not have been possible but for Class Counsel's sustained efforts which include two appeals to the Ninth Circuit and Supreme Court proceedings, each of which involved arguments by Trans Union which could have potentially terminated class treatment or foreclosed any recovery.

Third, the contingent nature of this action also supports the fee award here. Class Counsel have litigated this case since 2012 on a contingency basis assuming significant risk of no recovery at all.

Fourth, the lack of any class member objections also supports the fee award. *See Waldbuesser v. Northrop Grumman Corp.*, No. CV 06-6213-AB (JCX), 2017 WL 9614818, at *5 (C.D. Cal. Oct. 24, 2017) ("The presence or absence of objections from the class is also a factor in determining the proper fee award.").

Finally, an award $4,200,723.90 results in a negative multiplier and 35 percent reduction to Class Counsel's lodestar. "A negative multiple 'strongly suggests the reasonableness of [a] negotiated fee.'" *Moreno v. Capital Bldg. Maint. & Cleaning Servs.*, No. 19-cv-07087-DMR, 2021 WL 4133860, at *6 (N.D. Cal. Sep. 10, 2021) (quoting *Rosado v. eBay Inc.*, No. 5:12-cv-04005-EJD, 2016 WL 3401987, at *8 (N.D. Cal. June 21, 2016)).

The percentage-of-recovery analysis therefore does not render the requested fees unreasonable. *See Edwards v. Nat'l Milk Producers Fed'n*, 2017 WL 3616638, at *9 (N.D. Cal. June 26, 2017) ("Rather than abandon the percentage-of-recovery method, the best way to guard against a windfall is first to examine whether a given percentage represents too high a multiplier of counsel's lodestar.").

\* \* \*

The Court thus approves Class Counsel's request for $4,200,723.90 in attorney's fees.

**B. Costs**

### 1) Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (internal quotation marks and citation omitted). Plaintiff requests $299,276.10 in costs which include the costs of investigation, filing fees, travel, court reporters and transcripts, subpoena service, expert witnesses, mediation fees, and administrative costs such as research, mailing, and messenger expenses. (Dkt. No. 420-1, Soumilas Decl. at ¶¶ 41-48, 50, 52, 54, 58, 68, and exhibits thereto.) These costs are all well documented and reasonable. Accordingly, the Court awards $299,276.10 in costs.

### 2) Settlement Administration Costs

The Settlement Agreement also requests that the settlement administrative costs be paid out of the Settlement Amount. According to the Settlement Administrator, the settlement administration costs are expected to total $85,000. (Dkt. No. 426-1 at ¶ 9 n.4.) While this is more than the costs of administration estimated at preliminary approval ($70,000), this increase is the result of modifications to the notice plan at the Court's request and the submission of 420 claim forms from individuals who were not on the class list. (*Id*.) Further, as detailed above, the Settlement Administrator provided both email and mail notice, provided the required CAFA notice, and created and monitored a website and a hotline. (Dkt. No. 418 at ¶¶ 6-15.) Courts regularly award administrative costs associated with providing notice to the class. *See, e.g., Bellinghausen v. Tractor Supply Co*., 306 F.R.D. 245, 266 (N.D. Cal. 2015). The Court therefore concludes that the Settlement Administrator's costs were reasonably incurred for the benefit of the class and approves the full amount to be deducted from the Settlement Amount.

**C. Service/Incentive Award**

Service or "[i]ncentive awards are fairly typical in class action cases." *Rodriguez v. W. Publ'g Corp*., 563 F.3d 948, 958 (9th Cir. 2009) (distinguishing incentive awards from incentive

18

agreements, the latter of which are "entered into as part of the initial retention of counsel" and "put class counsel and the contracting class representatives into a conflict position from day one"). However, the decision to approve such an award is a matter within the Court's discretion. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000). Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputation risk undertaken in bringing the action, and, sometimes to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Although incentive awards are viewed more favorably than incentive agreements, excessive awards "may put the class representative in a conflict with the class and present a considerable danger of individuals bringing cases as class actions principally to increase their own leverage to attain a remunerative settlement for themselves and then trading on that leverage in the course of negotiations." *Id.* at 960 (internal quotation marks and citation omitted). Thus, "district courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013).

The Court previously considered Mr. Ramirez's request for a service award and awarded him $75,000 (inclusive of his individual damages recovery) which is .125 percent of the total damages award. (Dkt. No. 345.) Plaintiff reiterates his request for an award in this amount and the Court sees no reason to deviate from its earlier analysis.

Accordingly, the Court approves the requested $75,000 service award which is inclusive of Mr. Ramirez's individual recovery.

**CONCLUSION**

For the reasons stated above, the Court GRANTS Plaintiff's motion for final approval of the parties' class action settlement. In addition, the Court GRANTS Plaintiff's motion for attorney's fees and costs; specifically, the Court awards the following: $4,200,723.90 in attorney's fees; $299,276.10 in litigation costs; settlement administration costs of no more than $85,000; and a $75,000 service and individual settlement award to Mr. Ramirez.

In accordance with the Northern District's Procedural Guidance for Class Action Settlements, "[w]ithin 21 days after the distribution of the settlement funds and payment of

attorneys' fees," Class Counsel shall file "a Post-Distribution Accounting" that provides the following, to the extent applicable:

> The total settlement fund, the total number of class members, the total number of class members to whom notice was sent and not returned as undeliverable, the number and percentage of claim forms submitted, the number and percentage of opt-outs, the number and percentage of objections, the average and median recovery per claimant, the largest and smallest amounts paid to class members, the method(s) of notice and the method(s) of payment to class members, the number and value of checks not cashed, the amounts distributed to each *cy pres* recipient, the administrative costs, the attorneys' fees and costs, the attorneys' fees in terms of percentage of the settlement fund, and the multiplier, if any.

https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/. Class Counsel shall "summarize this information in an easy-to-read chart that allows for quick comparisons with other cases," and "post the Post-Distribution Accounting, including the easy-to-read chart, on the settlement website." *See id*.

The parties shall file a proposed judgment by December 20, 2022.

This Order disposes of Docket Nos. 420, 426.

**IT IS SO ORDERED.**

Dated: December 15, 2022

JACQUELINE SCOTT CORLEY
United States District Judge